# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

KYLE BROUSSARD, ET AL

VERSUS

GO-DEVIL MANUFACTURING CO.
OF LA., INC. D/B/A GO-DEVIL
MANUFACTURERS OF LOUISIANA, INC.

CIVIL ACTION

NO. 08-124-BAJ-CN

## CONSOLIDATED WITH[1]

KYLE BROUSSARD, ET AL

VERSUS

MUD BUDDY, L.L.C. D/B/A
MUD BUDDY MANUFACTURING

CIVIL ACTION

NO. 08-125-BAJ-CN

## RULING ON CONSTRUCTION OF DISPUTED CLAIM TERMS

This matter is before the court following a hearing, pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed.2d 577 (1996), which was held on October 3, and December 5, 2011. The hearing was to resolve the parties' dispute over the proper claim interpretation to be used in this patent infringement action. Plaintiffs, Kyle Broussard and Gator Tail, L.L.C. ("Plaintiffs" or "Broussard" or "Gator Tail"), and Defendants, Go-Devil Manufacturing Co. of Louisiana, Inc. d/b/a Go-Devil Manufacturers of Louisiana, Inc. ("Go-Devil") or ("the 08-124 case") and Mud Buddy, L.L.C. d/b/a Mud Buddy

---

[1] The Court consolidated civil actions 08-124 and 08-125 for the *Markman* hearing only pursuant to Fed. R. Civ. P. Rule 42(a)(1), but the actions have not been consolidated pursuant to Rule 42(a)(2).

Manufacturing ("Mud Buddy") or ("the 08-125 case") (collectively "Defendants"), have each supplied pleadings urging the Court's adoption of their respective meaning of key terms used in the claim language of the two patents at issue.

The Court has taken them under advisement in reaching its decision. In addition, the Court has considered the claim language and its context, the claim prosecution history, and to some extent, relevant dictionary definitions and expert testimony offered by the parties. Because the interpretation of patent claims is a matter of law, the Court must resolve interpretation decisions prior to a jury being given the case for decision. Thus, this ruling sets forth the definitions which will be used by the jury when it considers the various claims at issue in this litigation.

## BACKGROUND

Plaintiffs accuse Defendants of infringing three United States Patents. The first, U.S. Patent No. 7,048,600 ("the '600 patent"), entitled "Method and Apparatus for Air Cooled Outboard Motor for Small Marine Craft" was issued to Kyle Broussard on May 23, 2006 (08-124; Pl.'s Ex. 1). The second, U.S. Patent No. 7,052,340 ("the '340 patent"), entitled "Method and Apparatus for Air Cooled Outboard Motor for Small Marine Craft," was issued to Mr. Broussard on May 30, 2006 (08-124; doc. 59-1, at 2).

The remaining patent, United States Patent Number 7,297,035 ("the '035 patent") entitled "Marine Craft Adapted for Shallow Water Operation" was issued

to Mr. Broussard on November 20, 2007 (*Id*).[2] Each patent pertains to outboard air-cooled motors, apparatuses, and assemblies for use on boats in shallow water and muddy environments (08-124; Compl., at 2).[3] Gator Tail, L.L.C. owns by assignment the '600 patent and the '340 patent (*Id*).

Broussard, the owner and president of Gator Tail L.L.C., alleges that he invented the boat motor at issue and filed a first, provisional patent (the '340 patent) on September 17, 2002 (Oct. 3, 2011, hr'g tran., 57:4 – 62; 65:2-5). Plaintiff asserts that he began selling the surface drive motor on July 1, 2004 (Oct. 3, 2011, hr'g tran., 66:18-21).

Plaintiffs aver that Go-Devil Manufacturing Co. and Mud Buddy, L.L.C. infringed on certain patents by "making, using, offering for sale, and selling within the United States outboard air-cooled motors, apparatuses, and assemblies covered by the one or more claims in the patents" (08-124; doc. 1, at 2). In defense, Go-Devil alleges that Plaintiffs' patents are "invalid and/or unenforceable; that Gator Tail is estopped from alleging infringement; that Gator Tail has failed to mitigate its damages; and that Gator Tail's claims are barred by the doctrines of laches and equitable estoppel" (08-124; doc. 19, at 2).

On July 23, 2010, the Gator Tail and Go-Devil filed a joint motion for a *Markman* hearing (08-124; doc. 58). On August 11, 2010, Defendant Go-Devil filed a Motion to Stay Proceedings pending the outcome of re-examination of Gator Tail's '340 patent filed (08-124; doc. 59). Plaintiffs opposed the motion

---

[2] All three patents are essentially the same and are directed to the same invention.
[3] The Court will refer to the three patents, collectively, as "the patents."

(08-124; doc. 60). On September 15, 2010, Plaintiffs filed a Notice of Termination of Re-examination of the '035 patent (08-124; doc. 63). Subsequently, this Court granted the Joint Motion for a *Markman* hearing on February 10, 2011 (08-124; doc. 65). On April 26, 2011, an order of transfer was issued for *Broussard et al. v. Mud Buddy L.L.C.*, Civil Action No. 08-0125 because the case involves subject matter that comprises a material part of the subject matter of *Broussard et al. v. Go-Devil Manufacturing Co. of LA, Inc.*, Civil Action No. 08-0124 (08-125; doc. 89).

    *Markman* hearings were held on October 3, and December 5, 2011. At the October 3, 2011 hearing, Broussard, the inventor of the Gator Tail motor, Dr. Ron Matthews ("Dr. Matthews"), and Ray Kleibert ("Kleibert") testified on behalf of the Plaintiffs; and Dr. Charles Garris ("Dr. Garris") testified on behalf of Go-Devil. At the December 5, 2011 hearing, Warren Coco ("Coco"), the owner and founder of Go-Devil, testified on behalf of Go-Devil, and Glenn Foreman ("Foreman"), and Don Kueny ("Kueny") testified on behalf of Mud Buddy.

## LEGAL STANDARD

### Law Governing Claim Construction

    "A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). The Supreme Court instructs that patent claim

4

construction is a matter of law and a threshold issue for the trial court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

## Sources of Evidence for Claim Construction

The four principle sources of evidence used in claim construction, in order of priority, are: (1) the language of the claim; (2) the remaining portions of the patent, known as the "specification"; (3) the patent application's history of proceedings before the Patent Office, known as the "prosecution history" or "file history," which includes the communications between the patent examiner and the applicant; and (4) limited extrinsic evidence related to the background technology and the state of the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).

The first three sources of evidence are considered intrinsic evidence. The fourth is extrinsic evidence and can be used in claim construction, but it is less important because "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the [intrinsic record] thereby undermining the public notice function of patents." *Id.* at 1318-19.

According to the United States Court of Appeals for the Federal Circuit, a court must start with and remain centered on the language of the asserted claim itself. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 311 F.3d 1111, 1116 (Fed. Cir. 2004); *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). Next, the court may examine the specification which "contains a written description of the invention that must enable one of ordinary

5

skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The specification is statutorily required to describe the claimed invention in "full, clear, concise and exact terms." 35 U.S.C. § 112.

