# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **KYLE BROUSSARD AND GATOR TAIL, L.L.C.** | **CIVIL ACTION** |
| | **NO. 08-CV-124-BAJ-RLB** |
| **VERSUS** | |
| | **CHIEF JUDGE JACKSON** |
| **GO-DEVIL MANUFACTURING CO. OF LA., INC., d/b/a GO-DEVIL MANUFACTURERS OF LOUISIANA, INC.** | **MAGISTRATE JUDGE BOURGEOIS** |
| | |
| **CONSOLIDATED WITH:** | |
| | |
| **KYLE BROUSSARD AND GATOR TAIL, L.L.C.** | **CIVIL ACTION** |
| | **NO. 08-CV-125-BAJ-RLB** |
| **VERSUS** | |
| | **CHIEF JUDGE JACKSON** |
| **MUD BUDDY, L.L.C. D/B/A MUD BUDDY MANUFACTURING** | **MAGISTRATE JUDGE BOURGEOIS** |

**<u>MEMORANDUM IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT FILED BY
GO-DEVIL MANUFACTURERS OF LOUISIANA, INC.</u>**

Respectfully submitted,

TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.
    Fredrick R. Tulley, #07534
    John P. Murrill, #023878
    Robin Price Toups, #030763
    451 Florida Street, 8th Floor
    P. O. Box 2471
    Baton Rouge, LA 70801/70821
    Telephone:  (225) 387-3221
    Fax:  (225) 346-8049

ATTORNEYS FOR GO-DEVIL MANUFACTURING
CO. OF LA., INC, d/b/a GO-DEVIL
MANUFACTURERS OF LOUISIANA, INC.

# TABLE OF CONTENTS

**Page No.**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iv

I.     INTRODUCTION -- THE BROADLY CONSTRUED CLAIMS. ...................................1

       A.     Elongated drive housing. ................................................................................1

       B.     The propeller, propeller shaft and shaft housing. ....................................1

       C.     An engine mounting plate attached to the drive housing.........................2

       D.     Means for temporary attachment to the transom. ....................................2

II.    BROUSSARD '340 AND '035 ARE INVALID UNDER §103 AS
       OBVIOUS. ..........................................................................................................3

       A.     The elements of '340 and '035, according to their known functions
              in prior art. ....................................................................................................6

              1.     An Air-Cooled Outboard Motor. .................................................6

              2.     An elongated drive housing. .......................................................7

              3.     A longer propeller and shaft. ......................................................8

              4.     A timing belt connecting two parallel shafts to permit the
                     horizontal motor output shaft to drive the parallel, lower
                     driven shaft with the propeller attached. ...............................10

              5.     A "portable" motor or drive system with means for
                     temporary attachment to the transom.......................................15

              6.     An engine mounting plate attached (directly or indirectly) to
                     the drive housing and attached (directly or indirectly) to the
                     propeller shaft housing..............................................................16

       B.     Applying *KSR* analysis using Torrey '035 as the starting point. ...........17

              1.     The elements and limitations of Torrey. ...................................17

              2.     The Broussard element missing from Torrey but found in
                     other prior art. ..........................................................................20

C.      Applying the *KSR* analysis using the Scavenger as the starting point. ........................................................................22

D.      Applying the *KSR* analysis using Saito as the starting point. ..............................28

     1.      Saito elements in common with Broussard.................................29

     2.      The element of Broussard not found in Saito but known in other prior art. ........................................................30

E.      Dependent Claims.................................................................32

     1.      Transmission. ...............................................................32

     2.      Steering and throttle controls ('340, Claim 3). ............................33

     3.      A rudder fin..................................................................33

     4.      Thrust bearings within the propeller shaft and internal seals along the shaft (Claims 4 and 11 of '340)..................................33

     5.      Timing pulleys compatible with the timing belt, unobstructed by other bodies (Claim 6 of '340 and Claim 5 of '035)........................................................................33

     6.      "A self-contained air cooled utility engine having a horizontal output shaft attached to said engine mounting plate said output shaft coupled to said upper drive assembly ('340, Claim 6)..................................................34

     7.      "A mounting bracket assembly for temporarily attaching the portable drive assembly to the transom, the mounting bracket assembly comprising a mounting bracket and a pivotal assembly for positioning the portable drive assembly in the horizontal plane" ('340, Claim 2); and "a portable drive assembly…with pivotal means for temporarily attaching said sealed drive housing to a boat transom" ['035, Claim 8(c)]; "said pivotal means compris[ing] both horizontal and vertical means," ('035, Claim 9); and "a [transom] mounting bracket…and pivotal assembly for positioning the portable drive assembly in the horizontal plain" ('035, Claim 12)  and for positioning it "beyond vertical" ('035, Claims 13 and 15).............................34

     8.      A water-sealed drive housing ['340, Claims 8(a) and 9]..........................35

F.      Conclusion as to Obviousness. ..............................................35

III.    BROUSSARD '340 AND '035 ARE INVALID FOR LACK OF ENABLEMENT. .................................................................................................36

    A.    No enablement in the application for '340 of an engine mounting plate, nor of a "drive assembly" without an engine. ...............................................40

    B.    No enablement in '340 and '035 of a propeller shaft having segments coupled together with a U-joint, such that one part of the shaft operates at an angle. .....................................................................44

    C.    Conclusion as to lack of enablement. ...................................................46

IV.    THE '340 AND '035 PATENTS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION..................................................................................46

    A.    The '340 patent is directed to new matter added by amendment to the original patent application...............................................................46

    B.    The '340 and '035 patents lack written description of a device containing segmented propeller shafts connected by U-joints. ...........................48

    C.    Conclusion as to written description.....................................................49

V.    THE '340 PATENT IS INVALID AS INDEFINITE.......................................49

CERTIFICATE OF SERVICE ....................................................................................52

# TABLE OF AUTHORITIES

**Page No.**

## Cases

*AK Steel Corp. v. Sollac & Ugine*,
   344 F.3d 1234 (Fed. Cir. 2003) ........................................ 37
*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) ........................................ 47
*Automotive Technologies International, Inc. v. BMW of North America, Inc.*,
   501 F.3d 1274 (Fed. Cir. 2007) .................................. 37, 44
*Biosig Instruments, Inc., v. Nautilus, Inc.*,
   715 F.3d 891 (Fed. Cir. 2013) ........................................ 49
*Capon v. Eshhar*,
   418 F.3d 1349 (Fed.Cir.2005) ........................................ 47
*Carnegie Mellon University v. Hoffman-La Roche, Inc.*,
   541 F.3d 1115 (Fed. Cir. 2008) ........................................ 46
*Genentech Inc. v. Novo Nordisk A/S*,
   108 F.3d 1361 (Fed. Cir. 1997) ........................................ 36
*Gentry Gallery, Inc. v. Berkline Corp.*,
   134 F.3d 1473 (Fed. Cir. 1998) ........................................ 38
*Harries v. Air King Products Co.*,
   183 F.2d 158 (2 Cir. 1950) ........................................ 38, 39
*In re Oda*,
   443 F.2d 1200 (CCPA 1971) ........................................ 38
*KSR Int'l Co. v. Teleflex, Inc.*,
   550 U.S. 398, 127 S.Ct. 1727,
   167 L.Ed.2d 705 (2007) ................... 3, 4, 5, 6, 17, 20, 22, 28, 32, 35, 36
*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed. Cir. 2007) ........................................ 37
*MacKay Radio & Telegraph Co. v. Radio Corp. of America*,
   306 U.S. 86 (1939) ........................................ 39
*Marconi Wireless Telegraph Co. v. U.S.*,
   320 U.S. 1 (1931) ........................................ 38
*O'Reilly v. Morse*,
   56 U.S. (15 How.) 62, 121 (1853) ........................................ 46
*Permutit Co. v. Graver Corp.*,
   284 U.S. 52 (1931) ........................................ 39
*Randall Mfg. v. Rea*,
   2013 WL5813334 (Fed Cir. Oct. 30, 2013) ........................................ 35
*Sakiraida v. Ag Pro, Inc.*,
   425 U.S. 273, 96 S.Ct. 1532,
   47 L.Ed.2d 784 (1976) ........................................ 35
*Schering Corp. v. Amgen Inc.*,
   222 F.3d 1347 (Fed. Cir. 2000) ........................................ 39

iv

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
    305 U.S. 47 (1938)........................................................................................ 38
*Sitrick v. Dreamworks, LLC*,
    516 F.3d 993 (Fed. Cir. 2008) ..................................................................... 37
*Synthes USA, LLC v. Spinal Kinetics, Inc.*,
    2013 WL 5788675 (Fed. Cir. Oct. 29, 2013)................................................ 47
*Teva Pharmaceuticals, U.S.A., Inc. v. Sandoz, Inc.*,
    723 F.3d 1363 (Fed. Cir. 2013) ..................................................................... 50
*Tronzo v. Biomet, Inc.*,
    156 F.3d 1154 (Fed. Cir. 1998) ..................................................................... 39
*TurboCare Div. of Demag Delaval v. General Electric Co.*,
    264 F.3d 1111 (Fed. Cir. 2001) .............................................................. 38, 39
*Vas-Cath, Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991) ........................................................ 46, 47, 48
*Wellman, Inc. v. Eastman Chemical Co.*,
    642 F.3d 1355 (Fed. Cir. 2011) ............................................................... 49, 50

## Statutes

35 U.S.C. §112................................................................................ 36, 38, 44, 46
35 U.S.C. §132............................................................................................... 38

## Other Authorities

Donald S. Chisum, Chisum on Patents §11.04 ............................................... 38

## I.    INTRODUCTION -- THE BROADLY CONSTRUED CLAIMS.

As the claims were construed by this Court, there are several material elements of the so-called "invention" that are virtually unlimited in scope, such that the elements and related limitations read on a wide variety of prior art.