The Court's claim construction decision is also informed by the Federal Circuit's decision in *Phillips*. In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e. as of the effective filing date of the patent application." *Id.* This principle of patent law stems from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

6

Finally, the court in *Phillips* also addressed the use of dictionary definitions and expert testimony as extrinsic evidence in claim construction. The court held that courts must follow the general principle that intrinsic sources offered in support of a proposed claim construction deserve greater weight than extrinsic sources. *See Id.* at 1316. The court cautioned that an overreliance on extrinsic sources such as dictionaries can cause the construction of a claim to be unduly expansive. *Id.* at 1331. Similarly, the court also instructed that courts should discount expert testimony if it is at odds with the claim construction mandated by the claim itself. *Id.*

## ANALYSIS OF DISPUTED TERMS[4]

At the *Markman* hearing, the parties submitted arguments and evidence on the following disputed terms: (1) portable drive assembly;[5] (2) means for temporary attachment;[6] (3) elongated drive housing;[7] (4) engine mounting plate;[8] (5) attached externally to the drive housing;[9] (6) engine mounting plate located adjacent upper drive assembly;[10] (7) propeller shaft;[11] (8) thrust bearing;[12] (9) water sealed;[13] and (10) pivotal assembly.[14]

---

[4] To be read *with* the '035 and '340 patents.
[5] '340 Patent at claims 1, 3-9, and 11-13; '035 Patent at claims 1, 3, 6, 9, and 12.
[6] '340 Patent at claims 1 and 8.
[7] '340 Patent at claim 1; '035 Patent at claims 1 and 13.
[8] '340 Patent at claims 1 and 8(b); '035 Patent at claim 1.
[9] '340 Patent at claims 1 and 8(b); '035 Patent at claim 1.
[10] *Id.*
[11] '340 Patent at claim 6.
[12] '340 Patent at claims 4 and 11.
[13] '340 Patent at claims 7, 8(a)-(c), and 8(e).
[14] '340 Patent at claim 9; '035 Patent at claims 6 and 12.

The Court, herein, also addresses at least a dozen other terms and issues that were raised in the parties' briefs. In properly construing the disputed terms, this Court will examine the intrinsic evidence included in (1) the language of the claim; (2) the specification; and (3) the prosecution history. *Markman*, 52 F.3d at 979. Finally, the Court will examine any relevant extrinsic evidence consistent with the limitations set forth in *Phillips*.

## I. Portable Drive Assembly[15]

| | |
|---|---|
| Claim language: | "A portable drive assembly having means for temporary attachment" ('340 Patent at claim 1, col. 3, ln. 61-62). |
| Plaintiffs' definition: | *Portable from one craft to another without undue effort or modification.* (08-124; doc. 54, at 12-14; doc. 57, at 4-8; doc. 78 at 6-12) |
| Go-Devil's definition: | *A drive assembly easily moved from one watercraft to another* (08-124; doc. 53, at 8-10; doc. 56 at 3-10; doc. 76, at 8-13). |

**FINDING:**

Here, the Court concludes that both the intrinsic and extrinsic evidence support a finding for Plaintiffs' claim construction of this term. First, in the claim language, portable and temporary are read to mean movable from one craft to another in the context of outboard marine motor arts. Plaintiffs have demonstrated that a person of ordinary skill within the outboard marine motor

---

[15] This term was not briefed by Mud Buddy. However, the Court notes that at the *Markman* hearing Mud Buddy argued that the term "means for temporary attachment" included "portable drive assembly" and submitted testimony as to that issue. The Court did not, and will not, allow Mud Buddy to exceed the scope of its briefing. As such, the Court will not consider Mud Buddy's arguments as to this phrase.

arts would agree that outboard motors attach to and detach from the watercraft transom without undue effort and watercraft modification.

Second, in the patent specifications, Plaintiffs demonstrate that essential to their concept is an engine that is high powered, fast in speed, but most importantly, a portable device. Plaintiff's specifically described the need to move the engine from boat-to-boat without "extensive modifications" (08-124; Pl.'s Ex. at 23). Thus, the intrinsic evidence favors the claim construction of the Plaintiffs.

The Court is not persuaded by Defendant's reliance on extrinsic evidence. Defendant's witness, Dr. Garris, testified that different companies have considered portable engines to weigh 115 pounds (Tr. 1; 186:23), under 168 pounds (Tr. 1; 297:9-10); and under 105 pounds (Tr. 1; 297:12-13). However, one of Defendant's witnesses also admitted that another such engine was considered portable despite weighing 1,200 pounds and requiring another boat or motor to tow it (Tr. 2, 47:14-48:22). The testimony does not establish a clear and consistent weight limit.

Finally, neither dictionary definitions nor any other extrinsic evidence demonstrate that portable is meant to require a specified weight limit and handles.[16] Thus, the extrinsic evidence also does not support a finding for the narrower claim construction proposed by Defendant. Accordingly, the Court construes the phrase "a portable drive assembly having means for temporary

---

[16] Although Defendant Go-Devil references dictionary definitions of "portable" which contain the words "easily carried," the Court is not persuaded by Defendant's conclusions. First, "carried" is not indicative of materials carried "by hand." Second, under *Phillips*, this Court is most concerned with the term's meaning in the particular field of the marine arts. *Id.* at 1313.

9

attachment" as "portable from one craft to another without undue effort or modification."[17]

## II. Means for Temporary Attachment

Claim language:    "A portable drive assembly having means for temporary attachment to the transom of a shallow draft watercraft..." ('340 Patent at claim 1, col. 3, ln. 61-62 and claim 8, col. 4, ln. 35-36).

Plaintiffs' definition:    *Portable from one craft to another without undue effort or modification.* (08-125; doc. 48, at 2-3; 08-124; doc. 48, at 2-3; doc. 54, at 12-14; doc. 57, at 8-11; doc.78 at 12-18).

Go-Devil's definition:    *Attached to the transom using a connection method that readily allows removal, without the use of bolts, screws, or similar fasteners.* (08-124; doc. 53, at 11-16; doc. 56 at 3-10 doc. 76, at 13-18).

Mud Buddy's definition:    *A drive assembly that is not permanently attached to the transom of a shallow draft watercraft and is readily capable of being moved from one craft to another.* (08-125; doc. 44, at 4; doc. 47, at 4-5; doc. 106, at 21-26).

**FINDING:**

Plaintiffs' use of the phrase "means for temporary attachment" presumptively creates a means-plus-function claim as a matter of law. *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). Under any means-plus-function claim, not only must the specification describe the associated structure for accomplishing the stated means, but the

---

[17] The Court disregard's Defendant's argument that, according to the prosecution history, the term "portable" only appears in the patent to avoid prior art. As noted, Plaintiffs have demonstrated that essential to their invention, since its inception, is an engine that is portable.

specification must contain language associating that structure to the means described in the claim. 35 U.S.C. §112, ¶6.

However, the claims of a patent are afforded a statutory presumption of validity. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001). Further, "a challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Id.* at 1376-77. The required reference is satisfied when "a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification." *S3, Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001).

Here, Plaintiffs' claim is amendable to construction and the referenced specification would be understood by one skilled in the art as being adequate to perform the recited function. Plaintiffs assert, and the Court agrees, that the reference does not need to be blueprint precise. Plaintiffs aver that the structure should include any attachment to the transom by a method ordinarily considered temporary or removable, including by jack screws and nuts and bolts (08-124; doc. 54 at 14). In the '340 Patent, specification to the corresponding structure is as follows:

"The engine assembly 10 is pivotal in a kick-up position in the horizontal plane as well as the vertical plane in the typical outboard mounting

arrangement as illustrated in FIG. 5. . . . The drive housing 22 is adjustable [sic] attached to the transom in a manner whereby the drive housing extends only to a point approximately flush with the keel or bottom of the boat as seen in FIG. 4."