### A.    Elongated drive housing.

None of the claims in the '340 patent and the '035 patent contain any limit on how short the drive housing can be.  The only limitation is that the drive housing must be "elongated," which means it is longer than it is wide.  While Broussard's preferred embodiment describes a housing that extends essentially from the top of the transom to near the bottom of the boat,[1] nothing in the claims contain any such limitation.  Hence, the drive housing can be as long as the distance from just above the transom to the bottom of the boat, or so short that it stops at the top of the transom -- or any length in between.  As will be shown, this broad claim element encompasses pre-existing designs for drive housings for use with long tail motors, as well as housings for surface drive type motors, despite the fact that Broussard's preferred embodiment shows only a surface drive style propeller and shaft.

### B.    The propeller, propeller shaft and shaft housing.

Nothing in Broussard '340 and '035 limits the claims to cover only short-to-medium length shafts such as those found in the typical surface drive propeller system (which is the type of system described in the preferred embodiment).  Rather, the propeller shaft and its housing can be infinitely long, so long as the housing extends <u>at least</u> 12" (or 18")[2] beyond the drive housing.  Similarly, there are no limitations regarding the location or orientation of the propeller

---

[1] *See* '340 patent, Col. 3, Line 44; and '035 patent, Claim 1.

[2] As construed by this Court, Claims 1 and 8 of the '340 patent specify "at least 12".  Claim 13 of '340 specifies "at least 18".  Claim 1 of '035 specifies "at least 18".

and shaft -- only that the propeller shaft must be driven by the timing belt and that the shaft housing must be connected, directly or indirectly, to the drive housing.  Thus, the propeller shaft can be at any angle relative to the water level and the propeller can operate at any depth.  The claims therefore encompass typical long tail shafts (as shown in Foreman, designated prior art in the Broussard patents) which are much longer than surface drive propeller shafts and extend from above the transom down into the water at an angle.

C.    **An engine mounting plate attached to the drive housing.**

The Court construed "engine mounting plate" as "a plate to which the engine can be mounted."  Ruling on Construction of Disputed Claim Terms at 16-19.  Further, the Court agreed with plaintiff that the phrase "attached externally" does not require a direct attachment.  Rather, the attachment can be indirect, so long as there is maintained a "fixed relationship between the engine mounting plate and the elongated drive housing."  *Id.* at 19-21.  There can be intermediate structures between the mounting plate and the drive housing.  *Id.* at 21.  Hence, there are effectively no meaningful limitations in either Broussard patent on where or how the motor is mounted and attached to the drive assembly.  The motor's drive shaft can face forward or backwards.  The motor can be structurally supported by the drive housing or by something else. Again, the broad construction of the word "attached to" encompasses any number of motor and drive system configurations found in prior art.  The only limitation is that the engine must mount to an engine mounting plate that is perpendicular to the drive housing and attached, directly or indirectly (as opposed to "mounted"), to the housing.

D.    **Means for temporary attachment to the transom.**

As urged by Broussard and as construed by the Court, just about any means to mount an outboard motor and drive system on a transom meets the limitations in Claims 1 and 8 of the '340 patent and Claims 1 and 6 of the '035 patent.  So long as the motor is readily removable,

such as by unscrewing a clamp or by unscrewing bolts through holes in the transom or bolts through brackets attached to the transom, Claims 1 and 8 of '340 and Claims 1 and 6 of '035 cover the device.  All such devices are found in prior art.

## II.   BROUSSARD '340 AND '035 ARE INVALID UNDER §103 AS OBVIOUS.

The Broussard patents '340 and '035 are "combination" patents.  The patents unite old, familiar elements known in the prior art:  (1) an air-cooled outboard motor with a horizontal drive shaft; (2) a belt and pulley drive system whereby the upper pulley, driven by the motor's output shaft, uses a belt to drive the lower pulley connected to the propeller shaft; (3) an elongated housing enclosing the drive system; (4) a long propeller shaft within a shaft housing, designed to operate in shallow, weed-filled or muddy waters by operating on or near the surface of the water and extending some distance behind the stern of the boat; (5) an engine mounting plate upon which the engine is mounted; and (6) a portable drive system with means to temporarily attach the motor and drive system to the transom of a boat.[3]

The controlling case on the standard for determining the validity of a combination patent is *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007), in which the Supreme Court overruled the approach then followed by the Federal Circuit:  the "teaching, suggestion, or motivation" test ("TSM test").  Under the overruled TSM test, for a patent to be invalid on the basis of obviousness, the court was required to hold that "some motivation or suggestion to combine the prior art teachings could be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art."  550 U.S. at 407.  The Supreme Court held that the Federal Circuit's application of the TSM test represented an overly "rigid approach."  *Id.* at 415.  Instead, the Supreme Court adopted "an expansive and

---

[3] *See* '340 patent, Claims 1 and 8; '035 Patent, Claims 1 and 6.

flexible approach" to obviousness (*id.*), one that allows for the generous application of common sense.  The Court held that where known elements in prior art are combined according to their known functions so as to achieve a predictable result that solved a known problem, the invention was obvious and not patentable under §103.  The Court explained "familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle…." *Id.* at 415.

At issue in *KSR* was a patent for a mechanism that combined an electronic sensor with an adjustable automobile throttle pedal to permit transmitting the pedal's position to a computer controlling the throttle in the vehicle's engine.  The invention combined known elements of prior art:  mechanically adjustable pedals, a support structure for the pedal incorporating a pivot point, and electronic pedal sensors for computer-controlled throttles.

The Federal Circuit had examined three prior patents and determined that the teachings of each of them, standing alone, did not suggest to a person of ordinary skill to put a sensor on the type of adjustable pedal at issue.  Likewise, the Federal Circuit held that it was irrelevant that it might have been obvious to one skilled in the art to at least try the combination.  *Id.*

The Supreme Court reversed, holding that the Federal Circuit's use of the TSM test represented an "overly narrow conception of the obviousness inquiry…." *Id.* at 419.  "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls.  What matters is the objective reach of the claim….One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of the invention a known problem for which there was an obvious solution encompassed by the patent's claims." *Id.* at 419-420.  The Supreme Court observed that "under the correct analysis, <u>any</u> need or problem known in the field of endeavor at

the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420 (emphasis supplied).

The Court held the Federal Circuit erred by foreclosing inquiry into any reason or motivation to combine known elements to solve a particular problem unless those elements in prior art were themselves designed to solve the same problem.  This overly rigid view of obviousness improperly ignored common sense, the Court held.  "Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle….A person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* (emphasis supplied).

The Supreme Court further explained that "when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability.  For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417.

Moreover, the Supreme Court also reversed the Court of Appeal's holding that "a patent claim cannot be proved obvious merely by showing that the combination of elements was 'obvious to try.'" *Id.* at 421.  The Supreme Court reasoned:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it was obvious under §103.

5

Here, the Broussard "invention" is nothing more than the combination of prior art elements according to their established functions.  The so-called "innovations" by Broussard use prior art elements in a predictable way to achieve a predictable result.  The combination of known elements by Broussard resulted from common sense, not innovation.  Under *KSR*, therefore, the patents are invalid for obviousness.

*KSR* requires one first to analyze each element of the claim to assess its function according to prior art and then to determine whether the patents' combination of the known elements yielded predictable results and/or whether the combination was "obvious to try."  Each of the elements in the Broussard patents, as they relate to their known properties and their use in the marine industry prior to the '340 patent, will be discussed in detail.

A.    **The elements of '340 and '035, according to their known functions in prior art.**

1.    **An Air-Cooled Outboard Motor.[4]**

In the prior art relating to the propulsion of flat-bottomed mud boats, the so-called long tails used conventional, air-cooled motors mounted on the transom.  These had been in use for more than 30 years before Broussard.  The motors mounted to a transom "in the conventional manner."[5]  Since they were directly connected to the "long tail" propeller shaft or indirectly coupled to it by a universal joint, the long tail motors had horizontal drive shafts.  Mud boats used air-cooled motors out of necessity.  Unless they had a closed-loop water cooling system, traditional water cooled outboard motors, like those used in the vast majority of outboard motor boats, could not work in mud boats.  Traditional water cooled outboard motors would suck mud and vegetation up into the cooling system if they were required to operate where mud boats were

---

[4] *See* '340 Claims 1 and 8; and '035 Claims 1 and 7.
[5] *See* this Court's Ruling on Construction of Disputed Claim Terms at 12.

designed to go.  Thus, outboard motors that were air cooled were a necessity for use in mud boats.  Air-cooled motors have the further advantage that they were usually lighter and less expensive than their water cooled counterparts.  *See* Torrey, 2,996,035; Foreman, 6,361,388 (filed 1999); Saito, 5,741,165 (filed 1997); Ikuma, EP 0902174 (filed 1998).[6]  *See also* Garris Expert Report at 55 (ex. A to Garris Declaration).