(col. 3, ln. 5-10, 15-18).

In Figure 6, an inverted U-channel is shown, which is typical of outboard marine motor mounts. The specification further states that the invention "mounts to small flat bottom boats in much the same manner as water cooled outboard engines . . . ."[18] Further that, "air cooled outboard engine assembly 10 is mounted to a small flat bottom boat 12 in the conventional manner . . . ."[19] In sum, the conventional, U-channel mounting bracket secured by clamp screws (jack screws), is plainly shown in the specification and the use of the conventional mounting method is referenced. Thus, a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification. Therefore, the means-plus-function claim is satisfied.[20]

The Court adopts Plaintiffs' proposed claim construction for "means for temporary attachment." As previously noted, in the claim language, portable and temporary are read to mean movable from one craft to another in the context of outboard marine motor arts. Plaintiffs assert that the parties are in agreement

---

[18] '340 Patent at column 2, lines 10-14.
[19] *Id.* at column 2, lines 64-67.
[20] Plaintiffs' supplemental submission of *Cummins-Allison Corp. v. SBM Co., Ltd.*, 2011-1049, 2012 WL 1890153 (Fed. Cir. May 25, 2012) only further substantiates the Court's position.

that bolts are the conventional mounting means for outboard motors, and that bolts are removable in 10 minutes with simple hand tools found in every shop.[21] As to the permanency of bolts, Broussard testified that a theft of an outboard motor occurred even though the motor was bolted to a transom (Tr. 1, 86:13-87:4). Warren Coco, the owner and founder of Go-Devil, testified and acknowledged that bolts mounting an outboard motor to a transom could be removed (Tr. 2, 21:3-12).

Finally, as also previously noted, in the patent specifications, Plaintiffs demonstrate that essential to their concept is an engine that is a portable device. Accordingly, the Court construes "a portable drive assembly having means for temporary attachment to the transom of a shallow draft watercraft..." as "portable from one craft to another without undue effort or modification."[22]

## III.   Elongated Drive Housing

| | |
|---|---|
| Claim language: | "A portable drive assembly having means for temporary attachment to the transom of a shallow draft watercraft said portable drive assembly comprising an elongated drive housing..." ('340 Patent at claim 1, col. 3, ln. 61-64); |
| Plaintiffs' definition: | *A drive housing that is greater in measurement in one axis than in the other two axes.* (08-125; doc. 48, at 4-5; 08-124; doc. 54, at 14-15; doc. 57, at 11-14; doc. 78, at 18 -23). |

---

[21] *See* Broussard Testimony (Tr.1, 85:16-86:8); Dr. Matthews Testimony (Tr. 1, 189:1-4); Coco testimony (Tr. 2, 43:7-16); Foreman testimony (Tr. 2, 73:19-74:3); Kueny testimony (Tr. 2, 103:4-19).
[22] Both Go Devil and Mud Buddy couch their arguments principally in terms of the means-function-plus claim. Defendants also assert other arguments similar to those described under "portable drive assembly." The Court disagrees with these arguments for the legal and factual reasons already outlined above.

Case 3:08-cv-00124-BAJ-SCR   Document 82   06/25/13   Page 13 of 42

| | |
|---|---|
| Go-Devil's definition: | *A long housing of rectangular cross-section which encloses an upper drive assembly (excluding universal joints), a lower driven assembly (excluding universal joints), and a timing belt connecting the upper drive assembly to the lower driven assembly, and having provision for the engine mounting plate attached directly to the drive housing. The "elongated drive housing" does not include an extended housing for a universal joint or similar drive component.* (08-124; doc. 53, at 17-18; doc. 56, at 10-11; doc. 76, at 26-28). |
| Mud Buddy's definition: | *A water tight, elongated drive housing that is adjustably attached to the transom and encloses an upper drive assembly and a lower driven assembly.* (08-125; doc. 44, at 6-7). |

**FINDING:**

The Court adopts the claim construction for this term that is outlined by Plaintiffs. Under *Phillips*, Patent claim terms are generally given their plain meaning as understood by one of ordinary skill in the art. 415 F.3d at 1313. Plaintiffs assert that elongated "simply means a drive housing that is greater in measurement in one axis than in the other two axes" (08-124; doc. 54, at 14). To illustrate, Plaintiffs' brief contains a picture and diagram showing Defendant Go-Devil's motor and housing, having a greater measurement on the Y axis compared to the X and Z axes (08-124; doc. 54, at 14-15).

Defendant Go-Devil argues that the figures in the '340 and '035 specifications show a long housing of rectangular cross-section, without any extended housing for a universal joint or similar component (08-124; doc. 53 at 22). According to Defendant Go-Devil, consequently, the claim is limited to

14

vertical housings having rectangular cross-sections without complex appendages, such as a housing for a universal joint (*Id*). Defendant Mud Buddy asserts that the words "water tight" should be appended to "elongated drive housing" because "water tight" is found in the specification (08-125; doc. 44 at 7).

Consequently, both the intrinsic and extrinsic evidence support a finding for Plaintiffs' claim construction. First, Plaintiffs assert, and the Court agrees, the figures showing a strictly rectangular drive housing and the description of water tight housing are simply preferred embodiments and do not limit the claim language. The order of preference in ascertaining the meaning of claims places the claim language above both the specification and the prosecution history. *Markman*, 52 F.3d at 979.

Second, although Defendant Go-Devil argues that the prosecution disclaimer doctrine applies to Plaintiffs' patent history in this case, the Court disagrees. Although a patentee is precluded from recapturing through claim construction specific meanings disclaimed during prosecution, the prosecution disclaimer doctrine applies when the patentee unequivocally imparts a novel meaning to those terms or expressly relinquishes claim scope during prosecution. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). This is not the case in Plaintiffs' prosecution history here, where the term "elongated drive housing" was introduced in part to distinguish their invention from the inboard/outboard configuration of the Stojkov '566 patent.

Finally, during the *Markman* hearing, Broussard testified that it was not his intent to disclaim using a universal joint (Tr. 1, 94:5-7). Dr. Garris further testified that "elongated basically means larger in one direction than in the other" (Tr. 1, 355:25-356:1). Further, Defendants' witnesses failed to adequately address the term "elongated" during the hearing and did not offer evidence that an "elongated drive housing" be water tight and free of universal joints.

Accordingly, the Court construes "a portable drive assembly having means for temporary attachment to the transom of a shallow draft watercraft said portable drive assembly comprising an elongated drive housing…" as "a drive housing that is greater in measurement in one axis than in the other two axes."