## 2. An elongated drive housing.[7]

Another element of the Broussard patent is a housing enclosing the drive mechanism. This element is found in the prior art of outboard motors.  Mounted on the transom of a boat, outboard motors use mechanical means to drive the propeller and its shaft located below the water line.  For motor and drive assemblies in which the drive mechanism is aft of the transom, it is necessary, and obvious, to enclose the mechanical device(s) used to transmit the motor's driving force to the lower driven assembly (the propeller and shaft) in order to protect them from water intrusion and corrosion.[8]  Because they house the drive system extending from the motor on or above the transom down to the propeller shaft, drive housings by definition are elongated. Such enclosures had been prominent features of outboard motors for decades.  Typical examples of enclosed housings in the prior art are shown in the following patents -- Newman, 4,869,692

---

[6] All patents discussed in this memorandum are attached as evidence to the motion for summary judgment:  United States Patent 7,052,340 (Broussard) (ex. E); United States Patent 7,297,035 (Broussard) (ex. F); United States Patent 4,408,994 (Blanchard) (ex. G); United States Patent 3,951,096 (Dunlap) (ex. H); United States Patent 6,361,388 (Foreman) (ex. I); European Patent 0902174 (Ikuma) (ex. J); United States Patent 5,336,119 (Lais) (ex. K); United States Patent 4,869,692 (Newman) (ex. L); United States Patent 5,435,763 (Pignata) (ex. M); United States Patent 2,513,050 (Pugh) (ex. N); United States Patent 4,726,796 (Rivette) (ex. O); United States Patent 6,234,854 (Rydzewski) (ex. P); Japanese Patent H9-202298 (Saito) (ex. Q); United States Patent 5,741,165 (Saito) (ex. R); United States Patent 5,178,566 (Stojkov) (ex. S); United States Patent 2,996,035 (Torrey) (ex. T); United States Patent 941,827 (Trouche) (ex. U); and United States Patent 4,992,066 (Watson) (ex. V).

[7] *See* '340 Claims 1 and 8; and '035 Claim 1.

[8] Only where the drive assembly is inboard of the transom, such in Torrey and the Scavenger, is there no need to protect the drive assembly from splashing water.  Even then, an enclosed drive housing can perform an essential safety function, as in the Scavenger.

(filed 1988) (ex. L), and Saito, 5,741,165 (filed 1997) (ex. R).  *See also* photograph of Yamaha portable outboard motor, below.



### 3.    A longer propeller and shaft.[9]

According to Broussard '340 and '035 (exs. E, F), the propeller shaft housing must extend at least 12" or 18" beyond the drive housing, which means that the partially enclosed propeller shaft must be even longer.  This feature was common in the prior art of long tail motors, as described in Foreman (ex. I) and Torrey (ex. T):



---

[9] *See* '340 Claims 1 and 8; '035 Claim 1.



and in inboard/outboard surface drive motors, as described in Trouche, 941,827 (ex. U).



In the prior art of mud boat motors, propeller shafts were longer than ordinary outboard motor propeller shafts.  Because the propeller shaft operated at or near the surface of the shallow water, it extended some length beyond the stern of the boat to catch the water beyond the depression made immediately behind the boat as it moved through the water.  Hence, it was obvious to one skilled in the art to employ a longer propeller shaft in motors used to propel flat-bottomed mud boats.  *See* Foreman, 6,361,388 (filed 1999); Rydzewski, 6,234,854 (filed 1998); Rivette, 4,726,796 (filed 1986); and Trouche, 941,827 (filed 1905) (exs. I, P, O, and U).

645925.4

**4.      A timing belt connecting two parallel shafts to permit the horizontal motor output shaft to drive the parallel, lower driven shaft with the propeller attached.** [10]

First level mechanical engineering textbooks describe three basic methods for an engine with a drive shaft to drive a second shaft, other than a direct connection between the two:  (1) a belt drive; (2) its cousin, a chain drive, and (3) a gear drive.  *See, e.g.*, the comparison at http://en.wikipedia.org/wiki/Chain_drive.

(1)



(2)



(3)



---

[10] '340 Claims 1 and 5; and '035 Claims 1, 5, and 11.

The classic belt drive arrangement is the least costly, the most efficient of the three and does not require lubrication.  Belt drives work best with parallel shafts.  Timing belts are just a type of belt drive.  They have "teeth" molded onto the inner surface of the belt, to correspond with sprockets on the outer surface of the pulleys.  Timing belts, as opposed to "V" belts or flat belts, reduce slippage and are often used when timing of the drive system is critical for operation, such as with an automobile camshaft.  *See* Garris Supp. Expert Report at 3-4 (ex. B to Garris Declaration).

Traditional outboard motors use gear drives to transmit power from a vertical engine drive shaft to a horizontal propeller shaft.  Gear drives can be used to transmit power between perpendicular or other angled-shafts.  However, gear drives cost more than belt drives, they are heavier, they require far more precise alignment and they must have lubrication.  *See* Stojkov, 5,178,566 (filed 1990) (ex. S), discussed below.  Therefore, timing belt and other belt-driven parallel shafts found their way into the marine industry long before the Broussard patent, and their advantages over gear drives were well known.[11]

A belt drive system for use in a motor designed to operate in shallow, weedy water is disclosed in Torrey, 2,996,035, filed December 3, 1958 (ex. T).



---

[11] Nevertheless, at least one example of mud boat prior art, Saito, employed a gear drive.  Saito used gear drive to do what Broussard does with belt.

Another example of a mud boat motor and drive assembly with a belt drive is the Scavenger Backwater motor.



Similarly, Stojkov, 5,178,566 (1993) (ex. S), disclosed a belt-driven outboard system for marine vessels, including both inboard/outboard vessels and outboard motor boats.



12

Stojkov explained a major advantage of using a belt drive: "The conventional outdrive includes a rigid coupling shaft and associated gears to couple the rotary output from the drive shaft to the propeller shaft.   Accurate positioning of the various parts of such a conventional out drive is necessary in order to assure proper alignment and meshing of respective gears and shafts, as is well known…."   (Ex. S, [col. 2, lns. 63-65.])   Stojkov elaborated that the conventional gear drive system was relatively heavy, expensive, and required an oil-filled chamber for lubrication.   Thus, Stojkov's belt drive innovation was designed to reduce weight, lower manufacturing costs, and, because of the flexible coupling using belt or chain drives, require less precision in assembly.   Id. [col. 3, lns. 5-22].

    *See also* Pignata, 5,435,763 (1995) (ex. M) (a timing belt drive system for use with both outboard motors and inboard/outboard motors):



Lais, 5,336,119 (filed 1992) (ex. K):



FIG. 1

Blanchard, 4,408,994 (filed 1981) (ex. G) (combination belt drive and gear drive):



Newman, 4,869,692 (filed 1988) (ex. L) (a belt or chain drive system in combination with a gear drive, for use in portable outboard motors);



645925.4

Watson, 4,992,066 (filed 1989) (ex. V) (dual belt drive or chain drive assembly for an inboard/outboard motor, acting as a drive mechanism and a transmission):



Dunlap, 3,951,096 (1976) (ex. H) (belt-driven system for an inboard/outboard boat):



     **5.**     **A "portable" motor or drive system with means for temporary attachment to the transom.**

Under this Court's construction of the Broussard claims, the means for attaching the Broussard drive system to the transom is "conventional," the same way most outboard motors are mounted.  The drive system is "portable," in that it can be easily moved from boat to boat, like standard outboard motors.  By definition, therefore, there was nothing novel about

Broussard's portable drive system with a means of "conventionally" attaching the drive system to the transom. Broussard referenced prior art in describing how his invention mounted to the boat. For example, the following prior art patents disclosed standard U-channel transom mounts secured by clamp screws and/or bolts: Torrey (see prior drawing) (ex. T); Saito, 5,741,165 (filed 1997) (below) (ex. Q):



Foreman (see prior drawing) (ex. I); and Pugh, 2,513,050 (filed 1948) (below) (ex. N):



6. **An engine mounting plate attached (directly or indirectly) to the drive housing and attached (directly or indirectly) to the propeller shaft housing.**

Again, the element of an engine mounting plate upon which a motor is mounted was well known in the prior art. *See* Garris Expert Report at 41, 43, 47 (ex. A to Garris Declaration). Mounting plates of various configurations are sold over the counter. One well-known advantage of installing a plate between the motor and an underlying supporting structure is to permit

16

engines of different sizes to be mounted without having to re-drill holes in a frame, the motor or other heavy metal base upon which the motor sits. Examples of the use of engine mounting plates abound in prior art. The Scavenger Backwater uses such a plate, as does Torrey, Saito, Foreman, and Watson (exs. T, R, I, and V).

**B.     Applying *KSR* analysis using Torrey '035 as the starting point.**

An easy starting point in the obviousness analysis under *KSR* is Torrey '035 (ex. T), which includes all elements and limitations of Claims 1 and 8 of Broussard '340 and Claims 1 and 7 of '035 except a drive housing. Torrey describes a portable outboard motor drive and steering unit temporarily attached to the transom of a small boat. It is designed for operation in shallow or weedy waters. The following diagrams illustrate Torrey:



**1.     The elements and limitations of Torrey.**

As can be seen, Torrey has the following elements in common with Broussard:

(a)     An air cooled outboard motor with a horizontal output shaft.

The above drawing from Torrey '035 shows an air-cooled motor, which, as explained above, was the obvious choice for propelling a mud boat through shallow, weed-filled or muddy waters.  Torrey also discloses a horizontal shaft motor, which would be the preferred, most efficient configuration for a timing belt drive system.

(b)      A portable drive assembly with means for temporary attachment to the transom.

Torrey discloses a drive assembly upon which is mounted the air-cooled motor that temporarily mounts ("in the usual position") to the transom of a boat by means of a U-clamp and jack screw, just as the drawings in Broussard '340 disclose.

(c)      A belt and pulley drive system.

Torrey discloses an upper pulley driven by the horizontal engine drive shaft and a lower pulley driven by a belt connecting the upper pulley and the lower pulley.  Attached to the lower pulley is a propeller shaft, perpendicular to the belt.

Broussard '340 and '035 disclose the same type of drive system.  There is an upper pulley driven by the motor output shaft, a lower driven pulley, and a belt connecting the two. See Figure 7 from the '340 patent below.