## IV. Engine Mounting Plate

| | |
|---|---|
| Claim language: | ". . . an engine mounting plate attached externally to said drive housing located adjacent said upper drive assembly…" ('340 Patent at claim 1, col. 3, ln. 66-67 and col. 4, ln. 1); and |
| | "A portable outboard engine and drive assembly having means for temporary attachment to the transom of a shallow draft watercraft comprising: an engine mounting plate attached externally to said sealed housing located adjacent said upper drive pulley assembly perpendicular to said sealed housing;" ('340 Patent at Claim 8(b), col. 4, ln. 35-37 and ln. 41-43) |
| Plaintiffs' definition: | *A structure to which the engine can be mounted.* (08-125; doc. 45, at 12-13; doc. 48, at 5-8; 08-124; doc. 54, at 14-15; doc. 57, at 14-15; doc. 78, at 23-25). |

16

|                        |                                                                                                                                                                                                              |
| ---------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
| Go-Devil's definition: | *A flat thin plate, and not the structure to which the plate itself is mounted.* (08-124; doc. 53, at 19-21; doc. 56, at 12-13; doc. 76, at 19-25).                                                           |
| Mud Buddy's definition: | *A plate where an engine can be mounted, but the plate does not function or cooperate with other structures in providing protection to the engine.* (08-125; doc. 44, at 7-10; doc. 47, at 6-7; at 7-9; doc. 106, at 27-30). |

## FINDING:

The Court rejects both Plaintiffs' and Defendants' claim constructions of this term. Under *Phillips*, patent claim terms are generally given their plain meaning as understood by one of ordinary skill in the art.[23] Plaintiffs assert that an engine mounting plate is "simply a structure to which the engine can be mounted," and that nothing in the claim language or any intrinsic evidence limits that definition. Both Defendants argue, and the Court agrees, that to accept Plaintiffs' claim construction with the term "structure" added would be to accept a proposal that is so broad that it encompasses any structure to which the engine can be mounted. Thus, the word "structure" is not included in the claim construction.

Defendants argue dissimilar claim constructions from each other. Go-Devil contends that "engine mounting plate" means a flat, thin plate and does not include any structure to which the plate itself might be mounted. However, Plaintiffs accurately point out that all parties have presented some form of evidence of engine mounting plates that are not simply flat, thin plates (08-124;

---

[23] *Phillips*, 415 F.3d at 1313.

Case 3:08-cv-00124-BAJ-SCR   Document 82   06/25/13   Page 17 of 42

doc. 78, at 25). Defendant Mud Buddy argues that an engine mounting plate cannot serve any protective function (08-124; doc. 78, at 28). Mud Buddy, however, offered no testimony in support of this limitation at the *Markman* hearing.[24]

Nevertheless, all parties agree that the engine mounting plate is the part of the structure that supports the engine and to which the engine is mounted. Warren Coco, the owner and founder of Go-Devil, testified that he would define the term "engine mounting plate" as "a way to mount the engine and it bears the significant weight of the engine. It's primary point of mounting it, basically." (Tr. 2, 70:19-22). Mud Buddy proposes that one of ordinary skill in the art would understand an engine mounting plate to be at least "a plate that functions as the primary weight bearing component of the engine" (08-125; doc. 106 at 28).

Thus, here, the terms are readily understandable, and the Court concludes that a plate where an engine can be mounted is sufficient to describe an engine mounting plate. The Court construes the terms in a manner that a person of ordinary skill within the outboard marine motor arts would understand. As shown in the intrinsic record, Plaintiffs' patent figures depict a flat member disposed beneath the engine 18 directly adjacent to a transmission housing 22.[25] In the diagram, the engine mounting plate 19 is the mechanism which bears the

---

[24] The Court gives no weight to Defendant Mud Buddy's prosecution history argument. Plaintiff successfully rebutted this argument in their reply brief (08-125; doc. 48, at 6-8) where they demonstrate that the dispute with the examiner was centered on the correct characterization of Saito structure 15, i.e. a tray portion or an engine mounting plate.
[25] '035 Patent Fig. 1 and col. 4, lines 10-12.

majority of the weight of the engine. Accordingly, the Court construes "engine mounting plate" as "a plate to which the engine can be mounted."

## V. Attached Externally to the Drive Housing

Claim language:

". . . an engine mounting plate attached externally to said drive housing located adjacent said upper drive assembly..." ('340 Patent at claim 1, col. 3, ln. 66-67 and col. 4, ln. 1); and

"A portable outboard engine and drive assembly having means for temporary attachment to the transom of a shallow draft watercraft comprising: an engine mounting plate attached externally to said sealed housing located adjacent said upper drive pulley assembly perpendicular to said sealed housing;" ('340 Patent at claim 8(b), col. 4, ln. 35-37, 41-43)

Plaintiffs' definition:

*Attachment of the engine mounting plate to the elongated drive housing's exterior.* (08-124; doc. 54, at 15-16; doc. 57, at 15-16; doc. 78, at 25-26).

Go-Devil's definition:

*The engine mounting plate directly fixes to the elongated drive housing, cannot include an indirect attachment by way of an intermediary bracket.* (08-124; doc. 53, at 19-21; doc. 56, at 12-13).

Mud Buddy's definition:

*The plate is attached to the outside of the drive housing and adjacent to the upper drive assembly and attached perpendicular to the drive housing.*

**FINDING:**

Here, the Court concludes that both the intrinsic and extrinsic evidence support a finding for Plaintiffs' claim construction of this term. The '340 and '035 patents describe an engine mounting plate "attached externally to the drive

housing."[26] Plaintiffs assert, and the Court agrees, that "attached externally" means attachment of the engine mounting plate to the elongated drive housing's exterior. The claims' language does not limit the manner of attachment and does not exclude the presence of additional attaching structures.

Defendant Go-Devil asserts that *Searfoss v. Pioneer Consolidated Corp.*[27] holds that a claim using the term "attachment" should be limited to only direct attachment (doc. 53, at 12-13). The Court disagrees. First, as Plaintiffs correctly identify, the court in *Searfoss* considered the meaning of "connection" as opposed to the word "attached," which is the term used in this case. *Id.* Second, as to that issue, the court held that merely because one object touches and rests upon a second object, that does not "indirectly connect" the first object to anything else that the second object touches. *Id.*

Here, the attachment claimed by Plaintiffs maintains a fixed relationship between the engine mounting plate and the elongated drive housing. According to Plaintiffs, through connections fastened and joined via welds or bolts, the components move together as a fixed unit.[28] This is quite different from the patent at issue in *Searfoss* where the first object merely touched and rested upon the second.

Extrinsic evidence also supports the claim construction offered by Plaintiffs. At the *Markman* hearing, Dr. Matthews testified that there was nothing

---

[26] '035 Patent at claim 1, 8(b), 8(f); '340 Patent at claim 1.
[27] *Searfoss v. Pioneer Consol. Corp.*, No. 99-CV-76394-DT, 2003 WL 24014319, *5 (E.D. Mich. Aug. 6, 2003).
[28] '035 Patent Figure 1.

20

in the claim limitation that would preclude placing intermediate structures between the engine mounting plate and the elongated drive housing's exterior. (Tr. 1, 198:9-25). Dr. Matthews further testified that no dictionary definition of "attachment" requires direct attachment, and offered examples of things that are commonly recognized as attached – even if attached indirectly – such as the belt drive, the drive pulley, and the upper pulley (Tr. 1, 199-200, doc. 78, at 30).

Accordingly, the Court construes ". . . an engine mounting plate attached externally to said drive housing adjacent said upper drive assembly..." and "A portable outboard engine and drive assembly having means for temporary attachment to the transom of a shallow draft watercraft comprising: an engine mounting plate attached externally to said sealed housing located adjacent said upper drive pulley assembly perpendicular to said sealed housing," as "Attachment of the engine mounting plate to the elongated drive housing's exterior."