(d)      A propeller connected to a "relatively long" propeller shaft partially enclosed in a shaft housing.

Since the propeller and shaft are designed to operate in shallow, weed-filled water, Torrey discloses that the shaft must be "relatively long" and "arranged to be substantially horizontal under boat propulsion conditions." (Ex. T [col. 3, lns. 40-44.])  The shaft housing is water tight, to permit lubrication of bearings within the shaft housing and to protect them from water.



Broussard discloses the same features.  Both '340 and '035 disclose a "relatively long" propeller shaft partially within a housing [at least 12" (Claim 1 of '340) or "at least 18"" (Claim 13 of '035)], designed to operate at or near the surface of shallow, weed filled or muddy water. A propeller is attached to the end of the shaft.  As in Torrey, the propeller is driven by the lower belt and pulley assembly.  The shaft housings in both are sealed to protect the bearings.

(e)     An engine mounting plate perpendicular to the belt drive and parallel to the horizontal engine drive shaft.

Torrey discloses that the engine mounts on a horizontal "motor-mounting platform."  *See* part #42 in the prior diagram.   The mounting platform is thin and is connected to an "intermediate body portion" that structurally supports the "motor-mounting platform" and the motor mounted on it.  In Torrey's design the motor is required only to be "suitable."  In other words, the motor-mounting platform is designed to accommodate motors of varying sizes, which is exactly what an engine mounting plate is designed to do.  Torrey discloses that the platform (plate) and the structure on which it sits may comprise a fabricated assembly.  (Ex. T [col. 3, lns.

15-18.])  In other words, the "platform" in Torrey can come in two separate parts, the platform itself and its structural support, just as an engine mounting plate mounts to a separate supporting structure.



Similarly, Broussard claims an engine mounting plate adjacent to the upper drive assembly and perpendicular to the belt drive system.  The motor mounts on the plate.  The '035 patent further explains that the plate sits on a suitable structure just as does the plate in Torrey.

### 2.      The Broussard element missing from Torrey but found in other prior art.

The only element of Broussard '340 and '035 missing from Torrey is an elongated drive housing enclosing the belt and pulley drive assembly, to which housing is attached (directly or indirectly) the engine mounting plate and the propeller shaft housing.  Torrey's belt and pulley drive system is not enclosed by any housing but is exposed to the elements.[12]

The issues presented by *KSR*, therefore, are (1) at the time of Broussard's patent application, was the enclosed drive housing missing in Torrey nevertheless found in prior art apart from Torrey, and (2) if yes, would it have been obvious to one skilled in the art to combine the elements found in Torrey, according to their known functions, with an enclosed drive

---

[12]   In the preferred embodiment of the Torrey design, the engine output shaft faces forward in the boat, whereas Broussard's output shaft faces aft.  However, there are no claim limitations in either patent requiring the engine to face any particular direction, so long as the output shaft can drive the lower driven assembly using a belt.

housing as found in other prior art, to achieve a predictable result?  There can be no genuine dispute that each of these questions is answered in the affirmative.

Almost every pre-2002 patent covering some form of an outboard motor disclosed a drive housing enclosing the drive system.  *See, e.g.,* Saito (ex R).  One need only to look at any outboard motor catalog to find that most outboard motors come with elongated, enclosed drive housings.  The housings protect the drive system from water and serve a safety function.  Torrey is the exception rather than the rule.  Unlike traditional outboard motors, the drive shaft in Torrey faces forward and the drive assembly to it is inboard of the transom.  Hence, Torrey doesn't need an enclosed housing to keep the drive assembly dry.  But if one wanted to make more room inside the boat by turning the motor around, making the drive shaft face aft, then there would be a need to worry about the belt and pulley mechanism becoming wet from splashing.

Clearly at the time of Broussard's application in 2002, it would have been obvious to one skilled in the art that the Torrey design could be improved by enclosing the belt and pulley drive system in a drive housing, particularly if one wanted to move the drive assembly outboard of the transom and to lengthen the belt and pulley as Broussard does.  *See, e.g.,* Garris Expert Report at 28 (ex. A to Garris Declaration).  Such a combination would make the Torrey motor and drive system far more safe and would protect the belt and pulley from getting wet, thereby reducing wear and preventing slippage.  Similarly, turning the Torrey motor around would yield the obvious improvement of making more space in the boat.  In such a configuration a housing would not only be obvious but would be a necessity if one were to turn the motor in Torrey around -- as Foreman and Broussard do -- so that the motor's output shaft faced the rear of the boat.  Without an enclosed drive housing in such configuration, the belt and pulleys would suffer significant degradation from splashing water.

Finally, if one decided to add a drive housing to the Torrey design, it would also be obvious to attach (directly or indirectly) the housing to the motor-mounting platform (engine mounting plate) and to the propeller shaft housing. From the Torrey diagrams, it is apparent that such attachments would be essential if the housing were to serve its primary function of protecting the belt and pulley drive system from splashing water. Further, the shaft housing would form convenient attachment points for a drive housing, such that the housing would not interfere with the motor and drive's operation.

Thus, it would have been obvious to one skilled in the art in 2002 to improve the Torrey design by turning the motor around and by incorporating an enclosed, elongated drive housing like those found in prior art, to protect the belt and pulley drive from the elements and to make it safer. As a consequence, Broussard '340 and '035, which combine known elements from Torrey and other prior art to achieve a predictable result, are invalid for obviousness.

### C.   Applying the *KSR* analysis using the Scavenger as the starting point.

Under *KSR* one may assess whether the combination in question combines known elements from prior art to achieve a predictable result. It should be possible, therefore, to start the analysis with more than one example of prior art to determine whether modifying each example with different elements from other prior art achieves the same predictable result. See *KSR*, 550 U.S. at 425. The Broussard patents meet this test.

Take the Scavenger Backwater design as another starting point. Scavenger is a lightweight, portable drive system to temporarily mount on a transom of a flat-bottomed mud boat for use in shallow, muddy or weed-filled waters and swamps. Scavengers use a belt and pulley drive system and have a long propeller and shaft to maneuver in shallow, weedy and muddy water. The Scavenger embodies every element and limitation of Claims 1 and 8 of the '340 patent and Claims 1 and 7 of the '035 patent except that Scavenger uses a V-belt rather than

22

a timing belt and the Scavenger drive housing is not sealed.[13] *See* Garris Supp. Expert Report at 7-12 (ex. B to Garris Declaration).

The Scavenger Backwater design has the following elements in common with Broussard '340 and '035:

(a)      An air-cooled outboard motor with a horizontal output shaft.

Like typical mud boat motors, the Scavenger has an air-cooled motor with a horizontal output shaft.



(b)      A portable drive assembly with means for temporary attachment to the transom.

Scavengers are portable, as seen in this photograph:

---

[13] See discussion above regarding Torrey that it would have been obvious to substitute a water-tight housing.

645925.4



It attaches to the transom of a boat by means of a simple clamp and is easily removable.



(c)     A belt and pulley drive system.

The Scavenger employs a belt drive whereby the upper drive assemble drives the lower driven assembly using a V-belt (Broussard uses a timing belt -- see below).



24

(d)      A propeller attached to a long (in excess of 18") propeller shaft partially enclosed in a shaft housing.





(e)      The belt and pulley drive assembly is enclosed in an elongated drive housing.

The drive housing is elongated, in that it is longer than it is wide, and it encloses the belt and pulley drive assembly.



25



(f)     An engine mounting plate perpendicular to and attached to the drive housing, adjacent to the upper drive assembly.

The Scavenger has an engine mounting plate to which the drive housing is attached.  The mounting plate is perpendicular to the drive housing and is adjacent (i.e., near) the upper drive assembly.





645925.4

(g)      A propeller shaft housing attached to the elongated drive housing.

As shown in the below photograph, Scavenger utilizes a propeller shaft housing that is attached to the bottom of the engine mounting plate, which in turn is attached to the drive housing.  As this Court construed the word "attached" in the Broussard claims, there need not be a direct attachment, so long as the two elements "attached" move fixedly with one another.  Ruling on Construction of Disputed Claim Terms at 19-21.  As can be seen in this photograph of a Scavenger, that is the case with the engine mounting plate.  Both the drive housing and the propeller shaft housing are attached to the engine mounting plate, which means that the three components move fixedly with one another.



(h)      The element found in Broussard but not in the Scavenger.

Claim 1 of the Broussard '340 patent and Claim 1 of the '035 patent disclose a timing belt whereas the Scavenger uses a V-belt.[14]   Particularly in marine applications, substitution of a timing belt for a V-belt in the belt and pulley drive system is obvious to anyone skilled in the art. As Dr. Garris points out, timing belts and V-belts may be substituted for one another in the design of a belt drive assembly, and timing belts have distinct advantage over V-belts in terms of ability to bear load and to prevent slippage.   *See* Garris Supp. Expert Report at 3-6, Shigley et al, "Standard Handbook of Machine Design" (ex. B to Garris Declaration).   Indeed, the '035 patent discusses use of a "belt drive" and many of the claims are not limited to timing belts.  *See* '035 patent, Col. 2, lines 65-66 (ex. F).

### D.   Applying the *KSR* analysis using Saito as the starting point.

Yet another place to start the *KSR* analysis is Saito, 5,741,165, filed 1997 (ex. R).  Saito Japanese patent, H9-202298, was filed in 1996 (ex. Q).  Saito disclosed a surface drive outboard motor and drive system temporarily mounted to the transom of a flat-bottomed boat for use in shallow, muddy and weed-filled water.  See Figure 1 from Saito '165 (ex. R) and the following figure from the Saito Japanese patent (ex. Q) below.