## VI. Located Adjacent the Upper Drive Assembly[29]

Claim language:           ". . . an engine mounting plate attached externally to said drive housing located adjacent said upper drive assembly..." ('340 patent at claim 1, col. 3, ln. 66-67 and col. 4, ln. 1); and

"A portable outboard engine and drive assembly having means for temporary attachment to the transom of a shallow draft watercraft comprising: an engine mounting plate attached externally to said sealed housing located adjacent said upper drive pulley assembly perpendicular to said

---

[29] This term was not briefed by Mud Buddy.

sealed housing;" ('340 Patent at claim 8(b), col. 4, ln. 35-37, 41-43)

Plaintiffs' definition:     *Adjacent to the upper drive assembly, without restriction as to its location relative to the lower driven assembly.* (08-124; doc. 54, at 15; doc. 78 27-28).

Go-Devil's definition:     *Located near the top of the elongated drive housing in close proximity to the upper drive assembly.* (08-124; doc. 53, at 22-23).

**FINDING:**

Here, the Court concludes that both the intrinsic and extrinsic evidence support a finding for Plaintiffs' claim construction of this term.    Plaintiffs argue, and the Court agrees, that "located adjacent the upper drive assembly" should be defined as a location for the engine mounting plate that is adjacent to the upper drive assembly, without restriction as to its location relative to the lower driven assembly (08-124; doc. 54, at 15).

Defendant Go-Devil asserts that, since the engine mounting plate is not identified in the figures of the '340 patent, it *interprets* the term to mean that the "horizontal plane of the engine mounting plate is attached directly to the drive housing in close proximity to the upper portion of the drive sprocket in the upper drive assembly" (08-124; doc. 53, at 22-23).   The Court disagrees.   The claim language describes the shaft housing attachment in proximity to the lower driven assembly, and nothing in the claim's language restricts the claim to a manner of attachment.   Thus, Defendant Go-Devil's definition is not supported by intrinsic evidence.

The extrinsic evidence also favors Plaintiffs' claim construction. At the *Markman* hearing, Dr. Matthews testified that the engine mounting plate need only be adjacent to the upper drive assembly so that the engine's output shaft can turn the upper drive pulley, but it does not need to be near the top of the elongated drive housing if the engine's shape, size, and output shaft location do not require it (Hr. Tr. 1, 201:20-203:20). This contradicts Defendant's argument that the engine mounting plate be in close proximity to the upper portion of the drive sprocket. Plaintiffs also argue that the dictionary definition of adjacent, which is "not distant: nearby," supports their assertion that there should be no restriction on the engine mounting plate's location relative to the lower driven assembly. (08-124; Pl.'s Ex. 82 citing *Merriam-Webster*).

Accordingly, the Court construes ". . . an engine mounting plate attached externally to said drive housing adjacent said upper drive assembly…" and "A portable outboard engine and drive assembly having means for temporary attachment to the transom of a shallow draft watercraft comprising: an engine mounting plate attached externally to said sealed housing located adjacent said upper drive pulley assembly perpendicular to said sealed housing," as "adjacent to the upper drive assembly, without restriction as to its location relative to the lower driven assembly."

Case 3:08-cv-00124-BAJ-SCR   Document 82   06/25/13   Page 23 of 42

## VII. Shaft Housing Attached to the Drive Housing[30]

Claim language: "...said lower driven assembly further comprising a propeller shaft partially enclosed within a shaft housing attached to said drive housing..." ('340 Patent at claim 1, col. 4, ln. 2-4).

Plaintiffs' definition: *Attachment of the shaft housing to the drive housing.* (08-124; doc. 54, at 15-16; doc. 57, at 16-19; doc. 78, at 28-30)

Go-Devil's definition: *A single straight propeller shaft partially enclosed in a single shaft housing the shaft. Shaft housing is directly connected to the elongated drive housing without any intermediary structure, especially without universal joint housing.* (08-124; doc. 56, at 10-11; doc. 76, at 33-34)

**FINDING:**

Here, the Court concludes that both the intrinsic and extrinsic evidence support a finding for Plaintiffs' claim construction of this term. Nothing in the '340 or '035 patents' claim language restricts the claim to the manner of attachment, nor does it limit the claim to direct attachment. Defendant Go-Devil argues that the claim construction should be more restricted. Relying in part on the prosecution history, Defendant asserts that the attachment method cannot include universal joints, and the housing cannot include universal joint housing when there is no suggestion that the shaft housing 26 is connected to the elongated drive housing 24 by any other means than directly (08-124; doc. 53, at 28).[31]

---

[30] This term was not briefed by Mud Buddy.
[31] Defendant Go-Devil also argues that the use of the phrases "a shaft" and "said shaft" are limitations that distinguish the patents from prior art. Further, that this distinction limits the claims to a single shaft,

Plaintiffs argue, and the Court agrees, that well established jurisprudence holds that "comprising" is a transitional word and the drafter uses the term to mean "I claim at least what follows and potentially more." *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005)

Further, Plaintiffs assert that the term "drive shaft" is understood by a person with ordinary skill in the art to include shafts comprised of segments connected by universal joints. Dr. Matthews testified that everything behind the rear cover of the elongated drive housing is considered to be the propeller shaft, even if it were physically two shafts separated by a U-joint (Hr. Tr. 1, 78:23-80:1). Further, Broussard testified that he did not intend there to be any restriction on the way that the shaft housing could be attached to the drive housing, and that he did not intend to disclaim the possibility of using a universal joint in the propeller shaft. (Tr. 1, 99:13-100:19).

Thus, the extrinsic evidence also supports the claim construction proposed by Plaintiffs. Accordingly, the Court construes "...said lower driven assembly further comprising a propeller shaft partially enclosed within a shaft housing attached to said drive housing..." as "attachment of the shaft housing to the drive housing."

---

as opposed to more than one kind of shaft (i.e. one with universal joints). The Court disagrees with this assertion for the same legal reasons set forth above.

## VIII. Adjacent Said Driven Assembly[32]

| | |
|---|---|
| Claim language: | "…a shaft housing attached to said drive housing adjacent said driven assembly…" ('340 Patent at claim 1, col. 4, ln. 3-4). |
| Plaintiffs' definition: | *the shaft housing is attached in proximity to the (lower) driven assembly.* |

**FINDING:**

Here, the Court adopts Plaintiffs' proposed claim construction of this term. The '340 and '035 patents describe a shaft housing "adjacent said driven assembly." Plaintiffs argue that "adjacent said driven assembly" means the shaft housing is attached in proximity to the (lower) driven assembly. Plaintiffs assert, and the Court agrees, that nothing in the claim's plain language restricts the claim to a manner of attachment. Further, neither Defendant has argued an alternative claim construction. Accordingly, the Court construes "…a shaft housing attached to said drive housing adjacent said drive assembly…" as "the shaft housing is attached in proximity to the (lower) driven assembly."

## IX. Extending at Least 12 Inches Beyond Said Housing[33]

| | |
|---|---|
| Claim language: | "…said driven assembly extending at least 12 inches beyond said drive housing…" ('340 Patent at claim 1, col. 4, ln. 4-5). |
| Plaintiffs' definition: | *the distal extent (the far end) of the shaft housing is at least 12 inches from the drive housing.* (doc. 54, at 16) |

---

[32] This term was not briefed by Defendant Go-Devil or Defendant Mud Buddy.
[33] This term was not briefed by Defendant Go-Devil or Defendant Mud Buddy.