---

[14] Independent Claim 8 of the '340 patent discloses a "sealed housing containing a timing belt drive assembly…." The Scavenger drive housing is not sealed, but, as explained above in the Torrey discussion, it would have been obvious to seal the housing to prevent damage from splashing water if one wanted to turn the motor around and extend the drive assembly down towards the water.



### 1. Saito elements in common with Broussard.

Saito employed the following elements according to their known functions, all of which are found in both Broussard patents:

(a)     An air-cooled outboard motor.

(b)     A plate upon which the motor was mounted, the plate being perpendicular to the elongated drive housing and attached indirectly to the drive housing.  The plate was attached indirectly to the drive housing.

(c)     An elongated drive housing to which was attached at its lower end the propeller shaft housing.

(d)     A propeller attached at the end of a longer propeller shaft that is partially enclosed in a shaft housing.

(e)     A portable drive system with means for temporarily mounting the motor and drive system to the transom of a flat bottomed boat, using clamp screws.

All of these elements are common to Broussard '340 and '035 and function according to their known characteristics.

**2.      The element of Broussard not found in Saito but known in other prior art.**

Unlike Torrey, Scavenger and Broussard, Saito employed a gear drive system like that found in most outboard motors.  To drive the gear drive system, Saito discloses a motor with a vertical output shaft that extends down to near the bottom of the boat.  The shaft drives the propeller shaft by means of bevel gears.  Broussard, Scavenger, Torrey, Watson, Stojkov, and Pignata, on the other hand, employ a belt and pulley drive system, using a motor with a horizontal output shaft.

Although Saito used a vertical drive motor and gear drive, it would have been obvious to one skilled in the art that Saito could be improved by the use of a less costly, lighter and more efficient belt drive arrangement in place of Saito's gear drive.  *See* Garris Expert Report at 40-41 (ex. A to Garris Declaration).  *See also* the belt drives in the Scavenger, Torrey, Stojkov, Watson, and Pignata (exs. T, S, V, and M).  The question then is how to modify the Saito design to accommodate a belt drive?  Again the answer was obvious and was found in the prior art.  Belt drives work best with parallel shafts.  Thus, one needed to substitute a motor with a horizontal output shaft for Saito's vertical drive motor.  Such an air-cooled, horizontal drive motor was already used extensively in the mud boat industry in long tail mud boat motors.  *See* Foreman, Torrey, and Scavenger (exs. I, T; Garris Supp. Expert Report).  Indeed, air-cooled, horizontal shaft outboard motors had been the state of the art in mud boats for quite some time for a very good reason.  Most gear drive outboard motors were not air cooled.  They were water cooled by pumping water up through the drive system and housing.  Hence, they were not used to power mud boats, which needed air-cooled engines to avoid having their cooling system fouled by mud and vegetation being sucked into the cooling system.

Further, the technique of connecting the motor's drive shaft to a timing belt or other type of belt in order to drive the lower driven propeller shaft was something taught in first level mechanical engineering courses and was found in prior art.  *See*, *e.g.*, the Scavenger, Torrey, Stojkov, Pignata, and Watson (exs. T, S, and V).  It would be obvious to anyone with a degree in mechanical engineering, let alone a shade tree mechanic, how to modify the Saito design to accommodate a horizontal shaft motor and belt drive in place of Saito's vertical shaft motor and gear drive.  And it would have been obvious to try, given the equally obvious knowledge of anyone skilled in the art that a belt drive is inherently cheaper, lighter and more efficient than a gear drive.

The Broussard patents themselves asserted that the use of a timing belt was obvious.  The '340 patent states (ex. E, col. 1, lns. 41-47) (emphasis supplied):

> The use of belt drive engines are well known within the art as being a most efficient means for driving a propeller shaft thereby reducing friction and improving mechanical advantage over right angle gear drives.  Therefore the use of a belt drive in combination with an air-cooled engines (sic) as disclosed by Pignata in U.S. Pat. No. 5,435,763 seems to be an obvious choice.[15]

Similarly, the '035 patent asserts (ex. F, col. 1, lns. 52-60) (emphasis supplied):

> The use of air cooled or water cooled marine engines coupled by belt to a transom mounted drive unit are well known within the art as being the most efficient means for driving a propeller shaft thereby reducing friction and improving mechanical advantage over right angle gear drives.  Therefore, the use of a belt drive in connection with an air cooled engine as disclosed by Pignata…seems to be an obvious choice.  (Emphasis supplied.)

In simplest terms, Broussard, himself acknowledged that substituting a belt drive for a "right angle gear drive" (as found in Saito) was obvious to one skilled in the art.  The improved

---

[15] Instead, Pignata attempted to solve the propulsion problem with a unique round, hollow, rotating cylinder with veins facing inward, driven by a timing belt within a vertical drive housing.  To convert Pignata's invention into Broussard's, all one need do is to substitute a surface drive style propeller shaft and propeller, as in Saito, in place of the driven cylinder.

efficiency from Broussard's belt drive allows Broussard to achieve more speed and power at a lower cost than Saito.

The *KSR* analysis leaves no room for dispute.  As a matter of law, Claims 1 and 8 of '340 and Claim 1 of '035 are invalid for obviousness, as they merely combine known elements from prior art according to their known functions, to achieve a predictable result -- something that Broussard himself admitted in both patents.

### E.      Dependent Claims.

As shown above, the independent claims in '340 and '035 are invalid for obviousness. This section of the brief will show how each of the dependent claims adds nothing more than an obvious element from known prior art, according to its known function, in order to improve the design.  The dependent claims are invalid for obviousness as well.

### 1.      Transmission.

Claims 2 and 10 of '340 and Claims 2 and 8 of '035 add a "transmission mounted to said engine mounting plate coupled externally to said upper drive assembly for reversing drive rotation" ('340) and "a transmission mounted to the engine mounting plate coupled externally to the upper drive assembly ('035)."  It is obvious that adding a transmission, as found in prior art, to an outboard motor and drive system to allow the operator to put the boat in reverse, is an improvement over an outboard motor without a transmission.  The prior art is replete with such devices and it is an obvious improvement to the basic motor and drive system to add a transmission.[16]  *See* Pignata (ex. M).  There is nothing novel about mounting the transmission to the same plate and structure that the engine mounts to.

---

[16] If Broussard contends that the unique aspect of his invention was to add a transmission to the drive system but without a motor, neither '340 nor '035 enables such a device.  See below.

**2.      Steering and throttle controls ('340, Claim 3).**

It is equally obvious to include steering and throttle controls on any outboard motor.  The prior art is replete with them.[17]  *See* Torrey, Foreman, Saito, and Scavenger (exs. T, I, and R).  *See also* Garris Expert Report at 44 (ex. A to Garris Declaration).

**3.      A rudder fin.**

Claims 4 and 12 of '340 and Claims 4 and 10 of '035 add a rudder fin as a component of the propeller shaft housing.  Again, it was known in the prior art that a rudder fin, including a vertical fin ('340, Claim 4), was an obvious improvement to any outboard motor and drive system, particularly mud boat motors.  Foreman, Scavenger and Torrey all disclose rudder fins, which help stabilize the propeller and shaft and keep them from lifting out of the water.  The addition of such a fin to the Broussard invention would have been obvious to one skilled in the art.

**4.      Thrust bearings within the propeller shaft and internal seals along the shaft (Claims 4 and 11 of '340).**

Both Torrey and Foreman disclose bearings and seals within the shaft housing.  One of ordinary skill in the art would understand the need for at least one of those bearings to be a "thrust" bearing.  *See* Garris Expert Report at 45 (ex. A to Garris Declaration).

**5.      Timing pulleys compatible with the timing belt, unobstructed by other bodies (Claim 6 of '340 and Claim 5 of '035).**

In the prior art, it was known that belt and pulley drives can consist of various types:  V-belts, timing belts, and flat belts, etc.  Timing belts and pulleys are less susceptible to slippage and are used when more precise timing is required, such as in an automobile cam shaft.  Belt drives can be unobstructed or fitted with tensioning devices to keep the belt taut.  There are

---

[17]  If Broussard contends that his steering and throttle controls are unique because they are part of a drive system without a motor, such a device is not enabled.  See below.

obvious advantages to both, and there is nothing unique or non-obvious to choose one over the other.  *Compare* Pignata (ex. M) (unobstructed timing belt) and Torrey (ex. T) (unobstructed "V" belt).  Hence, employment of "timing pulley" and a timing belt unobstructed by other bodies is an obvious design choice to a skilled artisan that was well known in prior art.

> **6.      "A self-contained air cooled utility engine having a horizontal output shaft attached to said engine mounting plate said output shaft coupled to said upper drive assembly ('340, Claim 6).**

See discussion above at pp.6-7.

> **7.      "A mounting bracket assembly for temporarily attaching the portable drive assembly to the transom, the mounting bracket assembly comprising a mounting bracket and a pivotal assembly for positioning the portable drive assembly in the horizontal plane" ('340, Claim 2); and "a portable drive assembly…with pivotal means for temporarily attaching said sealed drive housing to a boat transom" ['035, Claim 8(c)]; "said pivotal means compris[ing] both horizontal and vertical means," ('035, Claim 9); and "a [transom] mounting bracket…and pivotal assembly for positioning the portable drive assembly in the horizontal plain" ('035, Claim 12)  and for positioning it "beyond vertical" ('035, Claims 13 and 15).**

These claims are directed to the means by which the drive system mounts to the boat's transom.  The '340 patent discloses pivoting of the drive system in the horizontal direction; the '035 patent discloses pivoting vertically and horizontally.  There is nothing novel about either device.  It would be obvious to one skilled in the art to incorporate in an outboard motor and drive system a transom mounting bracket having the ability to pivot at the place where the motor mounts to the transom, both horizontally and vertically.  Without the ability to so pivot, the boat cannot be steered and it would be impossible to service the propeller and shaft (such as by removing clogged weeds) without removing the entire system from the boat.  Examples of similar pivoting capability are found in Torrey, Pignata (horizontal pivoting only), Watson, and Saito (exs. T, M, V, and R).  As a consequence, these dependent claims are obvious.