**FINDING:**

Here, the Court adopts Plaintiffs' proposed claim construction of this term. The '340 patent describes a shaft housing "extending at least 12 inches beyond said drive housing." Plaintiffs argue that this term means that the far end of the shaft housing is at least 12 inches from the drive housing, and that this is not a measurement of the shaft housing's length, only a measurement of how far the shaft housing's far end is from the drive housing (08-124; doc. 54, at 16).

Defendants have not offered an alternative claim construction, nor have they challenged that a person of ordinary skill in the art would not reach this conclusion. Accordingly, the Court construes "…said driven assembly extending at least 12 inches beyond said drive housing..." as "the distal extent (the far end) of the shaft housing is at least 12 inches from the drive housing."

## X.   Extending in Excess of 18 Inches Beyond Said Drive Housing[34]

Claim language:   "…the shaft housing extending in excess of 18 inches beyond the drive housing..." ('035 Patent at claim 1, col. 6, ln. 44-46).

Plaintiffs' definition:   *the distal extent (the far end) of the shaft housing is at least 18 inches from the drive housing.* (08-124; doc. 54, at 16)

**FINDING:**

Here, the Court adopts Plaintiffs' proposed claim construction of this term. The '035 patent describes a shaft housing "in excess of 18 inches beyond the drive housing." Plaintiffs argue that this term means that the far end of the shaft

---

[34] This term was not briefed by Defendant Go-Devil or Defendant Mud Buddy.

Case 3:08-cv-00124-BAJ-SCR   Document 82   06/25/13   Page 27 of 42

housing is at least 18 inches from the drive housing, and that this is not a measurement of the shaft housing's length, only a measurement of how far the shaft housing's far end is from the drive housing (08-124; doc. 54, at 16).

Defendants have not argued an alternative claim construction, nor have they challenged that a person of ordinary skill in the art would not reach this conclusion. *Markman*, 52 F.3d at 979. Accordingly, the Court adopts Plaintiffs' proposed term interpretation and construes "...the shaft housing extending in excess of 18 inches beyond the drive housing..." as "the distal extent (the far end) of the shaft housing is at least 18 inches from the drive housing."

## XI. Thrust Bearings

Claim language:

"...a shaft supported adjacent each end by **thrust bearings** in a manner whereby said shaft extends beyond each of said **thrust bearings** and a plurality of internal seals located along said shaft outboard of said **thrust bearings**..." ('340 Patent at claim 4, col. 4, ln. 18-22).

"The portable drive assembly according to claim 8 wherein said propeller shaft assembly further comprises a plurality of **thrust bearings** and seals at each end of said shaft housing." ('340 Patent at claim 11, col. 4, ln. 61-65).

Plaintiffs' definition:

*Thrust bearings are any mechanical means of supporting an axial (thrust) load while facilitating radial rotation of two surfaces relative to each other.* (08-125; doc. 45, at 12-14; doc. 48, at 8-9; 08-124; doc. 54, at 16-17; doc. 57, at 19-22; doc. 78 at 31).

*Go-Devil's definition:*

*Tapered roller bearings designed to take extreme thrust loads.* (08-124; doc. 53, at 27-28; doc. 56, at 13-14).

28

> *Mud Buddy's definition: A tapered roller bearing.* (08-125; doc. 44, at 10-11; doc. 47, at 7-8; doc. 106, at 30-31).

**FINDING:**

The Court adopts the claim construction outlined by Defendant Go-Devil for this term. The U.S. Court of Appeals for the Federal Circuit has held that under the prosecution disclaimer doctrine a patentee is precluded from recapturing through claim construction specific meanings disclaimed during prosecution. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The doctrine applies when the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution. *Id.*

Here, Plaintiffs expressly stated in their patent prosecution history that their thrust bearings were different from the ball bearings of the prior art because their "thrust bearings are tapered roller bearings designed to take extreme loads" (08-124; doc. 53-3, at 12). Plaintiffs specifically stated to the patent examiner:

> "...claim 4 is novel and distinguishes over the cited reference of Stojkov in that Stojkov does not disclose thrust bearing as suggested by examiner. The shaft bearings shown as items 244 and 245 are simple ball bearings. Thrust bearings are tapered roller bearings designed to take extreme thrust loads as disclosed in applicant's specification" (*Id.*)

Plaintiffs aver that when they claimed a "thrust bearing," a person with ordinary skill in the art would understand such as to encompass a range of thrust bearings. The Court disagrees. Plaintiffs unequivocally imparted a novel meaning to the term "thrust bearing" in their prosecution history.

Further, in looking to the specification, the only reference to the term "thrust bearing" also specifically references a tapered roller thrust bearing.[35] Both Defendants assert, and the Court agrees, that Plaintiffs should not be permitted to expand the term's meaning when they disavowed incorporating any other type of thrust bearing in the claim. Accordingly, the Court construes "thrust bearings" as "tapered roller bearings designed to take extreme thrust loads."

## XII. Horizontal Shaft Output[36]

| | |
|---|---|
| Claim language: | "The Portable drive assembly according to claim 1 further comprising a self contained air cooled utility engine having a **horizontal output shaft** attached to said engine mounting plate said output shaft coupled to said upper drive assembly." ('340 Patent at claim 6, col. 4, ln. 28-32). |
| Plaintiffs' definition: | *"a shaft exiting the air cooled engine and positioned so the shaft is substantially horizontal when the air cooled engine is mounted on the engine mounting plate and ready for normal operation."* (08-124; doc. 54 at 18-19). |

**FINDING:**

Here, the Court adopts Plaintiffs' proposed claim construction. The '340 patent describes a "horizontal output shaft attached to said engine mounting

---

[35] col. 3, lines 30-36, '340 Patent
[36] This term was not briefed by Defendant Go-Devil or Defendant Mud Buddy.

plate said output shaft coupled to said upper drive assembly." Plaintiffs argue that this term means "a shaft exiting the air cooled engine and positioned so the shaft is substantially horizontal when the air cooled engine is mounted on the engine mounting plate and ready for normal operation" (08-124; doc. 54, at 18-19).

Defendants have not argued an alternative claim construction, nor have they challenged that a person of ordinary skill in the art would not reach this conclusion. Accordingly, the Court construes "horizontal shaft output" as "a shaft exiting the air cooled engine and positioned so the shaft is substantially horizontal when the air cooled engine is mounted on the engine mounting plate and ready for normal operation."

### XIII. Attached to Said Engine Mounting Plate and Mounted to Said Engine-Mounting Plate[37]

Claim language:

". . . having a horizontal output shaft **attached to said engine mounting plate**..." ('340 Patent at claim 6, col. 4, ln. 30-32); and

"An air cooled **engine mounted to said engine-mounting plate** and coupled externally to said upper drive pulley assembly;" ('340 Patent at claim 8(f), col. 4, ln. 51-53); and

"The marine craft according to claim 1 further comprising a utility **engine mounted on the engine mounting plate** and coupled to the upper drive assembly." ('035 Patent at claim 7, col. 7, ln. 1-3).