34

### 8.    A water-sealed drive housing ('340, Claim 7).

Just as drive housings are obvious components of an outboard motor and drive system (see discussion above), a water-sealed housing is an equally obvious element found in prior art. The water-sealed feature improves the protection of the drive system from corrosion, belt slippage, and other damage caused by splashing water.  It would be obvious to one skilled in the art to improve the water protecting afforded by the housing by making it water tight.  *See* Watson, 4,992,066 (ex. V).  *See also* Garris Expert Report at 54 (ex. A to Garris Declaration).

### F.    Conclusion as to Obviousness.

All claims of these two Broussard patents are invalid, as the Broussard patents introduced nothing new to the art.  They "simply arrange[d] old elements with each performing the same function it had been known to perform, although producing a more striking result [in Broussard, more speed and power] than previous combinations…Such combinations are not patentable under standards appropriate for a combination patent."  *Sakiraida v. Ag Pro, Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976).   In the words of the Supreme Court in *KSR*, "ordinary skill and common sense" rather than innovation produced the Broussard patents.

In its most recent decision applying *KSR*, the Federal Circuit emphasized that the PTO sometimes misapplies the dictates of KSR, in which "the Supreme Court criticized a rigid approach to determining obviousness based on the disclosures of individual prior-art references, with little recourse to the knowledge creativity, and common sense that an ordinary skilled artisan would have brought to bear when considering combinations or modifications."  *Randall Mfg. v. Rea*, 2013 WL5813334 (Fed Cir. Oct. 30, 2013).  "Common knowledge and common sense available to persons skilled in the art are essential components in determining whether it would have been obvious to combine known elements from prior art to achieve a predictable result.  *Id.*, p. 12.

Under *KSR* and its progeny, the proper analysis requires an objective assessment of whether Broussard's combination of elements well-known in the prior art -- an air-cooled, portable outboard motor with a horizontal drive shaft (as in Foreman, Torrey and the Scavenger), an enclosed, elongated drive housing (as in Pignata, Saito and any number of outboard motors), a belt and pulley drive system (as in Pignata, Torrey, Watson, Stojkov, and the Scavenger), utilizing a timing belt (as in Pignata), an engine mounting plate (as in Torrey, Scavenger, and Saito) perpendicular to the drive housing and attached to it and to the propeller shaft housing (as in Scavenger, Torrey, and Saito), and a lower driven shaft within a shaft housing connected to the vertical drive housing and extending horizontally from the stern of the boat (as in Saito, Torrey and the Scavenger) -- yielded a predictable result.  In other words, would a person skilled in the art at the time of Broussard's patent application have recognized that combining the known elements in that fashion would yield the results achieved by the Broussard patent -- a mud boat outboard motor and drive system similar to Saito's but less costly, lighter and more efficient, due to the obvious use of a timing belt driven by an engine with a horizontal output shaft?  The answer is clearly yes.  There is nothing in Broussard that extends beyond the mere predictable use of known prior art elements considered to produce predictable outcomes through the exercise of knowledge of the prior art and common sense.

## III.     BROUSSARD '340 AND '035 ARE INVALID FOR LACK OF ENABLEMENT.

Section 112(a) requires that the inventor disclose in the patent specification sufficient information to enable a person skilled in the art to make or use the innovation.  Patents are required to "teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'"  *Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997).  A patent is invalid unless the written description enables the full scope of the broadest claim, even if one or more embodiments are specifically enabled.  In

645925.4

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371 (Fed. Cir. 2007), the Federal Circuit affirmed the lower court's holding invalid a patent for a high-pressure medical injection system. The patent application had recited only an injector with a pressure jacket.  Later, the patentee amended the application to incorporate injectors without pressure jackets.  The Federal Circuit held that the application's disclosure of a jacketed system "does not permit a person having skill in the art to make and use the invention as broadly as it was claimed, including without a pressure jacket." 481 F.3d at 1380.  The description can only leave gaps in the enablement of the full scope of the claims that can be filled in by the skilled artisan's knowledge and routine experimentation. *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).  Most importantly for this case, in *Liebel* the written description contained statements that disparaged a jacketless injector as too expensive and impractical.  The Federal Circuit held that this teaching away "'is itself evidence that at least a significant amount of experimentation would be necessary to practice the claimed invention.'"  *Liebel*, 481 F. 3d at 1379 (quoting *AK Steel*, 344 F.3d at 1244).

Based upon *Liebel*, the Federal Circuit affirmed summary judgments of invalidity for lack of enablement in *Automotive Technologies International, Inc. v. BMW of North America, Inc.*, 501 F.3d 1274 (Fed. Cir. 2007) (a patent for automotive side impact crash sensors), and *Sitrick v. Dreamworks, LLC*, 516 F.3d 993 (Fed. Cir. 2008) (patent relating to integration of an audio signal and video image into a video game).  In both *Automotive Technologies* and *Sitrick*, the Federal Circuit held the patents invalid for lack of enablement because they broadly claimed a larger scope than the enablement shown in the written descriptions.  In other words, the law is clear that if a claim covers a range of embodiments, the disclosure must contain sufficient written

description to enable the full scope of the range.  Otherwise, the patent is invalid for lack of enablement and lack of written description.

Another critical aspect of the enablement inquiry is that the inventor must disclose sufficient information in the original application to meet the enablement standard.

The new matter prohibition of §132 is a corollary of §112(a), ensuring the public that the applicant had possession of the invention <u>at the time the application was filed</u>.  *TurboCare Div. of Demag Delaval v. General Electric Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001) (emphasis supplied).  Thus, once a patent is filed, an applicant may not supplement the written description with new matter.  *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998) (An applicant's "original disclosure serves to limit the permissible breadth of his later-drafted claims."); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed Cir. 1991) (The applicant must "convey with reasonably clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention.").  See also *Schriber-Schroth Co. v. Cleveland Trust Co.*, 305 U.S. 47, 56-57 (1938); Donald S. Chisum, Chisum on Patents §11.04.  Courts must decide on a case-by-case basis what constitutes "new matter".  *In re Oda*, 443 F.2d 1200, 1203 (CCPA 1971).  This determination is a question of fact.  *Gentry Gallery*, 134 F.3d at 1479 (citing *Vas-Cath*, 935 F.2d at 1563).

In *Harries v. Air King Products Co.*, 183 F.2d 158 (2 Cir. 1950), Judge Learned Hand similarly recognized that determining what constituted "new matter" could sometimes be troubling:  "No doubt it is at times hard to say whether amendments are a 'departure from or improper addition to the specifications' or have 'merely made explicit what was already implicit'."  *Id.* at 160 (citing *Marconi Wireless Telegraph Co. v. U.S.*, 320 U.S. 1, 34 (1931)).  However, he noted that this inquiry is more easily made when by addition an applicant attempts

to add that which was previously disclaimed.  "A patent must be a certain guide; not a congeries of pregnant suggestions."  *Id.*  Such an addition is always new matter.  See also *MacKay Radio & Telegraph Co. v. Radio Corp. of America*, 306 U.S. 86, 89, 100-101 (1939) ("The disclosure and the claims were broadened not only contrary to their original terminology but to their spirit as well…We think that these alterations were not permissible.").

Judge Learned Hand went on:  "Moreover it is not legitimate to use the figures accompanying an application to eke out an invention when the text does not describe the missing element; drawings 'are of no avail where there is an entire absence of description of the alleged invention' in the specification or claims."  *Harries*, 183 F.2d at 163 (citing *Permutit Co. v. Graver Corp.*, 284 U.S. 52, 60 (1931)).

New material can be added by way of amendment, but the new material must be "inherently contained in the original application."  *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1352 (Fed. Cir. 2000).  In order for the disclosure to be inherent, "the missing descriptive matter must necessarily be present in the [original] application's specification such that one skilled in the art would recognize such a disclosure."  *TurboCare*, 264 F.3d at 1119 (citing *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998)).

Here, the broadly construed claims in Broussard encompass embodiments that are not even hinted at in the written description as originally set forth in the application.  The patents are therefore invalid for lack of enablement.

## A.   No enablement in the application for '340 of an engine mounting plate, nor of a "drive assembly" without an engine.

Broussard '340, Claim 1 claims a "portable drive assembly" with an "engine mounting plate attached externally [and perpendicular] to the upper drive assembly."  There is no mention of an engine in Claims 1, 2, 3, 4 and 5 of '340.[18]

In the application, Broussard '340 did not mention an engine mounting plate at all. Broussard added the words "engine mounting plate" to Claims 1 and 8 by amendment,[19] after the PTO examiner initially rejected the original application as obvious.  The application as originally filed described "a relatively high horsepower air cooled efficient belt drive engine that mounts to the transom of small boats in much the same manner as water cooled outboard engines….The engine mount includes tilt-up capability and pivotal horizontal steering…."  '340 Prosecution History File Wrapper, Application for Patent at 5, GDM000049 (ex. C to motion for summary judgment) (emphasis supplied).  In the detailed description of the preferred embodiment, the statement was made that "The air-cooled engine is vertically mounted with a horizontal shaft…and is structurally supported and enclosed in a cowling…."  *Id.* at 6, GDM000050 (emphasis supplied).  In simple terms, the as-filed application described an invention in which the engine was an integral component of the entire device, much like typical outboard motors that include both the engine and the drive system, all enclosed in a housing.