---

[37] This term was not briefed by Defendant Go-Devil or Defendant Mud Buddy.

|                       |                                                                                 |
|-----------------------|---------------------------------------------------------------------------------|
| Plaintiffs' definition: | *the engine is attached and mounted to the engine mounting plate, by any means, so that the engine is held in operating position.* (08-124; doc. 54, at 19). |

**FINDING:**

Here, the Court adopts Plaintiffs' proposed claim construction. The '340 patent describes a self contained air cooled utility engine ". . . having a horizontal output shaft attached to said engine mounting plate..." ('340 Patent claim 6, col. 4, ln. 30-32). The '340 patent also describes "an air cooled engine mounted to said engine-mounting plate and coupled externally to said upper drive pulley assembly;" ('340 Patent at claim 8(f), col. 4, ln. 51-53). Finally, the '035 patent describes "the marine craft according to claim 1 further comprising a utility engine mounted on the engine mounting plate and coupled to the upper drive assembly." ('035 Patent at claim 7, col. 7, ln. 1-3).

Plaintiffs argue that a person with ordinary skill in the art would understand these terms to mean that the engine is attached and mounted to the engine mounting plate, by any means, so that the engine is held in operating position. (08-124; doc. 54, at 19). Further, Plaintiffs assert that the means of attachment and mounting are not restricted in these claims (*Id*). Defendants have not argued an alternative claim construction, nor have they challenged that a person of ordinary skill in the art would not reach this conclusion. Accordingly, the Court construes "attached to said engine mounting plate and mounted to said engine-mounting plate" as "the engine is attached and mounted to the engine mounting plate, by any means, so that the engine is held in operating position."

## XIV. Water Sealed

Claim language:  "The portable drive assemble according to claim 6 wherein said drive housing is **water sealed**" ('340 at claim 7, col. 4, ln. 33-34); and

"a **sealed** housing containing a timing belt drive assembly comprising an upper drive pulley assembly and a lower driven pulley assembly" ('340 at claim 8(a), col. 4, ln. 38-40); and

"an engine mounting plate attached externally to said **sealed** housing located adjacent said upper drive pulley assembly perpendicular to said **sealed** housing" ('340 at claim 8(b), col. 4, ln. 41-43); and

"a propeller shaft partially enclosed within a shaft housing attached to said **sealed** housing extending from said driven pulley assembly at least 12 inches beyond said **sealed** housing" ('340 at claim 8(c), col. 4, ln. 44-47); and

"a pivotal means for temporarily attaching said **sealed** drive housing to a boat transom" ('340 at claim 8(e), col. 4, ln. 49-50).

Plaintiffs' Definition:  *Enclosed in a manner intended to resist the intrusion of water.* (08-125; doc. 45, at 11-12; 08-124; doc. 78, at 32)

Mud Buddy's Definition:  *Water tight.* (08-125; doc. 47, at 5-6, doc. 106, at 33-34).

**FINDING:**

The Court adopts the claim construction proposed by Plaintiffs. Both "water sealed" and "water tight" appear in the '340 patent. Defendant Mud Buddy's interpretation of the claim construction substitutes the term "water tight" for the term "water sealed." Defendant argues that the claim specification uses

33

the term "water tight" and thus this should be the term definition. The Court disagrees. While Defendant is correct in that the Court must look to the intrinsic record first for evidence of the meaning of the term, the extrinsic evidence demonstrates that "water sealed" and "water tight" mean different things.

First, Plaintiffs cite definitions and expert testimony which demonstrate that an enclosure that is water-tight is impervious to water (08-125; doc. 45, at 11). However, an enclosure that is "water sealed" may merely resist the intrusion of water. Second, Plaintiffs also cite other patents which use "water sealed" and "water-tight" in this fashion, demonstrating their different definitions. This supports Plaintiffs' assertion that a "water sealed" housing is simply enclosed in a manner intended to resist the intrusion of water. Further, Defendant presented no evidence at the *Markman* hearing to support its argument that the term "water sealed" should mean "water-tight." Accordingly, the Court construes "water sealed" as "enclosed in a manner intended to resist the intrusion of water."

### XV.  Pivotal Assembly

| | |
|---|---|
| Claim Language: | "…a mounting bracket and **a pivotal assembly** for positioning the portable drive assembly in the horizontal plane;" ('035 Patent at claim 6,col. 6, ln. 65-67); and |
| | "…a mounting bracket and **a pivotal assembly** for positioning the portable drive assembly in the horizontal plane." ('035 Patent at claim 12, col. 7, ln. 21-23). |
| Plaintiffs' Definition: | *a mechanical assembly for pivoting the motor to steer the boat.* (08-125; doc. 45, at 14; doc. 48, at 9-10). |

Mud Buddy's Definition: *The mounting bracket assembly includes a mounting bracket and a pivotal assembly. The pivotal assembly includes the lower pintle pin assembly that utilizes a pivot block secured to the pivotal assembly, in a rotative manner about the rod and is pivotally attached to the vertical housing by a pair of clevis pad eyes and a pivoting pin passing through the pad eyes and the block. An upper pintle block is secured to the pivotal assembly in a rotative manner about and by the rod. The upper block further includes the spreader plate secured within the frame by a pin extending through slots on each side of the frame thus allowing the frame to be pivotal relative to the pivotal assembly. The pivotal assembly further includes a second pivoting assembly formed by the pintle sleeve assembly that is pivotally connected to the transom bracket and rotational about pintle pivot pin secured by a fastener such as a nut. Further, the spreader plate is pivotally secured to the pintle block by a set of studs when used with the manual positioner assembly. However, an upper pintle block is used in combination with rod clevis pin when used with the linear actuator assembly. This pivotal assembly is used to position the portable drive assembly in the horizontal plane.* (08-125; doc. 44, at 11-14; doc. 47, at 8-9; doc. 106, at 31-33).

**Finding:**

The Court adopts the claim construction urged by Plaintiffs for this term. Under *Phillips*, patent claim terms are generally given their plain meaning as understood by one of ordinary skill in the art. *Phillips*, 415 F.3d at 1313. Further, it is improper to consult "the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and customary meanings attributed to the words

35

themselves." *Id*. at 1320 (quoting *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002)).

Here, Plaintiffs argue, and the Court agrees, the preferred embodiment's description of the "pivotal assembly" is but one example of a means to pivoting the drive assembly. The term should be given its plain meaning in constructing the claim definition. Although Defendant Mud Buddy argues that a proper construction of the term "pivotal assembly" should include the entire description provided in the specification for the '035 Patent, the Court disagrees. Defendant's construction is too complex and cumbersome.

A claim is not "indefinite" simply because it is hard to understand when viewed without benefit of the specification. *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1369 (Fed. Cir. 2001). The Court is confident that a person of ordinary skill in the art would understand the claim construction asserted by Plaintiffs. Accordingly, the Court construes "pivotal assembly" as "a mechanical assembly for pivoting the motor to steer the boat."

## XVI. Pivotal Means and Pivotal Means Comprises Both Horizontal and Vertical Pivoting Means

Claim language:

"A pivotal means for temporarily attaching said sealed drive housing to a boat transom" ('340 at claim 8(e), col. 4, ln. 49-50); and

"The portable drive assembly according to claim 8 wherein said pivotal means comprises both horizontal and vertical pivoting means." ('340 at claim 9, col. 4, ln. 54-56).