After filing his application for the '340 patent, Broussard amended Claims 1, 2 and 8 by adding as a limitation to the claims the concept of an engine mounting plate.[20]  In response to the

---

[18]   Dependent Claim 6 of '340 adds an air cooled utility engine having a horizontal output shaft attached to said upper drive assembly.  Independent Claim 8 of '340 includes both the engine and portable drive assembly, with the engine "mounted to said engine-mounting plate."

[19]   See discussion *infra* of "new matter."

[20]   Broussard also amended Claims 1 and 8 to incorporate the limitation that the propeller shaft housing extends "at least 12 inches" beyond the elongated drive housing.

examiner's rejection of the claims on the basis of obviousness, Broussard represented that "Claim 1 has been Currently Amended to claim only a drive assembly having means for temporary attachment to a boat transom, the drive assembly further comprising <u>an engine mounting plate but no engine</u>.  Since both of the cited references of Stojkov and Hasel are out drives that are fixed to a boat transom and do not include engine mounting plate. [Sic] The cited references do not teach or otherwise suggest the invention as Currently Amended."   *Id*., Amendment at 6, GDM000164 (emphasis supplied).  In response to the examiner's rejection of Claim 3, Broussard further elaborated on the concept of a "drive system" without-an-engine: "Where is (sic) may be obvious to some skilled within the art to provide speed and steering controls to an engine is (sic) quite unobvious to provide such controls for a drive assembly without an engine according to Clam 3 which is dependent on Claim 1.  Providing such steering and speed controls for a temporary drive with no engine is even more unobvious.  Not knowing what engine will be used or what kind of watercraft the drive assembly will be use (sic) on is far from obvious."  *Id*. at 10-11, GDM000165-000166 (emphasis supplied).

Nothing in the written description in the filed application enables such an invention. There is no mention in the original application of an engine mounting plate that is perpendicular to the drive housing and attached to it.  Instead, the specification states the engine is "vertically mounted and structurally supported, within a cowling."

The drawings support a reading of the specification that the engine is mounted "vertically," i.e., mounted using its side, rather than mounted on its bottom to a horizontal plate, which in turn would be structurally supported somehow.  They show an engine within a cowling having nothing on its bottom side supporting it.[21]

---

[21] Engine mounting plates require an underlying structure to support the plate and the engine mounted on the plate.



According to the drawings, the engine is an integral part of the vertical drive housing and cannot easily be unmounted or removed, and in particular neither the specification nor the drawings show any plate or other structure on which to mount the bottom of the engine.

Moreover, the "Summary of the Invention" makes no mention of "a drive system without an engine."  Rather, the Broussard invention is described to be "a relatively high horsepower air cooled, efficient belt drive <u>engine</u> that mounts to the transom…."  *Id*., Specification at 6, GDM000049 (emphasis supplied).  In the General Background Section, Broussard describes the need being met as "a need to provide a relatively high horsepower air cooled, <u>efficient belt drive engine</u> that mounts to small, flat bottomed boats in much the same manner as water cooled outboard engines with a foot that does not extend below the bottom of the boat…."  *Id*. at 4, GDM000048 (emphasis supplied).  In the Detailed Description of the Preferred Embodiment, it is "<u>the belt drive, air cooled outboard engine assembly</u>" that is mounted to the boat, not a "drive

42

assembly" with an engine mounting plate but no engine. *Id*. at 6, GDM000050 (emphasis supplied). The application stated: "[T]he engine assembly is steerable and throttle operated in much the same manner as a water-cooled outboard engine." Further, "the engine assembly is pivotal…in the typical outboard mounting arrangement." *Id*. at 6, GDM000050 (emphasis supplied) (emphasis supplied). The original Claim 1 in the Application makes no mention of an engine mounting plate nor of the concept that the invention is a fully functional drive system without an engine. To the contrary, the original claim, before it was amended, implies that an engine is an integral component of the invention by claiming "a transom mounted, air cooled drive system…." *Id*. at 9, GDM000053 (emphasis supplied). Similarly, the original Claim 3, encompassing throttle and steering controls, also referenced an "air cooled drive system." *Id*. (emphasis added). Clearly, the engine is the component that is air cooled by definition. Hence, the claim language suggests that the engine must be an integral component of the invention. Nowhere does Broussard describe any unique steering and throttle controls that are components of a drive system without an engine.

Moreover, Broussard's engine's horizontal output shaft must be in contact with the timing belt. Hence, the point of connection between the motor and belt requires some structure to hold the belt in place when the motor is removed or before the motor is mounted, if the motor is to be easily removable from a separate drive system. Again, no such structure is described or enabled.

Without substantial experimentation, one skilled in the art would not be able to make or use the critical aspects of the invention: an engine mounting plate that somehow is unsupported by any structure (neither the plate nor a supporting structure is shown or described), and a drive system with steering and throttle controls but without an engine. In sum, there is no written

43

description and enablement of the embodiment described in the amended claims:  a portable drive housing with a removable engine mounted [on the engine's bottom side] to an engine mounting plate attached horizontally to the drive housing, nor of a drive system without an engine containing throttle and steering controls.  This lack of enablement relates to the very aspect of the invention that Broussard represented to the PTO was novel.

In *Automotive Technologies*, the Federal Circuit held that "the novel aspect of the invention must be enabled in the patent."  501 F.3d at 1283.  The Court stated that it would be insufficient to "merely state that known technologies can be used to create [the novel aspect of the invention]."  *Id.*  Here, Broussard argued to the patent examiner that a novel feature of the invention was a portable drive system having steering and throttle controls, mountable on a transom, without an engine, but with an engine mounting plate on which a variety of engines could be mounted.  Such a device was not enabled in the application for the '340 patent.  It therefore is invalid under §112(a).[22]

**B.     No enablement in '340 and '035 of a propeller shaft having segments coupled together with a U-joint, such that one part of the shaft operates at an angle.**

Both the '340 and the '035 patents are also invalid for lack of enablement of a segmented propeller shaft containing one or more U-joints to permit the lower shaft segment to enter the water at an angle.  As construed by this Court, the Broussard patents are not limited to standard, surface drive, straight propeller shaft systems wherein a straight, horizontal propeller shaft operates near the surface of the water.  Rather, Broussard's broadly-construed claims encompass

---

[22]   Compare the complete lack of enablement in the '340 patent of a "portable drive assembly" without an engine but only an engine mounting plate, with the written description in the later-filed '035 patent.  The '035 patent makes clear that the subject drive system "must be adoptable to multiple engine configurations" and describes throughout a "portable drive assembly," "consisting principally of any number of commercially available air cooled or self-contained water cooled utility engine assemblies 'adoptively mounted to the frame assembly at engine mounting plate.'"  Importantly, although the '035 patent contains a description of an engine mounting plate, nothing in the written description of '035 describes a functional, portable drive assembly without an engine.

other types of propeller shafts, including those that are at an angle relative to the surface of the water and to the segment driven by the belt and pulley.  A U-joint between the segment entering the water and the segment driven by the timing belt permits the second segment of the shaft to operate at an angle.  Not only is there no enablement of the embodiment with the propeller shaft "angled-into-the water" using a U-joint, but the Broussard patents teach away from such a design.

The '340 patent states that "elongated drive shaft[s] extending at a shallow angle from above a boat's transom to just below the water surface…[through] [t]he use of a removable over the transom mounted air-cooled engine with extended drive shaft is awkward and often limited to a relatively low horsepower engines."  '340 Patent [col. 2, lns. 7-10] (ex. E to motion for summary judgment).  The written description further states that the drive housing extends "to a point approximately flush with the keel or bottom of the boat."  *Id.* [col. 3, lns. 15-18].  Nothing in the '340 specification describes a shorter drive housing that does not extend all the way to near the bottom of the boat, but in which the propeller shaft enters the water at an angle like the long tail design shown in Foreman by virtue of a U-joint coupling the two shaft segments together.

Similarly, the '035 patent discloses a drive housing that extends down to almost level with the bottom of the boat.  The '035 patent explains that the long tail design is "awkward and often limited to a relatively low horsepower engines (sic)."  '035 Patent [col. 2, lns. 20-24] (ex. F to motion for summary judgment).  There was obviously a need for a drive housing with a "foot that does not extend below the bottom of the boat but extends a sufficient distance behind the boat to insure proper angle of attack when the propeller is in contact with mud and vegetation."  *Id.* [col. 2, lns. 29-31].  Nothing in '035 alludes to splitting the propeller shaft into more than one

45

segment, using U-joints to permit the segment with the propeller attached to enter the water at an angle.  Rather, both '340 and '035 teach away from the traditional practice in mud boat design to have the propeller shaft extend rearward at an angle relative to the water.

### C.     Conclusion as to lack of enablement.

The '340 patent is invalid under §112(a) for lack of any enabling description of mounting the motor to a horizontal engine mounting plate and a corresponding functional drive system without an engine.  Both the '340 and the'035 patents are also invalid for lack of any enabling description of the embodiment, encompassed within the broadly construed claims, of a segmented propeller shaft, with the segments coupled by one or more U-joints, such that the segment with the propeller attached operates at an angle relative to the water's surface.  The written descriptions completely fail to teach one skilled in the art how to practice these embodiments with significant experimentation.

## IV.   THE '340 AND '035 PATENTS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION.

### A.     The '340 patent is directed to new matter added by amendment to the original patent application.

It is well settled that a patentee may only claim that which he has described in a patent's written description, and "if he claims more his patent is void."  *Carnegie Mellon University v. Hoffman-La Roche, Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) (citing *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 121 (1853)).  The written description must, *inter alia*, describe the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art" to make and use the invention.  35 U.S.C. §112.  The purpose of the written description requirement is to show that one is in possession of the invention.  *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563-4 (Fed. Cir. 1991).  "The invention is whatever is now claimed."  *Id.* (emphasis in original).