Plaintiffs' Definition:    *The motor is mounted for rotation, at least in partial range, on the watercraft's vertical axis and its lateral axis* (08-124; doc. 54, at 19, doc. 78, at 33).

Go-Devil's Definition:    *An inverted U-shaped bracket fitted with clamp screws which temporarily is attached to the transom, is pivotally attached to an L-shaped bracket enabling pivotal motion...in the vertical plane...is pivotally attached to the drive house which enables pivotal movement in the horizontal plane.* (08-124; doc. 53, at 11-15).

**FINDING:**

Plaintiffs' use of the phrase "a pivotal means for temporarily attaching" presumptively creates a means-plus-function claim as a matter of law. *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). As previously noted, under any means-plus-function claim, not only must the specification describe the associated structure for accomplishing the stated means, but the specification must contain language associating that structure to the means described in the claim. 35 U.S.C. §112, ¶6.

However, the claims of a patent are afforded a statutory presumption of validity. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001). Further, "a challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Id.* at 1376-77. The required reference is satisfied when "a person experienced in the

field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification." *S3, Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001).

Here, Plaintiffs' claim is amendable to construction and the referenced specification would be understood by one skilled in the art as being adequate to perform the recited function. As previously noted, the reference does not need to be blueprint precise.[38] The '340 patent claims "horizontal and vertical pivotal means." The specification states: "the engine mount contains tilt-up capability and pivotal horizontal steering" ('340 Patent col. 2, ln. 29-30) and "the engine assembly 10 is pivotal in a kick-up position in the horizontal plane as well as the vertical plane in the typical outboard arrangement as illustrated by Figure 5" (col. 3, ln. 8-11). Figure 5 illustrates the pivoting means (08-124; doc. 1-1, at 20). Thus, a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification.[39] Therefore, the means-plus-function claim is satisfied.

The Court, thus, adopts Plaintiffs' claim construction for this term. Accordingly, the Court construes "Pivotal Means and Pivotal Means Comprises Both Horizontal and Vertical Pivoting Means" as "the motor is mounted for

---

[38] As previously noted, Plaintiffs' supplemental submission of *Cummins-Allison Corp. v. SBM Co., Ltd.*, 2011-1049, 2012 WL 1890153 (Fed. Cir. May 25, 2012) only further substantiates the Court's position.
[39] Both Go Devil and Mud Buddy couch their arguments principally in terms of the means-function-plus claim. The Court disagrees with these arguments for the legal and factual conclusions previously outlined above. The Court also disregards Defendants' claim construction as being overly complex. Plaintiffs' construction sufficiently describes how an ordinary person skilled in the art would define the term.

Case 3:08-cv-00124-BAJ-SCR   Document 82   06/25/13   Page 38 of 42

rotation, at least in partial range, on the watercraft's vertical axis and its lateral axis."

### XVII. Plurality of Thrust Bearings and Seals at Each End of Said Shaft Housing[40]

Claim language:    "…shaft assembly further comprises a plurality of thrust bearings and seals at each end of said shaft housing." ('340 Patent at claim 11, col. 4, ln. 61-64).

Plaintiffs' definition:    *more than one thrust bearing and more than one seal along the propeller shaft housing, located at the ends* (08-124; doc. 54, at 19).

**FINDING:**

Here, the Court adopts Plaintiffs' proposed claim construction. The '340 patent describes "a plurality of thrust bearings and seals at each end of said shaft housing." Plaintiffs argue that this term means "more than one thrust bearing and more than one seal along the propeller shaft housing, located at the ends" (08-124; doc. 54, at 19). Defendants have not argued an alternative claim construction, nor have they challenged that a person of ordinary skill in the art would not reach this conclusion. Accordingly, the Court construes a "plurality of thrust bearings and seals at each end of said shaft housing" as "more than one thrust bearing and more than one seal along the propeller shaft housing, located at the ends."

---

[40] Although Defendant Go-Devil raises an issue with this term, its argument rests on the exclusion of housing universal joints connecting separate shafts. The Court ruled on the issue when it discussed the term, "Shaft housing attached to the drive housing." Defendant Mud Buddy did not brief this term.

## XVIII. Mounting Bracket Assembly[41]

Claim language:    "...further comprising a mounting bracket assembly for temporarily attaching the portable drive assembly..." ('035 Patent at claim 6, col. 6, ln. 62-64; '035 Patent at claim 12, col. 7, ln. 18-20).

Plaintiffs' definition:    *a mounting bracket for mounting the portable drive assembly to the transom and a pivotal assembly for positioning the portable drive assembly in the horizontal plane* (08-124; doc. 54, at 20).

**FINDING:**

Here, the Court adopts Plaintiffs' proposed claim construction. The '035 patent describes a "mounting bracket assembly." Plaintiffs argue that to a person with ordinary skill in the art, a "mounting bracket assembly" means a mounting bracket for mounting the portable drive assembly to the transom and a pivotal assembly for positioning the portable drive assembly in the horizontal plane. Plaintiffs further state that the claims plainly state the mounting bracket assembly is "for temporarily attaching the portable drive assembly to the transom." (doc. 54, at 19).

Defendants have not argued an alternative claim construction, nor have they challenged that a person of ordinary skill in the art would not reach this conclusion. Accordingly, the Court construes a "mounting bracket assembly" as "a mounting bracket for mounting the portable drive assembly to the transom and

---

[41] This term was not briefed by Defendant Go-Devil or Defendant Mud Buddy.

Case 3:08-cv-00124-BAJ-SCR   Document 82   06/25/13   Page 40 of 42

a pivotal assembly for positioning the portable drive assembly in the horizontal plane."

### XIX.  Mounting Bracket[42]

Claim language:   "…further comprising a **mounting bracket** assembly for temporarily attaching the portable drive assembly…" ('035 Patent at Claim 6, col. 6, ln. 62-64; '035 Patent at claim 12, col. 7, ln. 18-20); and

"…drive housing beyond vertical relative to the **mounting bracket** in the vertical plane." ('035 Patent at Claim 13 col. 8, ln 4-5).

Plaintiffs' definition:   *a structure by which the portable drive assembly is temporarily attached to the transom.* (08-124; doc. 54, at 20).

**FINDING:**

Here, the Court adopts Plaintiffs' proposed claim construction.  The '035 patent describes a "mounting bracket."   Plaintiffs argue that to a person with ordinary skill in the art, a "mounting bracket" means a structure by which the portable drive assembly is temporarily attached to the transom.  (08-124; doc. 54, at 19).  Defendants have not argued an alternative claim construction, nor have they challenged that a person of ordinary skill in the art would not reach this conclusion.  Accordingly, the Court construes "mounting bracket" as "a structure by which the portable drive assembly is temporarily attached to the transom."

---

[42] This term was not briefed by Defendant Go-Devil or Defendant Mud Buddy.

Case 3:08-cv-00124-BAJ-SCR   Document 82   06/25/13   Page 41 of 42

## CONCLUSION

The jury shall be instructed in accordance with the Court's foregoing interpretation of the disputed claim terms in the '600, '340, and '035 patents.

Baton Rouge, Louisiana June **25**, 2013.

_____
BRIAN A. JACKSON CHIEF JUDGE
UNITED STATES DISTRICTCOURT
MIDDLE DISTRICT OF LOUISIANA