"While broadening claims during prosecution to capture a competitor's products is not improper, the written description must support the broadened claims." *Synthes USA, LLC v. Spinal Kinetics, Inc.*, 2013 WL 5788675 (Fed. Cir. Oct. 29, 2013).   The court in *Synthes*, the most recent written description case out of the Federal Circuit, described the test as follows:

> Section 112, paragraph one of Title 35 requires a patentee to provide a written description that allows a person of skill in the art to recognize that the patentee invented what is claimed.   *See Ariad Pharms., Inc. v. Eli Lilly & Co.,* 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (citing *Vas-Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1562-63 (Fed. Cir. 1991)).   "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor ha[d] possession of the claimed subject matter as of the filing date."   *Id.*   Determination of whether a patent satisfies the written description requirement is a question of fact.   *Id.* (citing *Capon v. Eshhar,* 418 F.3d 1349, 1357-58 (Fed.Cir.2005)).   The "level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology."

*Id.* at p. 4.   See also the discussion above regarding the new matter prohibition of §132.

As discussed above in the enablement section, there was nothing inherent in the '340 application as filed directed to an invention of a "portable drive assembly" with an engine mounting plate but no engine.   Rather, the specification described the method of mounting the engine:   "The air-cooled engine is vertically mounted…."   There was no mention whatsoever of an engine mounting plate.   Rather, that phrase appeared for the first time in the amendment to the claims.   Claims 1 and 8 of the '340 patent are therefore invalid for lack of written description.

Other new matter added by amendment to the '340 application was the concept, found in Claims 1 and 8, that the propeller shaft housing need extend only "at least 12 inches" beyond the drive housing.   '340 Prosecution History File Wrapper, Amendment at 4, 6, GDM000159, 000161 (ex. C to motion for summary judgment).   This feature was not only new matter not described in the Application, but the specification expressly taught away from the use of so short of a propeller shaft housing.   The Detailed Description of the Preferred Embodiment states that

47

because of the water trough behind the transom of a speeding boat, "its (sic) is necessary to extend the length of the propeller shaft and its housing assembly <u>a significant distance in excess of 18 inches from the belt drive housing</u>…." '340 Patent [col. 3, lns. 42-45] (ex. E to motion for summary judgment) (emphasis supplied).  Nowhere, except in the amendment to the claims, is there any mention of a shaft housing as short as "at least 12 inches."

**B.    The '340 and '035 patents lack written description of a device containing segmented propeller shafts connected by U-joints.**

Both patents at issue in this case are also invalid for lack of written description regarding a segmented propeller shaft containing one or more U-joints to permit the lower shaft segment to enter the water at an angle relative to the upper segment that connects to the lower driven assembly.  This is yet another consequence of the broadly-construed claims sought by Broussard.  There is simply nothing in the description of the inventions in the '340 and 035 patents that "with reasonable clarity" conveys to a person skilled in the art that on the filing date of each patent Broussard was in possession of an invention containing segmented propeller shafts and a U-joint. *Vas-Cath Inc.*, 935 F.2d at 1563-64.  There is nothing in the written description in either patent that so much as hints at such an invention.  To the contrary, both '340 and '035 teach away from such a configuration.  See discussion *supra*.

Moreover, it is known to person skilled in the art that jointed or segmented propeller shafts connected by U-joints create design problems that the designer must solve.  For example, they can cause excessive torsional vibration that leads to accelerated wear and tear on mechanical drive elements and to operator discomfort and fatigue.  Kliebert Declaration (ex. B to motion for summary judgment).  As the declaration of Ray Kliebert, Jr., attests, a propeller shaft coupled at an angle to another shaft via a single U-joint is especially susceptible to torsional vibration that must be controlled.  Go-Devil engaged in extensive experimentation before it

solved the torsional vibration problem with Go-Devil's initial design of a segmented propeller shaft with a U-joint.  In fact, Go-Devil <u>could not</u> solve the torsional vibration problem using only a single U-joint; instead, a double U-joint with an H-yoke in the middle (also known as a double cardan joint) was eventually needed.  *Id.*

As Dr. Garris shows, vibration caused by marine propellers can be a serious problem and often is difficult to solve.  Garris Supp. Expert Report at 13 (ex. B to Garris Declaration).  The Broussard patents are notably silent in how the invention is designed to handle the increased vibration that results from an angled propeller shaft using U-joints.  They are therefore invalid for lack of written description.

### C.    Conclusion as to written description.

Claims 1, 3, and 8 of '340 are invalid for lack of written description because they contain new matter that not only was not inherent in the original application, but was contradicted by it. The description in the application is inadequate to show to one skilled in the art that Broussard was in possession of the invention claimed in Claims 1, 3 and 8 of the '340 patent, at the time he filed his application.

Further, both Broussard patents, '340 and '035, are invalid for lack of any written description of a drive system having a segmented propeller shaft and one or more U-joints. Nothing in either patent describe such a device in a way that would indicate to person skilled in the art that Broussard was in possession of such an invention.

## V.    THE '340 PATENT IS INVALID AS INDEFINITE.

"Claim terms must provide a discernible boundary between what is claimed and what is not claimed…."  *Wellman, Inc. v. Eastman Chemical Co.*, 642 F.3d 1355, 1367 (Fed. Cir. 2011). "A claim is indefinite only when it is not amenable to construction or insolubly ambiguous." *Biosig Instruments, Inc., v. Nautilus, Inc.*, 715 F.3d 891, 898 (Fed. Cir. 2013).  "To prove

indefiniteness, 'an accused infringer must demonstrate by clear and convincing evidence that one skilled in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art.'" *Teva Pharmaceuticals, U.S.A., Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1368 (Fed. Cir. 2013) (quoting *Wellman*, 642 F.3d. at 1366).  Here, all  independent claims of Broussard '340 and '035 are invalid for indefiniteness because they are insolubly ambiguous and are boundless with respect to the essential elements of the patents:  the "enclosed drive housing" and the manner in which it attaches to the engine mounting plate, on the one hand, and the propeller shaft housing, on the other.  The claims, as construed by the Court, provide no discernible boundaries for these key features of the invention.

Claims 1 and 8 of the '340 patent and Claim 1 of the "035 patent state that the portable drive assembly comprises "an elongated drive housing" to which an engine mounting plate is attached "externally to said drive housing" and "a [propeller] shaft [is] attached to said drive housing."  In Claim 1 of '340 and Claim 1 '035, the only limitation of the shape or type of "drive housing" that encloses the belt and pulley system is that the housing must be "elongated," which means that it is "greater in measurement in one axis than in the other two axes."  Ruling on Construction of Disputed Claim Terms at 13-16.

As can be seen in the discussion above regarding the state of the art of marine motors, this loose and vague definition encompasses a limitless number of types of drive housings.  Drive housings covered by this limitation include housings that run the gamut from ones that provide structural support for the engine and drive assembly to those, such as the wire mesh housing found in the Scavenger, that merely act as a safety guard, to any conceivable housing in

between, such as plastic housings found in many outboard motors.  The housing need not take any particular shape or form (rectangular, oval, and cylindrical housings all fit the definition).

The description of what and how things are "attached" to the drive housing render the claims hopelessly ambiguous.  The Court explained that Broussard's use of the word "attached" is not limited by the "manner of attachment and does not exclude the presence of additional attaching structures." *Id.* at 20.  In other words, the engine mounting plate and the propeller shaft housing need not be directly attached somehow to the drive housing.  So long as the attachment "maintains a fixed relationship" between the things that are "attached."  Again, as is shown above, in the discussion of prior art, this definition is so broad and limitless that it encompasses a boundless variety of drive assembly configurations. Included in the Broussard's claim is the Scavenger configuration, in which the engine mounting plate is mounted on the propeller shaft housing and the enclosed drive housing is attached to the side of the mounting plate by means of small bolts and nuts.  Broussard's claim in this regard also encompasses housing designs such as the one shown in the preferred embodiment of the '035 patent, wherein the drive housing acts as a structural member of the drive assembly.

In sum, those claims are so broad and all-encompassing so as to be insolubly ambiguous and boundless.  They are therefore invalid for indefiniteness.

## CONCLUSION

The '340 and '035 Patents are invalid.  There are no genuine issues of material fact, and Go-Devil is entitled to judgment as a matter of law.

Respectfully submitted,

**TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.**

BY: <u>s/ Fredrick R. Tulley</u>
        **Fredrick R. Tulley, #07534**
        **John P. Murrill, #023878**
        **Robin Price Toups, #030763**
        **451 Florida Street, 8th Floor**
        **P. O. Box 2471**
        **Baton Rouge, LA 70801/70821**
        **Telephone:  (225) 387-3221**
        **Fax:  (225) 346-8049**

**ATTORNEYS FOR GO-DEVIL MANUFACTURING CO. OF LA., INC, d/b/a GO-DEVIL MANUFACTURERS OF LOUISIANA, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of November, 2013, a true and correct copy of the foregoing was electronically filed with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Joel W. Mohrman
Anderson L. Cao
McGlinchey Stafford PLLC
1001 McKinney, Suite 1500
Houston, TX 77002-6420
jmohrman@mcglinchey.com
<u>acao@mcglinchey.com</u>

Jed H. Hansen
Thorpe, North & Western
P. O. Box 1219
Sandy, UT 84091-1219
hansen@tnw.com

        <u>s/ John P. Murrill</u>
        **John P. Murrill**

645925.4