# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

KYLE BROUSSARD, ET AL.                                    CIVIL ACTION

VERSUS

GO-DEVIL MANUFACTURING CO.                    NO.: 3:08-cv-00124-BAJ-RLB
OF LA., INC. D/B/A GO-DEVIL                              LEAD CASE
MANUFACTURERS OF LOUISIANA,
INC.

                                                   C/W 3:08-cv-00125-BAJ-RLB

## RULING AND ORDER

## I.    INTRODUCTION

In this consolidated patent infringement action,[1] Plaintiff Gator Tail, LLC

alleges that certain boat motors produced by Defendants Go-Devil Manufacturing

Co. of La., Inc. and Mud Buddy, LLC infringe the asserted claims of the patents-in-

suit. (08-cv-00124 Doc. 20; 08-cv-00125 Doc. 1)). On January 27 through January

31, 2014 the court held a three-day bench trial limited to the issue of patent

validity. (*See* 08-cv-00124 Doc. 95 at p. 2; *see also* Docs. 121, 123). Presently before

the Court are the parties' post-trial proposed findings of fact and conclusions of law

concerning the validity of the patents-in-suit. (08-cv-00124 Doc. 124, 125, 130, 131;

08-cv-00125 Docs. 139, 140, 144, 145)).

---

[1] The Court consolidated civil actions 3:08-cv-00124-BAJ-RLB *Kyle Broussard, et al. v. Go-Devil Manufacturing Co. of La., Inc. d/b/a Go-Devil Manufacturers of Louisiana, Inc.* and 3:08-cv-00125-BAJ-RLB *Gator Tail, et al. v. Mud Buddy, LLC d/b/a Mud Buddy Manufacturing* for the *Markman* hearing and for bench trial on the issue of patent validity, pursuant to Rule 42(a)(1). (*See* 08-cv-00124 Doc. 82, 90).

Pursuant to Federal Rule of Civil Procedure ("Rule") 52(a), and after having considered the entire record in this case and the applicable law, the Court concludes: (1) all asserted claims of the patents-in-suit are invalid due to obviousness; (2) United States Patent Number 7,052,340 is invalid due to lack of written description; and (3) Claims 1, 8, and 14 of United States Patent Number 7,052,340, and Claim 1 of United States Patent Number 7,297,035 are each invalid due to lack of definiteness. These findings of fact and conclusions of law are set forth in further detail below.

## II.    FINDINGS OF FACT[2]

### A. The parties

1.    Plaintiff and Counter Defendant Kyle Broussard ("Mr. Broussard") is a Louisiana resident residing at 2402 Terre Ruelle, New Iberia, Louisiana 70563. (08-cv-00125 Doc. 1 at ¶ 4).

2.    Plaintiff and Counter Defendant Gator Tail, LLC ("Gator Tail") is a Louisiana limited liability company with its principal place of business at 306 Broussard Road, Loreauville, Louisiana 70552. (08-cv-00124 Doc. 96-1 at ¶ 1).

3.    Mr. Broussard founded Gator Tail while completing his degree in mechanical engineering at the University of Louisiana. (*Id.* at ¶ 15).

4.    Gator Tail designs, builds, and sells outboard boat motors usable in shallow water, and is the owner of certain patents related to such motors. (*Id.* at ¶ 2, 7, 14).

---

[2]  Prior to trial, the parties submitted an exhibit of undisputed facts in conjunction with their Pretrial Order. (08-cv-00124 Doc. 96-1). Where appropriate, the Court takes its findings of fact from these undisputed facts.

5.     Where appropriate, Mr. Broussard and Gator Tail will be collectively referred to as "Plaintiffs."

6.     Defendant and Counter Claimant Go-Devil Manufacturing Co. of Louisiana, LLC ("Go-Devil") is the successor to Go-Devil Manufacturing Co. of Louisiana, Inc., and is a Louisiana limited liability company with its principal place of business at 18649 Womack Road, Baton Rouge, Louisiana 70817. (*Id.* at ¶¶ 9–10).

7.     Go-Devil manufactures and sells outboard boat motors usable in shallow waters, as well as blinds, custom boats, and boating accessories. (*Id.* at ¶ 13).

8.     At all times material hereto, Go-Devil has done, and continues to do business in the Middle District of Louisiana. (*Id.* at ¶ 14).

9.     Defendant and Counter Claimant Mud Buddy, LLC d/b/a Mud Buddy Manufacturing ("Mud Buddy") is a Utah corporation with its principal place of business at 7956 South, 1530 West, West Jordan, Utah 84088. (*Id.* at ¶ 8).

10.    Mud Buddy manufactures and sells outboard boat motors usable in shallow waters, as well as blinds, custom boats, and boating accessories. (*Id.* at ¶ 11).

11.    At all times material hereto, Mud Buddy has done, and continues to do business in the Middle District of Louisiana. (*Id.* at ¶ 12).

12.    Where appropriate, Go-Devil and Mud Buddy will be collectively referred to as "Defendants."

13.    The Court has subject matter jurisdiction, as well as personal jurisdiction over all parties.

3

## B. Background

14. Plaintiff Gator Tail and Defendants Go-Devil and Mud Buddy are each manufacturers of "mud motors," (*see* Trial Transcript, Vol. I, Jan. 27, 2014 (hereinafter "Transcript Vol. I") at p. 99)—*i.e.*, "outboard air-cooled motors, apparatuses, and assemblies for use on boats in shallow water and muddy environments," (Doc. 82 at p 3; *see also* Doc. 96-1 at ¶¶ 11, 13, 15). Such motors are used primarily for hunting and fishing.[3]

15. Prior to the early 2000s, the mud motor market was dominated by "long-tail" mud motors, (*see* Trial Transcript, Vol. III, Jan. 31, 2014 (hereinafter "Transcript Vol. III") at p. 130), so-named because the drive shaft connecting the motor's engine to its propeller was upwards of six feet long, causing the propeller to extend a considerable distance behind the transom of the boat on which the motor is mounted. (*See* Transcript Vol. I at pp. 121–22).

16. Long-tail mud motors continue to be manufactured and sold. (Transcript Vol. III at p. 145).

---

[3] At trial, Defendant Mud Buddy's expert witness, Don Kueny, described the concept behind a mud motor in the following terms:

> The concept of [a mud motor is to put] the propellor well behind the boat where the water wells up in kind of a mound. So you can keep the propellor very close to the surface and not run into things deep in the water. It allows you to use in shallow water. It's that part of the idea that the water mounds up behind the boat. And if you can put the propellor back behind the boat, it can run much—much higher in the water and still have solid water. And it avoids having the propellor deep, so you can run in shallow water. Particularly in the Far East it was developed more for debris in the water as much as for shallow water. But the whole idea is to put the propellor in that moun[d] of water so it can run shallow.

(Transcript II at pp. 92–93 (Mr. Kueny)).

17. However, in the last decade, consumers have increasingly switched to "surface-drive" (or "short-tail") mud motors, which achieve certain advantages over the traditional long-tail motor, such as greater horsepower, speed, and maneuverability. (*See* Transcript Vol. III at pp. 144–46).

18. Plaintiffs are the owners of certain patents related to surface-drive/short-tail mud motors. (*See* Gator Tail Ex. 1; Gator Tail Ex. 2).

## C. The patents-in-suit[4]

### 1. *United States Patent Number 7,052,340*

19. United States Patent Number 7,052,340 ("the '340 Patent"), entitled "Method and Apparatus for Air Cooled Outboad [sic] Motor for Small Marine Craft," naming Kyle Broussard as inventor, was issued on May 30, 2006, based on an application filed on September 15, 2003. (Gator Tail Ex. 1 at 0652).

20. The '340 Patent arises out of a provisional application filed September 17, 2002. (*Id.*).

### 2. *United States Patent Number 7,297,035*

21. United States Patent Number 7,297,035 ("the '035 Patent"), entitled "Marine Craft Adapted for Shallow Water Operation," naming Kyle Broussard as inventor,

---

4 Initially, Plaintiffs sued Defendants for infringement of *three* Patents. (*See* 08-cv-00124 Doc. 20 at ¶¶ 10–12; 08-cv-00125 Doc. 1 at ¶ 11). However, Plaintiffs have since abandoned their cause of action as to U.S. Patent Number 7,048,600 ("the '600 Patent"), entitled "Method and Apparatus for Air Cooled Outboard Motor for Small Marine Craft," and naming Kyle Broussard as inventor, (08-cv-00124 Doc. 20-1 at p. 1). (*See* 08-cv-00124 Doc. 54 at p. 1 ("The defendant willfully infringes on certain claims in Gator Tail's U.S. Patents Nos. 7,052,340 and 7,297,035." (footnotes omitted)); 08-cv-00125 Doc. 45 at p. 1 (same)). Accordingly, the Court does not address the '600 Patent.

was issued on November 20, 2007, based on an application filed on May 22, 2006. (Gator Tail Ex. 2 at p. 01838).

22. The '035 Patent is a continuation-in-part of the '340 Patent. (*Id.*).

23. Plaintiff Gator Tail is the assignee of the '340 and '035 Patents. (Doc. 96-1 at ¶ 2).[5]

24. The '340 and '035 Patents each describe substantially the same invention, specifically:

> A relatively high horsepower air-cooled engine in one embodiment of this invention is adapted to an efficient belt drive assembly capable of being transom mounted to small flat bottom boats in much the same manner as conventional outboard engines. The drive is equipped with a lower drive shaft that does not extend below the bottom of the boat but extends a sufficient distance behind the boat to insure contact with the water for conventional propulsion. A unique pivotal arrangement allows the engine and drive assembly to be positioned for proper angle of attack when the propeller is in contact with mud and vegetation below the bottom of the boat. This arrangement allows for a much shorter turning radius than can be achieved by the related prior art transom mounted mud motor systems. The engine mount includes incremental tilt positioning capability and a pivotal horizontal steering handle. The propeller is capable of providing propulsion when in contact with solids such as mud and vegetation, and provides relatively fast hull speed in deep water. A clutch is provided to disengage the engine from the drive and an electric drive motor is provided in contact with the belt drive for turning the drive in a reverse direction.

(Gator Tail Ex. 2 at p. 01852 ('035 Patent, "Summary of Invention"); *see also* Gator Tail Ex. 1 at p. 0657 ('340 Patent, "Summary of Invention")).

---

[5] Although the '035 Patent lists Gator Tail as the assignee, the '340 Patent does not indicate an assignee. (*Compare* Gator Tail Ex. 2 at p. 01838 (the '035 Patent, listing Gator Tail as the assignee), *with* Gator Tail Ex. 1 at p. 0652 (the '340 Patent, failing to list an assignee)). However, based on the parties' stipulation, the Court accepts as true that Gator Tail is, indeed, the assignee of the '340 Patent. (*See* Doc. 96-1 at ¶ 2).

25.    Selected renderings of the '340 Patent. (Gator Tail Ex. 1 at p. 0654)



26.    Rendering of the '035 Patent. (Gator Tail Ex. 2 at p. 01840).



### D. The asserted claims

27.    Plaintiffs assert that Defendants' products "infringe[] claims 1, 3–9, and 11–
13 of the '340 patent." (08-cv-00124 Doc. 54 at p. 1 n.1; 08-cv-00125 Doc. 45 at p.1
n.1 (same)).

28.    Further, Plaintiffs assert that Defendants' products "infringe[] claims 1, 3–7,
and 9–13 of the '035 patent." (08-cv-00124 Doc. 54 at p. 1 n.2; 08-cv-00125 Doc. 45
at p.1 n.2 (same)).

### 1.    The asserted claims of the '340 Patent

#### i.    Claim 1

29.    Claim 1 of the '340 Patent reads:

> A portable drive assembly having means for temporary attachment to
> the transom of a shallow draft watercraft said portable drive assembly
> comprising an elongated drive housing enclosing an upper drive
> assembly a lower driven assembly and a timing belt connecting said
> upper drive assembly to said lower driven assembly, an engine
> mounting plate attached externally to said drive housing located
> adjacent said upper drive assembly perpendicular to said drive housing
> said lower driven assembly further comprising a propeller shaft
> partially enclosed within a shaft housing attached to said drive
> housing adjacent said driven assembly extending at least 12 inches
> beyond said drive housing and a propeller attached to said propeller
> shaft.

(Gator Tail Ex. 1 at p. 0658).

#### ii.    Claim 3

30.    Claim 3 of the '340 Patent reads: "The portable drive assembly according to
claim 1 wherein said drive system further comprises steering and throttle controls."
(*Id.*).

8

### iii. Claim 4

31. Claim 4 of the '340 Patent reads:

> The portable drive assembly according to claim 1 wherein said propeller shaft assembly further comprises a shaft housing having a vertical triangular fin located below said shaft housing, a shaft supported adjacent each end by thrust bearings in a manner whereby said shaft extends beyond each of said thrust bearings and a plurality of internal seals located along said shaft outboard of said thrust bearings.

(*Id.*).

### iv. Claim 5

32. Claim 5 of the '340 Patent reads: "The portable drive assembly according to claim 1 wherein said upper drive assembly and said lower driven assembly further include timing pulleys compatible with said timing belt said belt being rotationally unobstructed or acted upon by other bodies." (*Id.*).

### v. Claim 6

33. Claim 6 of the '340 Patent reads: "The portable drive assembly according to claim 1 further comprising a self contained air cooled utility engine having a horizontal output shaft attached to said engine mounting plate said output shaft coupled to said upper drive assembly." (*Id.*).

### vi. Claim 7

34. Claim 7 of the '340 Patent reads: "The portable drive assembly according to claim 6 wherein said drive housing is water sealed." (*Id.*).

### vii. Claim 8

35. Claim 8 of the '340 Patent reads:

A portable outboard engine and drive assembly having means for temporary attachment to the transom of a shallow draft watercraft comprising:

   a) a sealed housing containing a timing belt drive assembly comprising an upper drive pulley assembly and a lower driven pulley assembly;

   b) an engine mounting plate attached externally to said sealed housing located adjacent said upper drive pulley assembly perpendicular to said sealed housing;

   c) a propeller shaft partially enclosed within a shaft housing attached to said sealed housing extending from said driven pulley assembly at least 12 inches beyond said sealed housing;

   d) a propeller attached to said propeller shaft;

   e) a pivotal means for temporarily attaching said sealed drive housing to a boat transom; and

   f) an air cooled engine mounted to said engine-mounting plate and coupled externally to said upper drive pulley assembly.

(*Id.*).

viii.   Claim 9

36.   Claim 9 of the '340 Patent reads: "The portable drive assembly according to claim **8** wherein said pivotal means comprises both horizontal and vertical pivoting means." (*Id.*).

ix.   Claim 11

37.   Claim 11 of the '340 Patent reads: "The portable drive assembly according to claim **8** wherein said propeller shaft assembly further comprises a plurality of thrust bearings and seals at each end of said shaft housing." (*Id.*).

x.   Claim 12

38.   Claim 12 of the '340 Patent reads: "The portable drive assembly according to claim **11** wherein said propeller shaft assembly further comprises a rudder fin extending below said shaft housing." (*Id.*).

xi.  Claim 13

39.  Claim 13 of the '340 Patent reads: "The portable drive assembly according to claim **8** wherein said propeller shaft assembly is in excess of 18 inches in length." (*Id.* at p. 0659).

## 2. *The asserted claims of the '035 Patent*

i.  Claim 1

40.  Claim 1 of the '035 Patent reads:

A marine craft comprising a hull comprising a transom; and a portable drive assembly temporarily attached to the transom, the portable drive assembly comprising an elongated drive housing enclosing an upper drive assembly and a lower driven assembly and a timing belt connecting the upper drive assembly to the lower driven assembly; and an engine mounting plate attached externally to the drive housing adjacent the upper drive assembly perpendicular to the drive housing; wherein the lower driven assembly comprises a propeller shaft at least a portion of which is enclosed within a shaft housing attached to the drive housing adjacent the driven assembly, the shaft housing extending in excess of 18 inches beyond the drive housing, and a propeller attached to the propeller shaft.

(Gator Tail Ex. 2 at p. 01854).

ii.  Claim 3

41.  Claim 3 of the '035 Patent reads: "The marine craft according to claim **1**, wherein the portable drive assembly further comprises steering and throttle controls." (*Id.*).

iii.  Claim 4

42.  Claim 4 of the '035 Patent reads: "The marine craft according to claim **1**, wherein the shaft housing comprises a rudder fin." (*Id.*).

iv.    Claim 5

43.    Claim 5 of the '035 Patent reads: "The marine craft according to claim 1, wherein the upper drive assembly and the lower driven assembly further include respective timing pulleys compatible with the timing belt, the timing belt being unobstructed or acted upon by other bodies." (*Id.*).

v.    Claim 6

44.    Claim 6 of the '035 Patent reads: "The marine craft according to claim 1, further comprising a mounting bracket assembly for temporarily attaching the portable drive assembly to the transom, the mounting bracket assembly comprising a mounting bracket and a pivotal assembly for positioning the portable drive assembly in the horizontal plane." (*Id.*).

vi.    Claim 7

45.    Claim 7 of the '035 Patent reads: "The marine craft according to claim 1 further comprising a utility engine mounted on the engine mounting plate and coupled to the upper drive assembly." (*Id.* at p. 01855).

vii.    Claim 9

46.    Claim 9 of the '035 Patent reads: "The marine craft according to claim 7, wherein the portable drive assembly further comprises steering and throttle controls." (*Id.*).

viii.    Claim 10

47.    Claim 10 of the '035 Patent reads: "The marine craft according to claim **7**, wherein the shaft housing comprises a rudder fin." (*Id.*).

ix.    Claim 11

48.    Claim 11 of the '035 Patent reads: "The marine craft according to claim **7**, wherein the upper drive assembly and the lower driven assembly further include respective timing pulleys compatible with the timing belt, the timing belt being unobstructed or acted upon by other bodies." (*Id.*).

x.    Claim 12

49.    Claim 12 of the '035 Patent reads: "The marine craft according to claim **7**, further comprising a mounting bracket assembly for temporarily attaching the portable drive assembly to the transom, the mounting bracket assembly comprising a mounting bracket and a pivotal assembly for positioning the portable drive assembly in the horizontal plane." (*Id.*).

xi.    Claim 13

50.    Claim 13 of the '035 Patent reads: "The marine craft according to claim **12**, further comprising a first pivoting assembly for positively positioning the elongated drive housing beyond vertical relative to the mounting bracket in the vertical plane." (*Id.*).

## B. The accused products

51. Plaintiffs' Amended Complaint against Go-Devil alleges that Go-Devil's "Surface Drive models"—*i.e.* "air-cooled outboard motors[,] alone and in combination with boat hulls"—"infringe . . . at least claim 1" of the '340 and '035 Patents. (Doc. 20 at ¶¶ 7, 11–14). Such Go-Devil motors include the following models: (a) "18hp Vanguard SD"; (b) "23hp Delta Waterfowl Vanguard SD"; (c) "35hp Vanguard SD"; (d) "23hp Vanguard SD"; (e) "25hp Kohler SD"; and (f) "27hp Kohler SD." (*Id.* at ¶ 7).

52. Plaintiffs' Complaint against Mud Buddy alleges that Mud Buddy's "Hyperdrive and HD series engines"—*i.e.* "outboard air-cooled motors, apparatuses, and assemblies"—"infringe at least one claim in at least one of the patents." (*Id.* at ¶ 12).

## C. Procedural history

53. On February 28, 2008, Plaintiffs filed their Complaint for patent infringement against against Go-Devil in this District, in what was labeled 08-cv-00124.

54. In a separately captioned action, also filed in this District on February 28, 2008, Plaintiffs sued for patent infringement against Mud Buddy, 08-cv-00125.

55. On May 2, 2008, Mud Buddy filed counterclaims for declaratory judgment of noninfringement and invalidity of the '340 and '035 Patents. (08-cv-00125 Doc. 9 at ¶¶ 24–32).

14

56.     On July 23, 2008 Plaintiffs filed an Amended Complaint against Go-Devil. (08-cv-00124 Doc. 20).

57.     On August 1, 2008, Go-Devil filed counterclaims for declaratory judgment of noninfringement and invalidity of the '340 and '035 Patents.  (08-cv-00124 Doc. 22 at ¶¶ 38–43, 47–53).

58.     The two actions proceeded independently.  On February 25, 2010 the Mud Buddy action, 08-cv-00125, was transferred to the U.S. District Court for the Eastern District of Louisiana. (08-cv-00125 Doc. 25).

59.     At various times during the pendency of these proceedings, Mud Buddy requested and received *ex parte* reexaminations of the '340 and '035 Patents by the U.S. Patent and Trademark Office ("PTO").  (*See* Doc. 96-1 at ¶¶ 18–20).

60.     Because the PTO reexamination proceedings were *ex parte*, neither Mud Buddy nor Go-Devil were permitted to comment on the evidence or arguments submitted by Gator Tail in support of its claims of patentability.  (08-cv-00124 Doc. 96-1 at ¶¶ 19–20).

61.     Upon reexamination, the PTO initially *rejected* all of the claims in the '340 Patent. (Gator Tail Ex. 16 at p. 01332).

62.     Likewise, upon reexamination, the PTO initially *rejected* all of the claims in the '035 Patent. (Gator Tail Ex. 17 at p. 01722).

63.     Ultimately, however, the PTO confirmed the validity of each Patent.  (08-cv-00124 Doc. 96-1 at ¶¶ 19–20).

15

64.    On April 26, 2011 the Mud Buddy action, 08-cv-00125, was returned to this Court. (08-cv-00125 Doc. 89). In its Order of Transfer, the District Court for the Eastern District of Louisiana noted that the Mud Buddy action "involves subject matter that comprises a material part of the subject matter of *Broussard et al. v. Go-Devin* [sic] *Manufacturing Co. of LA, Inc.*, Civil Action No. 08-0124." (*Id.* at p. 1; *see also* 08-cv-00124 Doc. 69).

65.    On July 5, 2011, this Court consolidated the Go-Devil action, 08-cv-00124, and the Mud Buddy action, 08-cv-00125, for purposes of a claim construction hearing on the '340 and '035 Patents, pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). (*See* 08-cv-00124 Doc. 73; *see also* Doc. 82 at p. 1 n.1).

66.    On October 3, and December 5, 2011, the Court held a claim construction hearing on the '340 and '035 Patents. (08-cv-00124 Doc. 77; *see also* Doc. 82 at p. 1).

67.    Following the claim construction hearing, the Court allowed the parties to submit post-hearing briefs. (08-cv-00124 Doc. 77).

68.    On September 26, 2012, the parties submitted their final briefs on claim construction. (*See* Doc. 81).

69.    On June 25, 2013, this Court issued its Ruling on Construction of Disputed Terms (hereinafter "*Markman* Hearing Ruling"). (08-cv-00124 Doc. 82).

16

70. On October 31, 2013, upon stipulation of the parties, the Court set dates for a consolidated bench trial on the issue of the validity of the '340 and '035 Patents. (08-cv-00124 Doc. 95).

71. On January 27 through January 31, 2014, the court held a three-day bench trial on patent validity. (*See* Transcript Vols. I–III).

72. At the close of evidence, the Court directed the parties to submit post-hearing briefs on the issue of patent validity. (Transcript Vol. III at p. 313).

73. On February 21, 2014, the parties submitted their initial post-trial briefs on the validity of the '340 and '035 Patents. (08-cv-00124 Doc. 124, 125; 08-cv-00125 Doc. 139, 140).

74. On June 13, 2014, the parties submitted supplemental briefs limited to the issue of definiteness in light of the U.S. Supreme Court's decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).

75. For reasons fully explained below, the Court now determines that each of the asserted claims of the '340 and '035 Patents is invalid.

## II. DISCUSSION AND CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 2201. Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b).

"The public interest . . . favors the maintenance of a well-functioning patent system," *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 851

(2014), and, once issued, "[a] patent shall be presumed valid," 35 U.S.C. § 282. *See* *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245 (2011) ("[B]y its express terms, § 282 establishes a presumption of patent validity, and it provides that a challenger must overcome that presumption to prevail on an invalidity defense."). However, "the public also has a paramount interest in seeing that patent monopolies are kept within their legitimate scope." *Medtronic*, 134 S. Ct. at 851 (quotation marks and alterations omitted). For this reason, various statutory provisions exist for challenging the validity of a claimed invention, even after a patent has been issued. *Cf., Microsoft Corp.*, 131 S. Ct. at 2242 ("To receive patent protection a claimed invention must, among other things, fall within one of the express categories of patentable subject matter, § 101, and be novel, § 102, and nonobvious, § 103."). Defendants argue that Gator Tail's patents are invalid under various statutory provisions.

Having considered the entire record in this case, the substantial evidence in the record, the parties' post-trial submissions, and the applicable law, the Court concludes: (1) all asserted claims of the patents-in-suit are invalid due to obviousness; (2) the '340 Patent is invalid due to lack of written description; and (3) Claims 1, 8, and 14 of and '340 Patent, and Claim 1 of the '035 Patent are each invalid due to lack of definiteness. The Court's reasoning follows.

## A. Obviousness

Go-Devil and Mud Buddy each challenge the validity of the asserted claims as obvious in light of the prior art. (*See* 08-cv-00124 Doc. 124 at pp. 7–29; 08-cv-00125 Doc. 1–33). For the reasons that follow, the Court determines that Defendants have established by clear and convincing evidence that each asserted claim of the patents-in-suit is, indeed, obvious.

### 1.    *The legal standard*

Title 35, United States Code, Section 103(a) provides that a patent may *not* be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art." 35 U.S.C. § 103(a). A party seeking to challenge the validity of a patent based on obviousness must demonstrate by "clear and convincing evidence" that the invention described in the patent would have been obvious to a person of ordinary skill in the art at the time the invention was made. *See Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810 (1986) (per curiam). "The 'clear and convincing' standard of proof of facts is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.'" *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988) (citations omitted). "Although not susceptible to precise definition, 'clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of the

factual contentions are highly probable." *Id.* (quotation marks and alterations omitted).

Obviousness is a question of law that is predicated on several factual inquires. *See Richardson–Vicks v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997). Specifically, the trier of fact is directed to assess four considerations: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) secondary considerations of non-obviousness, such as commercial success, long felt but unsolved need, failure of others, acquiescence of others in the industry that the patent is valid, and unexpected results. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). "While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007). "If a court . . . conducts this analysis and concludes the claimed subject matter was obvious, the claim is invalid under § 103." *Id.*

Gator Tail concedes that the '340 and '035 Patents are combination patents— *i.e.*, "patent[s] based on the combination of elements found in the prior art," *KSR Int'l Co.*, 550 U.S. at 415. (*See* 08-cv-00124 Doc. 125 at p. 10 ("Gator Tail does not contend that every individual nut, bolt, and component, taken individually, is unique to Mr. Broussard's invention. Instead, Mr. Broussard's invention combines these elements in a way that was never done before and achieved great success.").

20

For such situations—specifically, "when the question is whether a patent claiming the combination of elements of prior art is obvious"—the Supreme Court has distilled certain "principles" as "instructive." *Id.* at 417.

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. . . . [A] court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.

*Id.* at 417. The Supreme Court has further instructed that when conducting this inquiry,

> [o]ften, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*Id.* at 418. "To facilitate review, this analysis should be made explicit." *Id.*

A few additional guideposts channel the Court's obviousness inquiry. Importantly, in determining what would have been obvious to one of ordinary skill in the art, the use of hindsight is not permitted. *See id.* at 421 (cautioning the trier of fact against "the distortion caused by hindsight bias" and "arguments reliant upon ex post reasoning" in determining obviousness). Further, the Supreme Court has instructed that while a Court may take into account whether "some motivation

or suggestion to combine the prior art teachings can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art," *id.* at 398, a court errs when it "transforms [this] general principle into a rigid rule that limits the obviousness inquiry," id. at 419; *see also Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356–57 (Fed. Cir. 2007) ("While the *KSR* Court rejected a rigid application of the teaching, suggestion, or motivation . . . test in an obviousness inquiry, the Court acknowledged the importance of identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does in an obviousness determination." (quotation marks omitted)).

Additionally, "[o]bviousness does not require absolute predictability of success," but rather, requires "a reasonable expectation of success." *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (*quoting In re O'Farrell*, 853 F.2d 894, 903–04 (Fed. Cir. 1988)). To this end, obviousness "cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). Finally, evidence of a "finite number of identified, predictable solutions" or alternatives "might support an inference of obviousness." *See Eisai Co. Ltd. v. Dr. Reddy's Labs. Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008) (*quoting KSR*, 550 U.S. at 421)).

## 2. The scope and content of the prior art

Under the first element of the *Graham* test for obviousness, the Court must determine the scope and content of the prior art. The scope of prior art is only that art which is analogous. *See In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992). Analogous art is art that is not "too remote to be treated as prior art." *Id.* at 657. In addition, "[a] prior art reference is analogous if it is from the same 'field of endeavor,' even if it addresses a different problem, or, if not within the same field, if the reference is 'reasonably pertinent to the particular problem with which the inventor is involved.'" *In re Conte*, 36 F. App'x 446, 450 (Fed. Cir. 2002) (unpublished but persuasive) (citing *In re Clay*, 966 F.2d at 658–59). The determination of relevant prior art is a question of fact. *In re Clay*, 966 F.2d at 658.

Relevant prior art is further defined by 35 U.S.C. § 102(a), which limits the time frame within which prior art can be found. In pertinent part, Section 102(a) provides: "A person shall be entitled to a patent unless . . . the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention . . . ." 35 U.S.C. § 102(a)(1).

The parties agree that the '340 Patent application was filed on September 15, 2003. (08-cv-00124 Doc. 96-1 at ¶ 5). The parties further agree that the '035 Patent application was filed on May 22, 2006, and that the '035 Patent is a "continuation-in-part of the '340 patent." (*Id.* at ¶¶ 4, 6). Thus, under section 102(a)(1), the prior

art of the '340 and '035 Patents includes any analogous patents, printed publications, or products issued prior to September 15, 2003.[6] It is undisputed that the prior art alleged by Defendants conform to the time limitations of 35 U.S.C. §§ 102(a).

As stated, Gator Tail concedes that the '340 and '035 Patents are combination patents. (*See* 08-cv-00124 Doc. 125 at p. 10). Further, the parties agree that the content of the prior art includes outboard marine motors—including long-tail mud motors—as well as patents and publications relating to outboard marine motors. (*See* Gator Tail Ex. 1 at p. 0656 (Fig. 11 of the '340 Patent, representing a long-tail mud motor identified as "Prior Art"); *see also id.* at p. 0652 (listing certain U.S. Patents as "References Cited," including long-tail motors Foreman and Trouche); Gator Tail Ex. 2 at pp. 01838–39 ('035 Patent listing certain U.S. Patents as "References Cited," including long-tail mud motor Torrey)).

At the trial on validity, the following prior art was admitted without objection:

> United States Patent 6,227,920 (Alby);
> United States Patent 4,544,362 (Arneson);
> United States Patent 4,408,994 (Blanchard);
> United States Patent 3,951,096 (Dunlap);
> United States Patent 6,361,388 (Foreman);

---

[6] The Court pauses briefly to acknowledge that, with regard to the '035 Patent, Plaintiffs are entitled to claim the benefit of the filing date of the '340 Patent application—*i.e.*, the "parent" application—*only* to the extent that the '340 Patent application discloses the subject matter claimed in the '035 Patent application. *See Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253–54 (Fed. Cir. 2004); 35 U.S.C. §§ 120, 121. The point is immaterial here, however, because all of the relevant prior art identified by Defendants *precedes* the '340 Patent's September 15, 2003 application date. (*See* Doc. 96-3 at ¶¶ 1–45).

United States Patent 5,188,548 (Ferguson);
United States Patent 4,836,811 (Griffiths);
United States Patent 4,354,848 (Hall);
United States Patent 6,468,120 (Hasl);
European Patent 0902174 (Ikuma);
United States Patent 3,629,885 (Jackson);
United States Patent 5,469,931 (Kawata);
United States Patent 5,336,119 (Lais);
United States Patent 6,494,431 (McCoy);
United States Patent 4,869,692 (Newman);
United States Patent 5,435,763 (Pignata);
United States Patent 2,513,050 (Pugh);
United States Patent 4,726,796 (Rivette);
United States Patent 6,234,854 (Rydzewski);
Japanese Patent H9-202298 (Saito);
United States Patent 5,741,165 (Saito);
United States Patent 5,178,566 (Stojkov);
United States Patent 4,367,860 (Strang);
United States Patent 2,996,035 (Torrey);
United States Patent 941,827 (Trouche);
United States Patent 4,992,066 (Watson);
United States Patent 2,928,630 (Wisman).

(*See* Doc. 122 at pp. 6–7, 10 (listing prior art admitted without objection at the validity phase trial). Accordingly, the Court finds that the scope of the prior art for determining obviousness includes *at least* these Patents.

Further, Plaintiffs acknowledge in their post-trial briefing that the prior art for determining obviousness includes "the Scavenger motor and the 1960's Honda motor," as well as "Pro-Drive, and Mud Buddy's gear drive motor." (Doc. 125 at pp. 8–9; *see* Doc. 122 at p. 5 (admitting without objection "[t]he webpages at www.scavengerbackwater.com and all subordinate pages, including all photographs, videos, drawings, and other information contained therein")). Thus, the Court determines that the scope of the prior art includes these motors as well.

25

The Court will now briefly describe the characteristics of certain prior art *most relevant* to the issue of obviousness.

i.     United States Patent 2,996,035 (Torrey)

United States Patent 2,996,035 ("the Torrey Patent"), issued August 15, 1961, discloses a traditional long-tail motor, comprising an air-cooled, belt-driven, horizontal shaft motor and drive assembly. (Go-Devil Ex. 43 at Fig. 1). The Torrey Patent's stated purpose is to power "a row boat or lighter, or the like, and particularly for the operation of such boats in shallow or weedy waters." (*Id.* Col. 1, lns. 15–17). Torrey accomplished this goal by, among other things, describing:

> a relatively long propeller shaft housing . . . so carried by the mounting bracket that the propeller may be operatively disposed partly in or fully beneath the surface of the supporting water, or may be raised clear of the water and be swung inboard to provide access to the propeller by an occupant of the boat.

(*Id.* at lns. 25–33).

Rendering of the Torrey Patent. (Go-Devil Ex. 43 at p. 001278).



26

ii.    The Scavenger Backwater Motor

The Scavenger Backwater motor is an air-cooled, belt-driven, horizontal shaft motor and drive assembly that has been in production since the early 2000s. (Gator Tail Ex. 23 at ¶ 8 (Don Kueny Supplemental Report); *see also* Transcript Vol. I at p. 386 (Testimony of Ray Kliebert); Transcript Vol. II at p. 32 (Testimony of Glenn Foreman)).    Although unpatented, (Gator Tail Ex. 23 at ¶ 8 (Don Kueny Supplemental Report)), it is agreed among the parties that the Scavenger Backwater is "simply the Torrey patent in practice." (08-00124 Doc. 125 at p. 8; *see* Transcript Vol. I at p. 286 (Testimony of Ray Kliebert ("The Scavenger Backwater motor is basically a derivative of the Torrey Patent."))); *see also* Doc. 103 at p. 19 ("As is readily apparent, Scavenger is very similar to Torrey . . . .")).

iii.    United States Patent 5,741,165 (Saito)

United States Patent 5,741,165 ("the Saito Patent"), issued April 21, 1998, discloses an air-cooled, gear-driven, vertical shaft motor and drive assembly for powering a shallow draft vessel in "shallow water." (*See* Go-Devil Ex. 40 at Abstract; col. 1, lns. 60–65).    The Saito Patent's stated purpose is to maintain certain advantages associated with long-tail motors—specifically, the ability to navigate shallow waters by providing for a "propulsion device [that] can be easily lifted out of the body of water to clear underwater objects"—while "overcom[ing] the disadvantages" associated with traditional long-tails—including (1) "somewhat limited" "range of movement" (i.e. turning radius); and (2) "significant[ intrusion]

27

into the hull of the watercraft." (*See id.* at col. 1, lns. 35–55). Saito accomplished this goal by "shortening . . . the overall length" of its motor, which "permits the watercraft to be maneuvered in very narrow waterways without the propeller 125 striking the shore or the bowel of the watercraft striking the shore." (*Id.* at col. 7, lns. 50–60). Go-Devil's expert witness, Dr. Charles Garris ("Dr. Garris"), testified that, in his opinion, "the main teaching of Saito, and the very important teaching, was the idea that a short-tail design would give you a better steering and maneuverability and better control." (Transcript Vol. II at p. 256).

Rendering of the Saito Patent. (Go-Devil Ex. 40 at p. 001222).



*Figure 7*

iv.   The Pro-Drive motor

The Pro-Drive motor is an air-cooled, gear-driven, vertical shaft motor and drive assembly that has been in production since the early 2000s. *See* Transcript

Vol. I at pp. 264–65 (Mr. Ray Kliebert) (stating that "the Pro-Drive unit was the first to come out . . . . [a]nd then Gator Tail came out," shortly after the Louisiana Sportsman Show in March 2004); *id.* at pp. 265–66 (Mr. Kliebert) ("The Pro-Drive came out with . . . a shorter, heavy duty outboard that was designed, air-cooled, which did not require water-cooled, you could run in the mud. So, what Pro-Drive did is . . . they [created a motor similar to that created by Mr. Broussard, which] used a vertical shaft motor.")). It is agreed among the parties that the Pro-Drive motor is the Saito patent in practice. (*See* Transcript Vol. II at pp. 177–78 (Dr. Matthews) (indicating that Saito and Pro-Drive are each "vertical drive, shallow water engines"); *see also* Transcript Vol. I at p. 267 (Mr. Kliebert) ("Pro-Drive is kind of more towards . . . a traditional outboard, where it's shorter. It's vertical shaft."); *see also id.* at p. 268 (Mr. Kliebert) ("[T]he whole purpose of [Pro-Drive's] short [drive] shaft is [to] allow it to be easier to steer."); *id.* at p. 288 (Mr. Broussard) (agreeing that "the Pro-Drive has the same kind of advantages [as the] Gator Tail short-tail drive," including maneuverability, ease of operation, and the ability to go in shallow- and open-water)).

### 3. *The level of ordinary skill in the art*

The second element in the *Graham* test for obviousness requires determining the level of ordinary skill in the pertinent art. *See Graham*, 383 U.S. at 17–18. Ascertaining the level of ordinary skill in the art is necessary for "maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d

714, 718 (Fed. Cir. 1991). Factors to consider include the educational level of the inventor, the educational level of those who work in the relevant industry, and the sophistication of the technology involved. *See id.*

Here, the parties have stipulated that a person of ordinary skill in the art with respect to the patents-in-suit would have "an undergraduate education in mechanical engineering and some experience in marine propulsion systems." (08-cv-00124 Doc. 96-1 at ¶ 17). The parties have further stipulated that "[t]he formal education may be substituted for at least five years of experience with marine motors." (*Id.*).

### 4. *Differences between the claimed subject matter and the prior art*

The third element in the *Graham* analysis requires the determination of any differences between the teachings found in the prior art and the claimed invention, from the vantage point of a hypothetical person with ordinary skill in the art. *See Graham*, 383 U.S. at 17–18; *Velander v. Garner*, 348 F.3d 1359, 1380 (Fed. Cir. 2003). The claims of the patent-in-suit must be considered "as a whole." *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1547–48 (Fed. Cir. 1983). It is "[t]he claims, not [the] particular embodiments [that] must be the focus of the obvious inquiry." *Jackson Jordan, Inc. v. Plasser American Corp.*, 747 F.2d 1567, 1578 (Fed. Cir. 1984). The Federal Circuit has emphasized the significance of claims in defining an invention:

30

The claims of the patent provide the concise formal definition of the invention. They are the numbered paragraphs which particularly point out and distinctly claim the subject matter which the applicant regards as his invention. It is to these wordings that one must look to determine whether there has been infringement. Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them.

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (quotations and alterations omitted). Thus, while it is entirely proper to use the specification of the patent to interpret what the patentee meant by a word or phrase in a claim, adding to the claim an extraneous limitation appearing in the specification is improper. *See id.* at 1433 (citations omitted).

Review of prior art, however, is not limited to claims asserted in the prior art. Differences between prior art and the claimed invention are "ascertained by interpretation of the teachings of the prior art and of the claims of the patent." CHISUM ON PATENTS, § 5.03[5], 5–239 (2003). In other words, a prior art reference must be considered in its entirety in an obviousness inquiry and must include a "full appreciation of what such reference fairly suggests to one of ordinary skill in the art." *W.L. Gore*, 721 F.2d at 1550.

The claims of the patent-in-suit are the starting point for determining any differences between the patent-in-suit and the prior art. Claim construction is a question of law for the Court to resolve. *See Markman*, 517 U.S. 370, 384. Here, the parties vigorously "disputed meanings and technical scope" of the claims in

31

question, and the Court held a *Markman* Hearing to clarify what is covered by the Gator Tail Patents. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). And because the Court's construction of the claims in dispute bears on the issue of obviousness, the Court references its *Markman* determinations in assessing whether the claims in dispute are obvious in light of prior art. *See id.* ("[C]laim construction may occasionally be necessary in obviousness determinations, when the meaning or scope of technical terms and words of art is unclear and in dispute and requires resolution in order to determine obviousness . . . .").[7]

---

[7] The '340 and '035 Patents each contain independent and dependent claims. (*See* Gator Tail Ex. 16 at 01229 (Ex Parte Reexamination Certificate, U.S. Patent No. 7,052,340 (indicating that Claims 1, 8, and 14 of the '340 Patent are independent claims, with the remaining claims depending on Claim 1 or claim 8); Gator Tail Ex. 17 at 01508 (Ex Parte Reexamination Certificate, U.S. Patent No. 7,297,035 (indicating that Claim 1 of the '035 Patent is an independent claim, with the remaining claims depending on Claim 1)). In its post-trial brief, Mud Buddy suggests that because each Patent's dependent claims were allowed only to the extent that they "add additional matter to . . . their respective independent claims," the Court may *limit* its obviousness analysis to only the independent claims. (*See* Doc. 140 at p. 10 ("The dependent claims [in the '340 and '035 Patents] were **only** allowed because they depend from (i.e., add additional matter to) their respective independent claims. As such, the validity of the '340 and '035 Patents rises and falls with the independent claims. The independent claims, however, are all obvious." (emphasis in original, footnotes omitted)). The law is clear, however, that "each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; and dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim." *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1375 (Fed. Cir. 2003) (quotation marks and alterations omitted). Accordingly, the Court must assess whether *each* of the claims in dispute—independent *and* dependent—are obvious in light of prior art, and therefore invalid. *Id.*

i.    Claim 1 of the '340 Patent

Claim 1 of the '340 Patent discloses:

A portable drive assembly having means for temporary attachment[8] to the transom of a shallow draft watercraft said portable drive assembly comprising an elongated drive housing[9] enclosing an upper drive assembly a lower driven assembly and a timing belt connecting said upper drive assembly to said lower driven assembly, an engine mounting plate[10] attached externally to said drive housing[11] located adjacent said upper drive assembly[12] perpendicular to said drive housing said lower driven assembly further comprising a propeller shaft partially enclosed within a shaft housing attached to said drive housing[13] adjacent said driven assembly[14] extending at least 12 inches beyond said drive housing[15] and a propeller attached to said propeller shaft.

(Gator Tail Ex. 1 at p. 0658 ('340 Patent)).

---

[8]  In its *Markman* Hearing Ruling, the Court construed the phrase "a portable drive assembly having means for temporary attachment" as "portable from one craft to another without undue effort or modification." (Doc. 82 at pp. 9–10; *see also id.* at p. 13).

[9]  An "elongated drive housing" is "a drive housing that is greater in measurement in one axis than in the other two axes." (Doc. 82 at p. 16).

[10]  An "engine mounting plate" is "a plate to which the engine can be mounted." (Doc. 82 at p. 19).

[11]  An "engine mounting plate attached externally to [the] drive housing" is an engine mounting plate that is attached "to the elongated drive housing's exterior." (Doc. 82 at p. 21).

[12]  An "engine mounting plate . . . located adjacent [to the] upper drive assembly" is an engine mounting plate that is "adjacent to the upper drive assembly, without restriction as to its location relative to the lower driven assembly." (Doc. 82 at p. 23).

[13]  A "shaft housing attached to [the] drive housing" means "attachment of the shaft housing to the drive housing." (Doc. 82 at p. 25).

[14]  A "a shaft housing attached to [the] drive housing adjacent [the] driven assembly" is a "shaft housing . . . attached in proximity to the (lower) driven assembly." (Doc. 82 at p. 26).

[15]  A "driven assembly extending at least 12 inches beyond [the] drive housing" means "the distal extent (the far end) of the shaft housing is at least 12 inches from the drive housing." (Doc. 82 at p. 27).

33

a. Claim 1 of the '340 Patent in light of Saito, Pro-Drive and other prior art

As described above, Claim 1 of the '340 Patent broadly discloses an easily portable drive assembly intended to be attached to the transom of a shallow draft boat. (*Id.*; *see also* Doc. 82). Claim 1 further discloses that the portable drive assembly consists of a drive housing that is greater in measurement in the vertical axis than in the other two axes, with the upper portion of said drive housing attached at a perpendicular angle to a plate to which an engine can be mounted. (*Id.*; *see also* Doc. 82). Claim 1 further discloses that the drive housing encloses an upper drive assembly and a lower driven assembly, and a timing belt connecting the two. (*Id.*; *see also* Doc. 82). Additionally, Claim 1 discloses that the lower driven assembly is comprised of a propeller shaft enclosed within a propeller shaft housing, and that the propeller shaft housing is attached to the elongated drive housing, near the lower driven assembly. (*Id.*; *see also* Doc. 82). Finally, Claim 1 discloses that the distal extent of the shaft housing is at least 12 inches from the drive housing, and that a propeller is attached at the end of the propeller shaft. (*Id.*; *see also* Doc. 82).

The Court finds little meaningful difference between the teachings of the prior art, and Claim 1 of the '340 Patent. More specifically, the Court determines that the "improvement" achieved by Claim 1 of the '340 Patent is *not* "more than the predictable use of prior art elements according to their established functions." *KSR*, 550 U.S. at 417. For example, like Claim 1 of the '340 Patent, the Saito Patent

34

discloses an easily portable drive assembly intended to be attached to the transom of a shallow draft boat, said drive assembly consisting of an upper "powering internal combustion engine" connected to a lower "propeller shaft that is driven by said engine and which extends generally horizontally rearwardly from the watercraft hull." (Go-Devil Ex. 40 at 001226 (Saito Patent)). And although the Saito Patent does not claim a shaft housing in excess of 12 inches, it discloses that "the distance between [the] trim axis and the propulsion device [is] greater than the distance between the forward end of the tiller and [the] trim axis." (*Id.*).

Among Saito's stated goals is to create a mud motor with an improved turning radius compared to traditional long-tail mud motors. (*See id.* at p. 001223 ("It is, therefore, a principal object of the [sic] this invention to provide an improved marine propulsion system wherein the device may be kept relatively short and yet still can operate in shallow water and obtain the advantages of having the propulsion device positioned substantially to the rear of the hull."); *see also id.* at p. 001226 ("This shortening of the overall length [of the propeller shaft] permits the watercraft to be maneuvered in very narrow waterways without the propeller . . . striking the shore or the bowel of the watercraft striking the shore.")). Saito accomplished this goal by disclosing "a short-tail design," (Transcript Vol. II at p. 256), facilitated by employing bevel gears to connect an engine with a vertical drive shaft to a horizontally extending, driven propeller shaft. (Go-Devil Ex. 40 (the Saito Patent); *see* Transcript Vol. II at p. 256 ("The main teaching of Saito, and the very

important teaching, was the idea that a short-tail design would give you . . . better steering and maneuverability and better control.")).

However, by solving one problem associated with traditional mud motors—specifically, poor maneuverability—Saito (and its various embodiments, including Pro-Drive) created another—diminished balance. (*See* Transcript Vol. II at pp. 251–55; *see also* Transcript Vol. III at p. 52 (Dr. Garris: "The Saito Patent as shown in the patent figure would most likely be very heavily back-weighted."); *id.* at p. 205 (Question: "I think you would agree[] that it would be obvious for a person with ordinary skill, looking at the Saito design, that they would see a weight and balance issue caused by all of this weight hanging off the back of the boat in Saito?"; Dr. Matthews: "Yes, sir. There is weight off the back, like a long-tail."); *see also* Transcript Vol. I at p. 166 (Warren Coco) ("The Pro-Drive is excessively tail heavy.")). Saito's balance problems were *caused* by its vertical drive shaft motor, which had to be positioned "very far aft of the . . . transom," mounted to a cumbersome "L-shaped bracket." (*Id.* at p. 254 (Dr. Garris); *see also* Transcript Vol. III at p. 198 (Dr. Matthews); Go-Devil Ex. 40 (the Saito Patent)). The testimony at trial was that Saito's engine weight, combined with its propeller torque, creates an increased tendency for the propeller to "pivot . . . downward" into the water behind the boat. (*See* Transcript Vol. II at p. 255). To countermand this tendency, the operator must continually apply force to the steering shaft, resulting in fatigue. (*See id.*).

36

In light of the balance problem associated with Saito's short-tail, there was a compelling motivation for a person of ordinary skill in the field of marine motors "to combine the elements in the way [Gator Tail's] invention does." *See Takeda Chem. Indus., Ltd.*, 492 F.3d at 1356–57. Additionally, there was only a "finite number of identified, predictable solutions" to the problem. *See KSR*, 550 U.S. at 421. The evidence at trial convincingly demonstrated that to improve Saito's balance while maintaining its maneuverability, one of ordinary skill in the art would relocate Saito's engine—*i.e.* a significant portion of the motor's mass—to a pivot point above the boat's transom. (*See* Transcript Vol. II at pp. 256–57 (Dr. Garris) ("[O]ne of ordinary skill in the art, particularly in the art of long-tail shallow-draft water craft would immediately pick up on [Saito's] teaching [that a short-tail design would give you better steering, maneuverability, and control] . . . . [a]nd say, well, wait a minute . . . . in the case of . . . long-tails . . . we've been using horizontal shaft engines for years. And . . . we really know how important balance is. So, why don't we see how we can . . . take the teaching of Saito, which is a very important teaching, and apply it to . . . the same kind of technology that we've been using for years."); *id.* at pp. 248–49 (Dr. Garris) (explaining that it is "advantageous" to locate the motor's center of gravity above the transom "because the transom just naturally takes the weight."); *cf. id.* at pp. 145–46 (Mr. Kueny) ("[Saito] describes how to [achieve greater maneuverability] with a vertical engine. But there's no . . . necessity of using a vertical engine to get where he gets."). Moreover, the expert

witnesses tended to agree that in order to relocate the engine above the transom, one of ordinary skill in the art would necessarily substitute Saito's vertical drive-shaft engine for a horizontal drive-shaft engine, comparable to those used in long-tails.[16] (*See id.* at pp. 247–48 (Dr. Garris) ("The advantage to a horizontal drive engine is that . . . the designer could design the . . . horizontal position . . . of the motor to any point that the designer finds convenient. In other words, you could bring . . . the motor inside the . . . boat or you could put it further aft of the boat. You could put the . . . drive axis in the front of the motor, or you could put it in the back of the motor. In other words, by having a horizontal shaft, you have a lot more options than you do with the vertical shaft engine. With a vertical shaft engine, the shaft can only go downward. And if the motor has to be located outside the boat, the center of gravity of the motor has to be outside the boat."); Transcript Vol. III at p. 201 (Dr. Matthews) ("If you didn't want to have as much mass as that far away from the boat, then a horizontal output shaft engine would help."); *cf.* Transcript

_____

[16] At trial, Dr. Matthews insisted that a person of ordinary skill in the field of outboard marine motors would *not* be motivated to solve the balance issues associated with the Saito Patent by substituting a horizontal shaft engine for Saito's vertical shaft engine. (*See* Transcript Vol. III at pp. 176–77 (Dr. Matthews)). However, Dr. Matthews's prior deposition testimony on this point contradicted his trial testimony. In his deposition, Dr. Matthews stated, "I think that a mechanical engineer would look at Saito and say, we've got way too much structure hanging out behind the boat. And, so, this vertical crankshaft design in Saito is just not going to work in a mud-boat application. We need a horizontal crankshaft engine." (*Id.* at pp. 200–01). When given the opportunity to explain his change of tune at trial, Dr. Matthews stated simply that his deposition testimony was "obviously . . . wrong." (*Id.* at p. 201). However, when pressed at trial, even Dr. Matthews conceded: "If you didn't want to have as much mass as that far away from the boat, then a horizontal output shaft engine would help." (Transcript Vol. III at p. 201 (Dr. Matthews)).

The Court finds that Dr. Matthews's deposition testimony, coupled with his admission on cross-examination that "a horizontal output shaft engine would help" solve Saito's balance issues convincingly rebuts his testimony that a person of ordinary skill in the art would *not* think to modify the Saito motor to incorporate a horizontal drive shaft engine.

38

Vol. II at p. 149 (Mr. Kueny) (indicating that one of ordinary skill in the art "could certainly" adapt the Saito Patent's improvements, such as "choke and steering geometry[,] . . . . propellor location and output shaft angle" to "a horizontal engine with the shaft parallel to the output propellor shaft"); Transcript Vol. II at p. 130 (Mr. Kueny) ("Somebody who is familiar with engines, as I am, and has worked on all kinds of different crankshaft orientations [could] look at [Saito] and say, well, if I just used . . . a permanent 90 degrees and used a horizontal crankshaft engine and put a belt or a chain or gears down to that parallel shaft, that's a good idea. I could use that. The key there is getting the propellor back in the mound of water and you look for a way to do it.")).

Additionally, the witnesses agreed that after swapping Saito's aft-mounted vertical-shaft engine with a transom-mounted horizontal shaft engine, one of ordinary skill in marine motors would connect the engine's horizontal drive shaft to the driven propeller shaft with a belt or a chain. (*See* Transcript Vol. I at p. 227 (Mr. Kliebert) ("Belts are designed to transfer torque from parallel shafts that are relatively long distance apart."); Transcript Vol. II at pp. 266–68 (Dr. Garris) (explaining that belt drive is more "economical," more "flexible," and requires "less maintenance" than a gear drive); Transcript Vol. III at p. 203 (Dr. Matthews) (agreeing that "a belt drive or a chain drive" is the "best way" to connect "a horizontal shaft engine [with] a horizontal propeller shaft"); *see also id.* at pp. 204–08; *cf.* Gator Tail Ex. 5 at pp. 00018, 00026–27 (Dr. Matthews's Jan. 18, 2010

Rebuttal Report, discussing the relative inefficiency that would result from "[c]ombining a gear drive with a belt drive")).

Finally, the experts agreed that one of ordinary skill in the art would likely employ a timing belt rather than a chain or a v-belt to connect the horizontal drive shaft with the horizontal driven shaft, considering factors such as efficiency, cost, ease of manufacture, and ability to handle higher torque loads. (*See* Transcript Vol. II at pp. 102–03, 111 (Mr. Kueny); Transcript Vol. III at p. 209–10 (Dr. Matthews)).

Given this evidence, and the limited number of design choices available, the Court finds that "a [mud motor] designer of ordinary skill, facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit to upgrading [Saito] with a [horizontal shaft engine placed above the transom]." *See KSR*, 550 U.S. at 424. Gator Tail, of course, vigorously refutes this conclusion, emphasizing repeatedly that "Saito rejected and taught away from using a horizontal shaft engine." (*See* Doc. 125 at pp. 11; *see also id.* at p. 13 ("The defendants improperly try to ignore Saito's teaching away from the horizontal output engine and make that modification anyway."); *id.* ("The defendants also argued it would be obvious—despite Saito's rejection of horizontal shaft engines—to use such an engine because it would solve a supposed inherent flaw in Saito's rear weighted design."). In short, the Court is not persuaded by Gator Tail's arguments because they rely on the same "rigid" application of the "teaching, suggestion, or motivation" test rejected by the Supreme Court. *KSR*, 550 U.S. at 421–22.

Accordingly, the Court finds that the material disclosed in Claim 1 of the '340 Patent is obvious in light of Saito and/or Pro-Drive.

> b. Claim 1 of the '340 Patent in light of Torrey, Scavenger, and other prior art

The same conclusion is reached starting with the Torrey Patent and/or the Scavenger Backwater motor. Like Claim 1 of the '340 Patent, Torrey and Scavenger each disclose an easily portable drive assembly intended to be attached to the transom of a shallow draft boat, where the drive assembly consists of an upper drive assembly and a lower driven assembly, and a v-belt connecting the two. (Go-Devil Ex. 43 at pp. 001278 (Torrey Patent Fig. 1), 001281–82 (Torrey Patent Claims); *see also* Go-Devil Ex. 15 ("The webpages at www.scavengerbackwater.com and all subordinate pages, including all photographs, videos, drawings, and other information contained therein."[17])). Torrey and Scavenger further disclose lower driven assemblies comprised of propeller shafts enclosed within propeller shaft housings extending at least 12 inches from the lower driven assemblies, and propellers attached at the end of the propeller shafts. (*Id.*). Finally, Torrey and Scavenger each disclose an engine mounting plate attached at a perpendicular angle near the upper drive assembly, to which an engine can be mounted. (*Id.*).

---

[17] The Court last visited the Scavenger Backwater website on July 9, 2014.

Missing from the Torrey Patent and the Scavenger Backwater motor is: (1) a timing belt (instead of a v-belt); and (2) an elongated drive housing.[18] However, timing belts were known in the field of outboard marine motors before the '340 Patent. (*E.g.*, Go-Devil Ex. 35 at pp. 001209–10 (United States Patent 5,435,763 (Pignata)). Further, the testimony at trial established that it is well-within the grasp of a person of ordinary skill in mud motors to substitute a timing belt for a v-belt when the goal is to achieve greater torque. (Transcript Vol. II at pp. 202–203 (Dr. Garris: "A timing belt is the best for handling . . . higher torque, because it has teeth. . . . A v-belt . . . is used in a lot of wide-ranging applications and they're very effective. But . . . if you increase the torque beyond a certain amount or if the v-belt is not properly adjusted, it will begin to slip.")). Indeed, Gator Tail's own expert, Dr. Matthews, acknowledged that it would be "an obvious modification" to "use a timing belt" instead of a v-belt when "connect[ing] a high horsepower, high torque horizontal drive to a parallel propeller shaft," "[b]ecause a v-belt could slip." (Transcript Vol. III at p. 231).

Elongated drive housings—such as that claimed in Claim 1 of the '340 Patent—were also well-known in the field prior to the '340 Patent's issue. On reexamination, the PTO noted multiple examples of prior art disclosing "an elongated drive housing that encloses an upper drive assembly, a lower driven

---

[18] The Scavenger Backwater motor discloses a "see through guard" enclosing the upper drive and lower driven assemblies. (*See* Go-Devil Ex. 15 at https://www.scavengerbackwater.com/cgi-bin/scavengershop2/commerce.cgi?page=drive.htm, last visited July 9, 2014). However, the Court finds that this "see through guard" is *not* equivalent to the "elongated drive housing" claimed in the '340 Patent, as constructed by the Court following the *Markman* Hearing.

assembly, and a timing chain or belt that connects said upper drive assembly to said lower driven assembly," including United States Patent 4,869,692 (Newman), (Go-Devil Ex. 34), and United States Patent 4,992,066 (Watson), (Go-Devil Ex. 45). (Go-Devil Ex. 16 at 000176; *see also id.* (further identifying "Brindley (US 2,722,193)" as disclosing an "elongated drive housing")). The testimony at trial was that drive housings serve *at least* four functions on an outboard marine motor, including: (1) a "safety" function, (2) "an aesthetic function"; (3) "a sealing function . . . protect[ing] the machinery from . . . water . . . and from other things"; and (4) "a structural [function] . . . support[ing] the engine or other things." (Transcript Vol. II at pp. 237–38 (Dr. Garris); *see also id.* at pp. 104–05 (Mr. Kueny)). The Court finds that a mechanical engineer with experience in marine motors would easily recognize a drive housing as an improvement to the Torrey Patent and/or Scavenger Backwater motor.

Again, Gator Tail disputes this conclusion, asserting that "Torrey does not render Mr. Broussard's invention obvious" because the elongated drive housing claimed in Claim 1 of the '340 Patent is "structural,"—*i.e.*, "the structure through which the thrust forces were ultimately transmitted to propel the boat." (08-cv-00124 Doc. 125 at p. 14).[19] Although not stated in so many words, Gator Tail's

---

[19] Claim 1 of the '340 Patent fails to state that the claimed "elongated drive housing" is "structural." Nonetheless, for reasons fully explained below, the Court finds that this limitation is *required* by the '340 Patent's specification. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) ("It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim."); *cf. id.* ("Where a specification does not *require* a

position *seems to be* that because "adding a mere safety guard to Torrey (as was done in Scavenger) [would] not serve any structural function," *whatever* function a housing guard might serve in the Torrey design *cannot* be equivalent to the function that the elongated drive housing serves in the '340 Patent. (*See id.*).

The Court is not persuaded by Gator Tail's argument because it implicitly misconstrues the nature of the obviousness inquiry where combination patents are involved. As indicated above, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *KSR*, 550 U.S. at 417. The uncontroverted evidence at trial was that Saito improved the marine motor field by creating a more maneuverable mud motor. (Transcript Vol. II at p. 256 (Dr. Garris)). Saito's innovation was its "short-tail design." (*Id.*; Go-Devil Ex. 40 (the Saito Patent)). Mr. Broussard testified that his interest in a more maneuverable mud motor was prompted by his frustration with "traditional long-tail" motors (such as Go-Devil), which required "tak[ing] the prop out of the water" to make "a hard turn" in "tight" spaces. (Transcript III at p. 268–69 (Mr. Broussard)). Mr. Broussard further testified that "like Mr. Saito" he was motivated to remedy this deficiency of the long-tail design. (*Id.*).

---

limitation, that limitation should not be read from the specification into the claims.") (quotation marks omitted; emphasis in original)).

However, reconfiguring Torrey, Scavenger, and/or other similarly configured long-tail motors to achieve a "short-tail design"—*i.e.*, the "technique . . . used to improve [Saito]," *KSR*, 550 U.S. at 417—*necessitates* the addition of a "structural" drive housing, because without a drive housing capable of transferring the propeller's thrust to the boat, it is impossible to implement a shorter propeller shaft while at the same time "insur[ing] the proper angle of attack." (Gator Tail Ex. 1 at p. 0657 (the '340 Patent); *cf.* Transcript Vol. II at p. 130 (Mr. Kueny) ("The key there is getting the propellor back in the mound of water and you look for a way to do it.")). Stated differently, Mr. Broussard could select from among only a "finite number of identified, predictable solutions" when improving Torrey. *KSR*, 550 U.S. at 421. That the "actual application" of Saito's "short-tail design" to the Torrey Patent was within the abilities of a person of ordinary skill in marine motors is indicated by Mr. Broussard's undergraduate engineering capstone project—the origin of the claims disclosed in the the '340 Patent, (Transcript Vol. III at pp. 249–50 (Mr. Broussard); *see also id.* at p. 294 (explaining that the "[t]he project called Marsh Runner" developed into "Gator Tail"))—which candidly states that "the only major design specification to which the Marsh Runner [shallow water drive system] must comply is to incorporate a horizontal drive unit onto the existing 'Go-Devil' [long-tail] hall [sic]." (Mud Buddy Ex. 78 at p. 1115 ("Marsh Runner" Project Report)).[20]

---

[20] At trial, Mr. Broussard insisted that he did not write the Marsh Runner Project Report and

45

In sum, the Court finds that Claim 1 of the '340 Patent merely combines "prior art elements" of Saito—specifically, a short-tail design—and Torrey—a belt-driven motor—to achieve a predictable variation according to those elements' established functions. *KSR*, 550 U.S. at 417.

## c. The '340 Patent's PTO Proceedings

The Federal Circuit has consistently admonished that "an examiner's decision on an original or reissue application is evidence the court *must* consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence, and that, upon *reissue*, the burden of proving invalidity [is] made *heavier*." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 961 (Fed. Cir. 1986) (emphasis added, quotation marks omitted). However, "if the PTO did not have all material facts before it, its considered judgment may lose significant force. And, concomitantly, the challenger's burden to persuade the [factfinder] of its invalidity defense by clear and convincing evidence may be easier to sustain." *Microsoft Corp.*, 131 S. Ct. at 2251.

---

disclaimed this portion of its contents. (Trial Transcript Vol. III at p. 296 (Question: "Would you agree that all you did was stick a horizontal belt on a Go-Devil hull?" Mr. Broussard: "Absolutely not.")). At the same time, Mr. Broussard admitted: (1) he belonged to the project group that submitted the Report; (2) he earned an "A" grade on the Report; and (3) the Report, and the accompanying design project (the "Marsh Runner") was the genesis for the '340 and '035 Patents. (*Id.* at 294). Further, the Court notes that Mr. Broussard's name appears on the Project Report's cover sheet. (Mud Buddy Ex. 78 at p. 1111 ("Marsh Runner" Project Report)). Accordingly, even accepting as true that Mr. Broussard did *not* write the Report, the Court finds that he is responsible for its content, and accepts it as further evidence that Mr. Broussard's motor merely achieved a "predictable [variation] of prior art elements according to their established functions." *KSR*, 550 U.S. at 417.

For context, the Court briefly recounts the '340 Patent's prosecution history and reexamination history. On September 15, 2003 Mr. Broussard filed the application that would become the '340 Patent. (Gator Tail Ex. 1 at p. 0652 ('340 Patent)). On July 25, 2004, the PTO *rejected* Mr. Broussard's application, determining that each of its proposed claims were obvious under § 103. (Gator Tail Ex. 14 at pp. 01030–31, 01034). In its reasoning, the PTO specifically discussed the U.S. Patent 5,178,566 ("the Stojkov Patent"), U.S. Patent 6,468,120 ("the Hasl Patent"), U.S. Patent 6,302,750 ("the Foreman Patent"), and U.S. Patent 5,415,576 ("the Meisenburg Patent"). (*Id.* at pp. 01031–33).

Eventually, however, following a series of back-and-forth exchanges which included amendments to Mr. Broussard's application, the PTO allowed virtually all of the claims comprising the '340 Patent.[21] (*See* Gator Tail Ex. 14 at p. 00931 (allowing fourteen of the '340 Patent application's fifteen claims); *see also id.* at pp. 00992–93 (intermediate PTO determination indicating that Mr. Broussard's patent application "fails to meet the requirements of 37 CFR 1.121")). In allowing the '340 Patent's claims as amended, the PTO reasoned:

> The prior art disclosed by Watson (US 4,992,066), Newman (US 4,869,692) and Brindley (US 2,722,193) shows the use of a portable drive assembly that is comprised of a temporary attachment means to a transom of a watercraft, an elongated drive housing that encloses an upper drive assembly, a lower driven assembly and a timing chain or belt that connects said upper drive assembly to said lower driven assembly, but *does not show the use of an engine mounting plate that is*

---

[21] Specifically, the PTO allowed all but one of the application's 15 claims. (*See* Gator Tail Ex. 1 at p. 00931 (stating that "[c]laims 1–6 and 8–15 are allowed," but that "[c]laim 7 has been cancelled").

*attached perpendicular to said drive housing, or a lower driven assembly that includes a propeller shaft and shaft housing that extend at least 12 inches beyond said drive housing.* Therefore, the prior art as cited does not show or suggest the use of a portable drive assembly that is comprised of a temporary attachment means to a transom of a watercraft, an elongated drive housing that encloses an upper drive assembly, a lower driven assembly and a timing belt that connects said upper drive assembly to said lower driven assembly, and an engine mounting plate that is attached perpendicular to said drive housing, where said lower driven assembly is further comprised of a propeller shaft that is partially enclosed within a shaft housing attached to said drive housing that extends at least 12 inches beyond said drive housing, and a propeller that is attached to said propeller shaft.

(*Id.* at pp. 00932–33 (emphasis added)). Based on this analysis, the PTO issued the '340 Patent on May 30, 2006. (Gator Tail Ex. 1 at p. 0652).

On April 8, 2010, in response to this litigation, Defendant Mud Buddy requested reexamination of the '340 Patent. (Gator Tail Ex. 16 at p. 01446). On July 1, 2010, the PTO granted Mud Buddy's request, noting "[a] substantial new question of patentability affecting claims 1–14 of [the '340 Patent] . . . is raised by the request for *ex parte* reexamination." (*Id.* at p. 01436). Regarding the "engine mounting plate" and "lower driven assembly . . . extend[ing] at least 12 inches beyond said drive housing" that was so important to the PTO when it issued the '340 Patent, the PTO noted: "Saito teaches an engine mounting plate that is attached perpendicular to a drive housing and an elongated drive assembly and a shaft housing extending in excess of 12 inches beyond the drive housing." (*Id.* at p. 01438).

48

Upon reexamination, the PTO once again initially *rejected all* of the claims of the '340 Patent as obvious. (*Id.* at 01332). In reaching its determination, the PTO relied principally on the Saito Patent, the Watson Patent (U.S. Patent 4,992,066), and the Foreman Patent (U.S. Patent 6,361,388). (*See id.* at pp. 01336–41). In pertinent part, the PTO concluded: "The Saito Patent . . . is specifically directed to mud boats and is intended for the same use and purpose as the claimed invention. Therefore, the teachings of the Saito Patent are deemed to provide a strong[] prima facie showing of unpatentability in answer to the . . . substantial new question of patentability . . . raised [in the request for re-examination]." (*Id.* at p. 01341).

However, as before, the PTO relented. On November 4, 2010, following review of additional information provided by Gator Tail, the PTO confirmed claims 1–14 of the '340 Patent and, further, added nine additional claims. (*Id.* at p. 01227–28; *see also id.* at p. 01225). In pertinent part, the PTO reasoned:

> The prior art which raised a substantial new question of patentability applied in this reexamination proceeding (the Saito Patent, alone or in combination with the Newman Patent, the Brindley Patent, the Foreman Patent, and/or the Watson Patent) fails to anticipate or render obvious a marine craft, or method of drive a [sic] marine craft, having a portable drive assembly comprising an elongated drive housing enclosing an upper drive assembly and a lower driven assembly and a timing belt connecting the upper drive assembly to the lower driven assembly in combination with all the limitations of independent claims 1, 8, and 14. *Specifically, the Saito Patent fails to teach the timing belt in the drive assembly, and therefore, does not anticipate the claims. The Saito Patent fails to render the claims obvious because the patent owner has persuasively argued and presented evidence that one of ordinary skill in the art would not substitute a timing belt for the bevel gears in the Saito Patent or use a timing belt in addition to the bevel gears in the Saito Patent. See*

49

*patent owner's response of August 26, 2010 and paragraphs 5–16 of the Matthew [sic] Declaration, especially paragraphs 11–15. In essence, the modification of the Saito Patent proposed in the rejection would lead to significant changes (e.g., changing the orientation of the drive system output shaft), which would not be obvious to one of ordinary skill in the art.*

(*Id.* at 01229) (emphasis added)). Regarding the remaining claims of the '340 Patent, the PTO reasoned: "Claims 2–7 and 15–20 depend on claim 1, and therefore, are allowable for the same reason. Claims 9–13 and 21–23 depend on claim 8, and therefore, are allowable for the same reason." (*Id.*). The PTO issued its Ex Parte Reexamination Certificate affirming the '340 Patent on January 25, 2010. (*Id.* at p. 01224). There is no indication in the '340 Patent's reexamination history that the PTO considered the Torrey Patent and/or the Scavenger motor in arriving at its determination. (*See id.*)

For various reasons, the Court finds that the evidence clearly and convincingly demonstrates that Claim 1 of the '340 Patent is obvious, despite the PTO's determination to the contrary. At the outset, the Court observes that the PTO was troubled by the '340 Patent from the beginning, and changed opinion multiple times regarding the '340 Patent's validity during the course of its prosecution and reexamination.[22] Of course, Gator Tail ultimately persuaded the PTO that the '340 Patent's claims are *not* obvious, and the PTO's confirmation of

---

[22] Specifically, the PTO: (1) initially *rejected* Mr. Broussard's patent application as obvious, (Gator Tail Ex. 14 at pp. 01030–31); before (2) issuing the '340 Patent following various amendments, (*id.* at p. 00931); then (3) *rejected* each of the claims in '340 Patent on reexamination, (Gator Tail Ex. 16 at p. 01332); before (4) confirming the '340 Patent and adding nine claims following submission of additional information, (*id.* at p. 01227–28).

the '340 Patent carries a presumption of validity. *See Custom Accessories*, 807 F.2d at 961.

The PTO's opinion regarding the validity of the '340 Patent loses much of its persuasive force in light of the evidence presented at trial. The PTO's Statement of Reasons for Patentability and/or Confirmation indicates that the examiner relied heavily on "paragraphs 11–15" of "the Matthew[s] Declaration." (Gator Tail Ex. 16 at p. 01229). There Dr. Matthews opined, in pertinent part:

> [A] person of ordinary skill in this art who was familiar with both the Saito Patent and Watson would not have found it obvious to re-orient the Saito engine to accommodate the belt(s) of Watson. To the contrary, such a person would be discouraged by Saito's disclosure from re-orienting Saito's engine from its vertically-oriented motor output shaft to a horizontally-oriented motor output shaft (Watson).

(*Id.* at p. 01281 ¶ 11).

At trial, however, Dr. Matthews admitted that Saito suffered from "weight and balance issue[s]" that would be obvious to a person of ordinary skill in marine motors, (Transcript Vol. III at p. 205 (Dr. Matthews)). Further, Dr. Matthews stated: "If you didn't want to have as much mass as that far away from the boat, then a horizontal output shaft engine would help." (*Id.* at p. 201 (Dr. Matthews)). Additionally, Dr. Matthews indicated that once the decision was made to incorporate a horizontal drive-shaft engine, "a belt drive or a chain drive" was the "best way" to connect the "horizontal shaft engine [with] a horizontal propeller shaft." (*Id.* at p. 203 (Dr. Matthews); *see also id.* at p. 231 (Dr. Matthews) (acknowledging that it would be "an obvious modification" to "use a timing belt"

51

instead of a v-belt when "connect[ing] a high horsepower, high torque horizontal drive to a parallel propeller shaft")).

Dr. Matthews's admissions at trial indicate that his prior Declaration—relied upon so heavily by the PTO in the reexamination proceedings—fell far short of providing a complete assessment of the '340 Patent's validity in light of Saito. The Court's confidence in Dr. Matthews's initial assessment of the patents-in-suit is further undermined by his admission at trial that he employed a "blinders on" approach when reviewing the Saito Patent as it related to the issue of obviousness: in his own words, Dr. Matthews "didn't want to go outside what [Saito] specifically said, don't use a horizontal engine. [Saito] wanted to use a vertical shaft engine." (Transcript Vol. III at pp. 210–11). This "blinders on" approach is in direct contradiction to the Supreme Court's admonishment in *KSR* that a factfinder must assess:

> interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*KSR*, 550 U.S. at 418.

In sum, the Declaration of Dr. Ron Matthews provided to the Examiner stopped far short of providing a complete analysis of the '340 Patent's validity in light of Saito. Further, it provided *no analysis whatsoever* of the '340 Patent's validity in light of Torrey and/or the Scavenger motor. (*See* Gator Tail Ex. 16 at pp.

52

01277–84)). To repeat: "if the PTO did not have all material facts before it, its considered judgment may lose significant force. And, concomitantly, the challenger's burden to persuade the [factfinder] of its invalidity defense by clear and convincing evidence may be easier to sustain." *Microsoft Corp.*, 131 S. Ct. at 2251.

Finally, there is little in the '340 Patent's prosecution and reexamination history to convince the Court that the PTO Examiner applied the proper legal standard in its determination that the material disclosed in the '340 Patent is not obvious—specifically, the standard reiterated by the Supreme Court in *KSR*. On this point, the Court notes that the '340 Patent was issued on May 30, 2006, eleven months *prior to* the Supreme Court's April 30, 2007 *KSR* decision. (Gator Tail Ex. 1 at p. 0652). And, as indicated above, the PTO's Statement of Reasons for confirmation of the '340 Patent fails to reference *any* legal standard, relying instead on the "patent owner's response of August 26, 2010 and paragraphs 5–16 of the Matthew [sic] Declaration," neither of which discusses *KSR*.[23] (*See* Gator Tail Ex.

---

[23] In its Order denying Defendants' motions for summary judgment on patent validity, the Court reached the opposite conclusion, observing: "the PTO specifically cited *KSR's* important insights on the propriety of combining references to reach its determination that the skilled artisan in the outboard motor arts would not make the combination of patents suggested by the defendants." (08-cv-00124 Doc. 111 at p. 6 (quotation marks and alterations omitted)). However, the Court's observation was based on an incomplete record. Close review of the '340 Patent's full reexamination history—which was only introduced at *trial*—reveals that the Court erred when it attributed the *KSR* analysis to the PTO.

Gator Tail's opposition to summary judgment cited "Remarks" that Gator Tail submitted to the PTO during the reexamination proceedings. (*See* 08-cv-00124 Doc. 103 at p. 26 ("During the reexaminations of the patents-in-suit, the PTO considered almost all the prior art cited by the defendants, and did so under *KSR Int'l Co. v. Teleflex Inc.*" (citing "Ex. C at 6")); Doc. 103-3 (Ex. C, '340 Patent Reexamination Excerpts)). These "Remarks" include the discussion of *KSR* noted by the Court in its Order denying summary judgment. (*Compare* Doc. 111 at p. 6 (Order Denying Summary Judgment), *with* Doc. 103-3 at p. 6 (Ex. C, '340 Patent Reexamination Excerpts)). Previously, Gator Tail submitted to the Court the PTO's Statement of Reasons confirming the '035 Patent, which, like

53

16 at pp. 01277–01284 (Declaration of Dr. Ron Matthews); *id.* at pp. 01358–01431

(Gator Tail's Aug. 26, 2010 Reply to Order Granting Ex Parte Reexamination)).

In sum, based on the evidence received at trial, the Court finds that the

PTO's confirmation of the '340 Patent was based on incomplete evidence. Further,

the Court lacks any assurance that the PTO's obviousness determination was made

according the controlling legal standard. Accordingly, because the PTO lacked the

"material facts" required to make its validity determination in light of *KSR*, the

Court finds that "its considered judgment . . . lose[s] significant force" and will not

prevent Defendants from proving their "invalidity defense by clear and convincing

evidence." *See Microsoft Corp.*, 131 S. Ct. at 2251.

the PTO's Statement of Reasons confirming the '340 Patent, bases its validity determination on the "patent owner's response of August 26, 2010." (*Compare* Doc. 63-1 at pp. 5–6 (PTO's Statement of Reasons for Confirming the '035 Patent), *with* Gator Tail Ex. 16 at pp. 01229–30 (PTO's Statement of Reasons for Confirming the '340 Patent)).

Gator Tail's reexamination *excerpts* submitted in support of its opposition to summary judgment, combined with its previously submitted Statement of Reasons confirming the '035 Patent, creates the impression that the PTO cited Gator Tail's "Remarks"—and the discussion of *KSR* contained therein—when affirming the validity of the patents-in-suit. Indeed, this is precisely the conclusion drawn by the Court in its January 6, 2014 Order denying summary judgment. (*See* Doc. 111 at p. 6). However, the *full* reexamination history of the patents-in-suit reveals that the Court's conclusion was incorrect. Gator Tail's "Remarks" were *not* part of the "patent owner's response of August 26, 2010" referenced in the PTO's Statement of Reasons confirming the patents-in-suit. Instead, the "Remarks" were submitted as part of Gator Tail's *October 22, 2010* "Response to the Reexamination First Office Action." (Gator Tail Ex. 16 at pp. 01259–74 (Gator Tail's Oct. 22, 2010 Response to the Reexamination First Office Action, discussing *KSR* at p. 01267)). The "patent owner's response of August 26, 2010" cited by the PTO refers to Gator Tail's August 26, 2010 "Reply to Order Granting Ex Parte Reexamination," which contains *no mention* of *KSR*. (*See id.* at pp. 01358–01431 (Gator Tail's Aug. 26, 2010 Reply to Order Granting Ex Parte Reexamination)).

Lacking the full reexamination history, the Court did not appreciate that the documents cited by the PTO when affirming the validity of the patents-in-suit were *not* the same documents submitted to the Court and cited by Gator Tail in its opposition to summary judgment. And although the Court will not go so far as to suggest that Gator Tail's Counsel "knowingly . . . ma[de] a false statement of fact or law to [the] tribunal [and/or] fail[ed] to correct a false statement of material fact or law previously made to the tribunal"—which would constitute a violation of Counsels' duty of candor, *see* M.D.La. LR83.2.4; La. R. Prof. Conduct 3.3—the Court is no longer confident that the PTO properly evaluated the validity of the patents-in-suit according to the Supreme Court's guidance in *KSR*. (*Cf.* Doc. 111 at p. 6).

54

ii.   The remaining claims of the '340 Patent

Having determined that Claim 1 of the '340 Patent is obvious in light of prior art, the Court has little trouble determining that the remaining claims of the '340 Patent are also obvious.

a.   Claim 3 of the '340 Patent

Claim 3 of the '340 Patent discloses "[a] portable drive assembly according to claim 1 wherein said drive system further comprises steering and throttle controls." (Gator Tail Ex. 1 at p. 0658 ('340 Patent)). For reasons explained above, the Court finds that Claim 1 of the '340 Patent is invalid as obvious. Further, the testimony at trial was uncontradicted that "virtually every outboard motor since the very beginning had to have a way to steer it and it had to have a way to make it go slow and fast, so they've all had steering and throttle controls," (Transcript Vol. II at p. 116 (Mr. Kueny)). (*E.g.*, Go-Devil Ex. 39 at pp. 001229, 001236–37 (Japanese Patent H9-202298 (Saito) showing steering control 42 & 43 and throttle control 44)). Accordingly, the Court finds that Claim 3 of the '340 Patent is also obvious in light of prior art. *KSR*, 550 U.S. at 417.[24]

b.   Claim 4 of the '340 Patent

Claim 4 of the '340 Patent discloses:

---

[24]   On reexamination, the examiner's analysis of claims *other than* claim 1 is limited to the observation that "[c]laims 2–7 and 15–20 depend on claim 1, and therefore, are allowable for the same reason." (Gator Tail Ex. 16 at p. 01229). Thus, for the same reasons as explained above regarding Claim 1, the Court finds that "[the PTO's] considered judgment . . . lose[s] significant force" regarding the remaining claims in the '340 Patent and will not prevent Defendants from proving their "invalidity defense by clear and convincing evidence." *See Microsoft Corp.*, 131 S. Ct. at 2251.

55

[a] portable drive assembly according to claim 1 wherein said propeller shaft assembly further comprises a shaft housing having a vertical triangular fin located below said shaft housing, a shaft supported adjacent each end by thrust bearings[25] in a manner whereby said shaft extends beyond each of said thrust bearings and a plurality of internal seals located along said shaft outboard of said thrust bearings.

(Gator Tail Ex. 1 at p. 0658 ('340 Patent)).

For reasons explained above, the Court finds that Claim 1 of the '340 Patent is invalid as obvious. The Court further finds that the two additional aspects stated in this claim—specifically, "a shaft housing having a vertical triangular fin located below said shaft housing" and "a shaft supported adjacent each end by thrust bearings"—are also obvious in light of prior art. (Transcript Vol. II at pp. 116–17 (Mr. Kueny); e.g., Go-Devil Ex. 43 at p. 001278–79 (Torrey Patent) (Fig. 2, disclosing shaft housing 51 with vertical triangular rudder fin 55 located below shaft housing 51; Fig. 5, disclosing propeller shaft 14 supported by thrust bearings adjacent to propeller end 52 and pulley end 16); Go-Devil Ex. 24 at p. 001116 (Foreman Patent) (Fig. 1, disclosing same)).

c. Claim 5 of the '340 Patent

Claim 5 of the '340 Patent discloses a "portable drive assembly according to claim 1 wherein said upper drive assembly and said lower driven assembly further include timing pulleys compatible with said timing belt said belt being rotationally unobstructed or acted upon by other bodies." (Gator Tail Ex. 1 at p. 0658 ('340

---

[25] "Thrust bearings" are "tapered roller bearings designed to take extreme thrust loads." (Doc. 82 at p. 30).

Patent)). For reasons explained above, the Court finds that Claim 1 of the '340 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim—specifically, "timing pulleys compatible with said timing belt said belt being rotationally unobstructed or acted upon by other bodies"—are also obvious in light of prior art. (Transcript Vol. II at pp. 117–18 (Mr. Kueny); *e.g.*, Go-Devil Ex. 35 at p. 001209 (Pignata Patent) (Fig. 3, disclosing upper drive assembly 38 and lower driven assembly 26, connected with timing pulleys 38 & 26 compatible with timing belt 40, where timing belt 40 is unobstructed or acted upon by other bodies)).

### d. Claim 6 of the '340 Patent

Claim 6 of the '340 Patent discloses a "portable drive assembly according to claim 1 further comprising a self contained air cooled utility engine having a horizontal output shaft[26] attached to said engine mounting plate[27] said output shaft coupled to said upper drive assembly." For reasons explained above, the Court finds that Claim 1 of the '340 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim—specifically, "a self contained air cooled utility engine having a horizontal output shaft attached to said engine mounting plate said output shaft coupled to said upper drive assembly"—are also obvious in

---

[26] A "horizontal output shaft" is "a shaft exiting the air cooled engine and positioned so the shaft is substantially horizontal when the air cooled engine is mounted on the engine mounting plate and ready for normal operation." (Doc. 82 at p. 31).

[27] "[E]ngine . . . attached to [the] engine mounting plate" means "the engine is attached and mounted to the engine mounting plate, by any means, so that the engine is held in operating position." (Doc. 82 at p. 32).

light of prior art. (Transcript Vol. II at pp. 118–19 (Mr. Kueny); *e.g.*, Go-Devil Ex. 35 at p. 001278 (Torrey Patent) (Fig. 1, disclosing air-cooled utility engine M with horizontal output shaft 15 with engine M mounted to mounting plate 42, where output shaft 15 is coupled to upper drive assembly 17); Go-Devil Ex. 24 at p. 001166 (Foreman Patent) (Fig. 1, showing same); Go-Devil Ex. 45 at p. 001284 (Watson Patent) (Figs. 1 & 2, showing same)).

### e. Claim 7 of the '340 Patent

Claim 7 of the '340 Patent discloses a "portable drive assembly according to claim **6** wherein said drive housing is water sealed[28]." (Gator Tail Ex. 1 at p. 0658 ('340 Patent)). For reasons explained above, the Court finds that Claim 6 of the '340 Patent is invalid as obvious. The Court further finds that the additional aspect stated in this claim—specifically, a "drive housing [that] is water sealed"—is also obvious in light of prior art. (Transcript Vol. II at pp. 119 (Mr. Kueny); *e.g.*, Go-Devil Ex. 45 at p. 001286 (Watson Patent) (Col. 2, ln. 14, "Housing 14 is sealed")).

### f. Claim 8 of the '340 Patent

Claim 8 of the '340 Patent discloses:

> A portable outboard engine and drive assembly having means for temporary attachment to the transom of a shallow draft watercraft comprising:
> a) a sealed housing containing a timing belt drive assembly comprising an upper drive pulley assembly and a lower driven pulley assembly;

---

[28] "[W]ater sealed" and "sealed" means "enclosed in a manner intended to resist the intrusion of water." (Doc. 82 at p. 34).

b) an engine mounting plate attached externally to said sealed housing located adjacent said upper drive pulley assembly perpendicular to said sealed housing;

c) a propeller shaft partially enclosed within a shaft housing attached to said sealed housing extending from said driven pulley assembly at least 12 inches beyond said sealed housing;

d) a propeller attached to said propeller shaft;

e) a pivotal means[29] for temporarily attaching said sealed drive housing to a boat transom; and

f) an air cooled engine mounted to said engine-mounting plate[30] and coupled externally to said upper drive pulley assembly.

(Gator Tail Ex. 1 at p. 0658 ('340 Patent)).

Independent Claim 8 essentially restates the subject matter disclosed in Claims 1–7. (Transcript Vol. II at pp. 119 (Mr. Kueny)). To the extent that Claim 8 merely recapitulates subject matter previously discussed, the Court finds that Claim 8 is also obvious for reasons explained above.

The only new subject matter disclosed by Claim 8 is "a pivotal means for temporarily attaching said sealed drive housing to a boat transom." The Court further finds that this additional aspect is also obvious in light of prior art. (*E.g.*, Go-Devil Ex. 35 at p. 001213 (Pignata Patent) (Col. 4, lns. 44–48, "Mounted to the outboard power unit 10 is a rotatable mounting plate 42 that enables the entire outboard power unit 10 to be pivoted . . . .")).

---

[29] A "pivotal means" and a "pivotal means [that] comprises both horizontal and vertical pivoting means" each mean that "the motor is mounted for rotation, at least in partial range, on the watercraft's vertical axis and its lateral axis." (Doc. 82 at pp. 38–39).

[30] "[E]ngine mounted to [the] engine-mounting plate" means "the engine is attached and mounted to the engine mounting plate, by any means, so that the engine is held in operating position." (Doc. 82 at p. 32).

### g. Claim 9 of the '340 Patent

Claim 9 of the '340 Patent discloses a "portable drive assembly according to claim **8** wherein said pivotal means comprises both horizontal and vertical pivoting means." (*Id.*). For reasons explained above, the Court finds that Claim 8 of the '340 Patent is invalid as obvious. The Court further finds that the additional aspect stated in this claim—specifically, "said pivotal means compris[ing] both horizontal and vertical pivoting means"—is also obvious in light of prior art. (Transcript Vol. II at pp. 120 (Mr. Kueny) ("[V]irtually every outboard motor since the teens, over the last century, has had [both horizontal and vertical pivoting means].");  *e.g.*, Go-Devil Ex. 43 at p. 001278 (Torrey Patent) (Figs. 1 & 2, showing that portable drive unit pivots in both the horizontal and vertical directions)).

### h. Claim 11 of the '340 Patent

Claim 11 of the '340 Patent discloses a "portable drive assembly according to claim **8** wherein said propeller shaft assembly further comprises a plurality of thrust bearings and seals at each end of said shaft housing[31]." (*Id.*). For reasons explained above, the Court finds that Claim 8 of the '340 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim— specifically, the "propeller shaft assembly further compris[ing] a plurality of thrust bearings and seals at each end of said shaft housing"—are also obvious in light of prior art. (Transcript Vol. II at pp. 120 (Mr. Kueny); *e.g.*, Go-Devil Ex. 43 at p.

---

[31] "[A] plurality of thrust bearings and seals at each end of said shaft housing" means "more than one thrust bearing and more than one seal along the propeller shaft housing, located at the ends." (Doc. 82 at p. 39).

001279 (Torrey Patent) (Fig. 5, showing: shaft 14 is supported adjacent to propeller end of shaft and extending beyond bearings 52; additional "suitable bearings" located along shaft, Col. 3, lns. 26–27; a seal provided where propeller mounting portion emerges from the housing, Col. 3, lns. 33–35)).

### i. Claim 12 of the '340 Patent

Claim 12 of the '340 Patent discloses a "portable drive assembly according to claim 11 wherein said propeller shaft assembly further comprises a rudder fin extending below said shaft housing." (*Id.*). For reasons explained above, the Court finds that Claim 11 of the '340 Patent is invalid as obvious. The Court further finds that the additional aspect stated in this claim—specifically, "a rudder fin extending below said shaft housing"—is also obvious in light of prior art. (Transcript Vol. II at pp. 121 (Mr. Kueny); *e.g.*, Go-Devil Ex. 43 at p. 001278 (Torrey Patent) (Figs. 1 & 2, showing rudder fin 55 extending below housing)).

### j. Claim 13 of the '340 Patent

Claim 13 of the '340 Patent discloses a "portable drive assembly according to claim 8 wherein said propeller shaft assembly is in excess of 18 inches in length. (*Id.* at p. 8). For reasons explained above, the Court finds that Claim 8 of the '340 Patent is invalid as obvious. The Court further finds that the additional aspect stated in this claim—specifically, a "propeller shaft assembly . . . in excess of 18 inches in length"—is also obvious in light of prior art. (Transcript Vol. II at pp. 121 (Mr. Kueny); *e.g.*, Go-Devil Ex. 24 at p. 001166 (Foreman Patent) (Fig. 1, teaching a

shaft housing 16 "that encases a drive shaft 26 which is three to seven feet in length," Col. 1, lns. 39–40)).

In sum, the Court finds that each of the asserted claims of the '340 Patent is obvious in light of prior art.

### iii. Claim 1 of the '035 Patent

The Court now turns to the claims disclosed by the '035 Patent. Claim 1 of the '035 Patent discloses:

> A marine craft comprising a hull comprising a transom; and a portable drive assembly temporarily attached to the transom, the portable drive assembly comprising an elongated drive housing enclosing an upper drive assembly and a lower driven assembly and a timing belt connecting the upper drive assembly to the lower driven assembly; and an engine mounting plate attached externally to the drive housing adjacent the upper drive assembly perpendicular to the drive housing; wherein the lower driven assembly comprises a propeller shaft at least a portion of which is enclosed within a shaft housing attached to the drive housing adjacent the driven assembly, the shaft housing extending in excess of 18 inches beyond the drive housing[32], and a propeller attached to the propeller shaft.

(Gator Tail Ex. 2 at p. 01854).

At the outset, the Court notes minor stylistic differences in claim language between Claim 1 of the '340 Patent and Claim 1 of the '035 Patent. These stylistic differences, however, do not affect the Court's obviousness analysis. *Cf. Lighting Ballast Control LLC v. Philips Electronics N. Am. Corp.*, 744 F.3d 1272, 1284 (Fed.

---

[32] A "shaft housing extending in excess of 18 inches beyond the drive housing" means "the distal extent (the far end) of the shaft housing is at least 18 inches from the drive housing." (Doc. 82 at p. 28).

Cir. 2014) ("Claim construction is a legal statement of the scope of the patent right; it . . . [turns] on the *content* of the patent documents." (emphasis added)).

The Court further notes that Claim 1 of the '035 Patent contains two minor substantive modifications compared to Claim 1 of the '340 Patent. First, claim 1 of the '035 Patent claims "[a] marine craft comprising a hull comprising a transom," (Gator Tail Ex. 2 at p. 01854), whereas Claim 1 of the '340 Patent references, but does not claim, "the transom of a shallow draft watercraft," (Gator Tail Ex. 1 at p. 0658). Second, claim 1 of the '035 Patent claims a "shaft housing extending in excess of 18 inches beyond the drive housing," (Gator Tail Ex. 2 at p. 01854), whereas Claim 1 of the '340 Patent claims "a shaft housing . . . extending at least 12 inches beyond [the] drive housing," (Gator Tail Ex. 1 at p. 0658). The Court finds that these minor substantive differences between the two Patents also do not meaningfully affect the Court's obviousness analysis.

Upon review, the Court finds that the content claimed in Claim 1 of the '035 Patent is indistinguishable from the content claimed in Claim 1 of the '340 Patent. (*See* Transcript Vol. II at p. 124 (Question: "Mr. Kueny, is there anything that's contained in claim one [of the '035 Patent] that's materially different from what we have just spoken about in claims of the 340 Patent?" Mr. Kueny: "I'd have to put them side by side, line for line. But I don't see anything different. It talks about portable drive assembly, elongated drive housing, engine mounting plate, shaft in excess of 18 inches. They appear to be the same.")). Accordingly, for the same

reasons stated above with regard to Claim 1 of the '340 Patent, the Court finds that

Claim 1 of the '035 Patent is obvious in light of prior art. Each Patent merely

combines "prior art elements" of Saito—specifically, a short-tail design—and

Torrey—a belt-driven motor—to achieve a predictable variation according to those

elements' established functions. *KSR*, 550 U.S. at 417.

a. The '035 Patent's PTO Proceedings

The '035 Patent's prosecution and reexamination history closely parallels the

prosecution and reexamination history of the '340 Patent. On May 22, 2006 Mr.

Broussard filed the application that would become the '035 Patent. (Gator Tail Ex.

2 at p. 01838 ('035 Patent)). On August 21, 2006, the PTO *rejected* Mr. Broussard's

application, asserting "nonstatutory obviousness-type double patenting" in light of

the '340 Patent. (Gator Tail Ex. 15 at pp. 01180–81 (Complete Prosecution History

of the '035 Patent). The PTO explained:

> Although the conflicting claims [between the '340 Patent and the
> instant application] are not identical, they are not patentably distinct
> from each other because they both disclose a portable drive assembly
> for attachment to the transom of a watercraft, said portable drive
> assembly being comprised of an [sic] drive housing that encloses an
> upper drive assembly, a lower driven assembly and a timing belt, and
> an engine mounting plate that is attached externally to said drive
> housing, where said lower driven assembly is further comprised of a
> propeller shaft that is enclosed with a shaft housing that is attached to
> said propeller shaft. Claims 1–12 of the present application disclosed a
> marine craft with a hull having a transom and the portable drive
> assembly as previously described, while claims 1–6, 8 and 13 of [the
> '340 Patent] disclose said portable drive assembly with means for
> attachment to the transom of a watercraft. Therefore, it would have
> been obvious to one of ordinary skill in the art at the time of the
> invention, to utilize a watercraft with a transom in combination with

said portable drive assembly, since said portable drive assembly has already been disclosed in [the '340 Patent] as having a means for attachment to a watercraft.

(*Id.* at pp. 01181–82).

As with the '340 Patent, however, the PTO ultimately relented, allowing "Claims 1–16"[33] of the '035 Patent *without* explanation. (*Id.* at p. 01149). Then, on August 20, 2007, the PTO allowed Mr. Broussard to submit a substitute specification and additional drawings. (*Id.* at pp. 01085–86). As before, no explanation accompanied the PTO's approval of these amendments. (*See id.*).

On November 13, 2009 Defendant Mud Buddy requested reexamination of the '035 Patent. (Gator Tail Ex. 17 at p. 01785 (Complete Reexamination History of the '035 Patent)). The PTO granted Mud Buddy's request,[34] observing: (1) "[t]he Saito Patent is a U.S. patent that was not cited/considered in an earlier concluded examination of the patent being re-examined"; and (2) "the Saito Patent raises a substantial new question of patentability regarding claims 1–16." (*Id.* at pp. 01746–47).

Upon reexamination, the PTO *twice* rejected all of the claims in the '035 Patent as obvious. (*Id.* at 01722, 01724 (March 4, 2010 Reexamination Decision); *id.* at 01618, 01620 (June 26, 2010 Reexamination Decision)). As in its

---

[33] During re-examination, the '035 Patent was amended to add Claim 17. (*See* Gator Tail Ex. 17 at pp. 01646, 01649, 01620).

[34] The PTO cover sheet accompanying the decision granting reexamination of the '035 Patent does not include a mailing date, nor does the PTO's decision otherwise indicate when it was issued. (*See* Gator Tail Ex. 17 at pp. 01740–49).

reexamination analysis of the '340 Patent, the PTO reached its initial

reexamination determinations on the '035 Patent relying principally on the Saito

Patent, the Watson Patent, and the Foreman Patent. (*See id.* at pp. 01726–31; *id.*

at pp. 01622–38)).

Once again, however, the PTO capitulated. On November 30, 2010, following

review of substantially similar materials to those which ultimately proved

persuasive in its reexamination of the '340 Patent, the PTO confirmed Claims 1–16

of the '035 Patent and, further, added one additional claim. (*Id.* at p. 01502–01504;

*compare* Gator Tail Ex. 16 at pp. 01277–324 ('340 Patent reexamination references

provided by Gator Tail), *with* Gator Tail Ex. 17 at pp. 01566–617 ('035 Patent

reexamination references provided by Gator Tail)).[35]  Indeed, the PTO's Statement

of Reasons for Patentability and/or Confirmation of the '035 Patent is, for all intents

and purposes, a carbon-copy of its Statement of Reasons for Patentability and/or

Confirmation of the '340 Patent.  (*Compare* Gator Tail Ex. 17 at p. 01508 ('035

Patent Statement of Reasons for Patentability and/or Confirmation), *with* Gator

Tail Ex. 16 at p. 01229)).  In relevant part, the PTO concludes:

> The Saito Patent fails to teach the timing belt in the drive
> assembly, and therefore, does not anticipate the claims [in the '035
> Patent].  The Saito Patent fails to render the claims obvious because

---

[35]  The Court notes that Gator Tail submitted slightly different versions of Dr. Matthews's Declaration with the respective reexaminations of the '340 and '035 Patents. (*Compare* Gator Tail Ex. 16 at pp. 01277–84 ('340 Patent Reexamination History featuring Dr. Matthews's Declaration dated Oct. 15, 2010), *with* Gator Tail Ex. 17 at pp. 01565–74 ('035 Patent Reexamination History featuring Dr. Matthews's Declaration dated Aug. 24, 2010). However, the differences between these two declarations do not appear to have had a material impact on the PTO's reasoning, nor do they materially impact on the Court's reasoning.

the patent owner has persuasively argued and presented evidence that one of ordinary skill in the art would not substitute a timing belt for the bevel gears in the Saito Patent or use a timing belt in addition to the bevel gears in the Saito Patent. *See patent owner's response of August 26, 2010 and paragraphs 5–16 of the Matthew [sic] Declaration, especially paragraphs 11 and 12.* In essence, the modification of the Saito Patent proposed in the rejection would lead to significant changes (e.g., changing the orientation of the drive system output shaft), which would not be obvious to one of ordinary skill in the art.

Claims 2–17 depend on claim 1, and therefore, are allowable for the same reason.

(Gator Tail Ex. 17 at p. 01508 (emphasis added)). As before, there is no indication in the '035 Patent's reexamination history that the PTO considered the Torrey Patent and/or the Scavenger motor in arriving at its determination. (*See id.* at p. 01502).

In its defense of the validity of the '035 Patent to the PTO, Gator Tail did little more than cut-and-paste its arguments and evidence in support of the validity of the '340 Patent. In turn, the PTO appears to have adopted its own reasoning from the '340 Patent proceedings to confirm the validity of the '035 Patent. Accordingly, the Court's concerns regarding the prosecution and reexamination history of the '340 Patent hold true for the prosecution and reexamination history of the '035 Patent, right down to the PTO's reliance on Dr. Matthews's Declaration.

To repeat, the evidence at trial was conclusive that Dr. Matthews's Declaration fell short of providing a complete analysis of the '035 Patent's validity in light of Saito and/or Torrey. In sum, the Court finds that the PTO's confirmation of the '035 Patent was based on incomplete evidence. Thus, because "the PTO did

not have all material facts before it, its considered judgment . . . lose[s] significant force," and Defendants may still prove their "invalidity defense by clear and convincing evidence." *See Microsoft Corp.*, 131 S. Ct. at 2251.

iv.    The remaining asserted claims of the '035 Patent

a.  Claim 3 of the '035 Patent

Claim 3 of the '035 Patent discloses a "marine craft according to claim 1, wherein the portable drive assembly further comprises steering and throttle controls. (Gator Tail Ex. 2 at p. 01854). For reasons explained above, the Court finds that Claim 1 of the '035 Patent is invalid as obvious. Minor stylistic differences aside, *cf. Lighting Ballast Control LLC*, 744 F.3d at 128, the material disclosed in Claim 3 of the '035 Patent is the same as the material disclosed in Claim 3 of the '340 Patent. (*Compare* Gator Tail Ex. 1 at p. 0658 ('340 Patent), *with* Gator Tail Ex. 2 at p. 01854 ('035 Patent)). Accordingly, the Court finds that Claim 3 of the '035 Patent is also obvious for the same reasons, and in light of the same prior art, as Claim 3 of the '340 Patent. (*See* Transcript Vol. II at p. 116 (Mr. Kueny) ("[V]irtually every outboard motor since the very beginning had to have a way to steer it and it had to have a way to make it go slow and fast, so they've all had steering and throttle controls"); *e.g.*, Go-Devil Ex. 39 at pp. 001229, 001236–37

(Japanese Patent H9-202298 (Saito) showing steering control 42 & 43 and throttle control 44)).[36]

## b. Claim 4 of the '035 Patent

Claim 4 of the '035 Patent discloses a "marine craft according to claim 1, wherein the shaft housing comprises a rudder fin." (Gator Tail Ex. 2 at p. 01854). For reasons explained above, the Court finds that Claim 1 of the '035 Patent is invalid as obvious. And, as indicated with regard to Claim 4 of the '340 Patent, rudder fins are common in the outboard marine motor field, and obvious in light of prior art. (*See* Transcript Vol. II at pp. 116–17 (Mr. Kueny); *e.g.*, Go-Devil Ex. 43 at p. 001278–79 (Torrey Patent) (Fig. 2, disclosing shaft housing 51 with vertical triangular rudder fin 55 located below shaft housing 51; Fig. 5, disclosing propeller shaft 14 supported by thrust bearings adjacent to propeller end 52 and pulley end 16); Go-Devil Ex. 24 at p. 001116 (Foreman Patent) (Fig. 1, disclosing same)).

## c. Claim 5 of the '035 Patent

Claim 5 of the '035 Patent discloses a "marine craft according to claim 1, wherein the upper drive assembly and the lower driven assembly further include respective timing pulleys compatible with the timing belt, the timing belt being unobstructed or acted upon by other bodies." (Gator Tail Ex. 2 at p. 01854). For

---

[36] On reexamination, the examiner's analysis of claims *other than* claim 1 is limited to the observation that "[c]laims 2–17 depend on claim 1, and therefore, are allowable for the same reason." (Gator Tail Ex. 17 at p. 01508). Thus, for the same reasons as explained above regarding Claim 1, the Court finds that "[the PTO's] considered judgment . . . lose[s] significant force" regarding the remaining claims in the '035 Patent and will not prevent Defendants from proving their "invalidity defense by clear and convincing evidence." *See Microsoft Corp.*, 131 S. Ct. at 2251.

reasons explained above, the Court finds that Claim 1 of the '035 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim—specifically, "timing pulleys compatible with the timing belt, the timing belt being unobstructed or acted upon by other bodies"—are also obvious in light of prior art. (*See* Transcript Vol. II at pp. 117–18 (Mr. Kueny); *e.g.*, Go-Devil Ex. 35 at p. 001209 (Pignata Patent) (Fig. 3, disclosing upper drive assembly 38 and lower driven assembly 26, connected with timing pulleys 38 & 26 compatible with timing belt 40, where timing belt 40 is unobstructed or acted upon by other bodies)).

### d. Claim 6 of the '035 Patent

Claim 6 of the '035 Patent discloses a "marine craft according to claim 1, further comprising a mounting bracket[37] assembly[38] for temporarily attaching the portable drive assembly to the transom, the mounting bracket assembly comprising a mounting bracket and a pivotal assembly[39] for positioning the portable drive assembly in the horizontal plane." (Gator Tail Ex. 2 at p. 01854). For reasons explained above, the Court finds that Claim 1 of the '035 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim—specifically, "a mounting bracket assembly for temporarily attaching the portable

---

[37] A "mounting bracket" is "a structure by which the portable drive assembly is temporarily attached to the transom." (Doc. 82 at p. 41).

[38] A "mounting bracket assembly" is "a mounting bracket for mounting the portable drive assembly to the transom and a pivotal assembly for positioning the portable drive assembly in the horizontal plane." (Doc. 82 at pp. 41–42).

[39] A "pivotal assembly" is "a mechanical assembly for pivoting the motor to steer the boat." (Doc. 82 at p. 36).

drive assembly to the transom, the mounting bracket assembly comprising a mounting bracket and a pivotal assembly for positioning the portable drive assembly in the horizontal plane"—are also obvious in light of prior art. (*E.g.*, Go-Devil Ex. 39 at p. 001244 (Saito Patent) (Fig. 1, disclosing mounting bracket 7 & 8, with pivotal assembly whereby portable drive assembly can pivot about shaft 11 to enable assembly to be pivoted in horizontal plane); Go-Devil Ex. 43 at 001278–79 (Torrey Patent) (Figs. 1, 2, 3, & 5, showing same)).

### e. Claim 7 of the '035 Patent

Claim 7 of the '035 Patent discloses a "marine craft according to claim 1 further comprising a utility engine mounted on the engine mounting plate[40] and coupled to the upper drive assembly." (Gator Tail Ex. 2 at p. 01855). For reasons explained above, the Court finds that Claim 1 of the '035 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim— specifically, "a utility engine mounted on the engine mounting plate and coupled to the upper drive assembly"—are also obvious in light of prior art. (*See* Transcript Vol. II at pp. 118–19 (Mr. Kueny); *e.g.*, Go-Devil Ex. 35 at p. 001278 (Torrey Patent) (Fig. 1, disclosing air-cooled utility engine M with horizontal output shaft 15 with engine M mounted to mounting plate 42, where output shaft 15 is coupled to upper drive assembly 17); Go-Devil Ex. 24 at p. 001166 (Foreman Patent) (Fig. 1, showing same); Go-Devil Ex. 45 at p. 001284 (Watson Patent) (Figs. 1 & 2, showing same)).

---

[40] "[E]ngine mounted on the engine mounting plate" means "the engine is attached and mounted to the engine mounting plate, by any means, so that the engine is held in operating position." (Doc. 82 at p. 32).

## f. Claim 9 of the '035 Patent

Claim 9 of the '035 Patent discloses a "marine craft according to claim 7, wherein the portable drive assembly further comprises steering and throttle controls." (Gator Tail Ex. 2 at p. 01855). For reasons explained above, the Court finds that Claim 7 of the '035 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim—specifically, "the portable drive assembly further compris[ing] steering and throttle controls"—are also obvious in light of the same prior art. (*See* Transcript Vol. II at p. 116 (Mr. Kueny) ("[V]irtually every outboard motor since the very beginning had to have a way to steer it and it had to have a way to make it go slow and fast, so they've all had steering and throttle controls"); *e.g.*, Go-Devil Ex. 39 at pp. 001229, 001236–37 (Japanese Patent H9-202298 (Saito) showing steering control 42 & 43 and throttle control 44)).

## g. Claim 10 of the '035 Patent

Claim 10 of the '035 Patent discloses a "marine craft according to claim 7, wherein the shaft housing comprises a rudder fin." (Gator Tail Ex. 2 at p. 01855). For reasons explained above, the Court finds that Claim 7 of the '035 Patent is invalid as obvious. The Court further finds that the additional material disclosed in this claim—specifically, "the shaft housing compris[ing] a rudder fin"—is also obvious in light of the same prior art. (*See* Transcript Vol. II at pp. 116–17 (Mr. Kueny); *e.g.*, Go-Devil Ex. 43 at p. 001278–79 (Torrey Patent) (Fig. 2, disclosing

72

shaft housing 51 with vertical triangular rudder fin 55 located below shaft housing 51; Fig. 5, disclosing propeller shaft 14 supported by thrust bearings adjacent to propeller end 52 and pulley end 16); Go-Devil Ex. 24 at p. 001116 (Foreman Patent) (Fig. 1, disclosing same)).

### h. Claim 11 of the '035 Patent

Claim 11 of the '035 Patent discloses a "marine craft according to claim **7**, wherein the upper drive assembly and the lower driven assembly further include respective timing pulleys compatible with the timing belt, the timing belt being unobstructed or acted upon by other bodies." (Gator Tail Ex. 2 at p. 01855). For reasons explained above, the Court finds that Claim 7 of the '035 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim—specifically, "timing pulleys compatible with the timing belt, the timing belt being unobstructed or acted upon by other bodies"—are also obvious in light of prior art. (*See* Transcript Vol. II at pp. 117–18 (Mr. Kueny); *e.g.*, Go-Devil Ex. 35 at p. 001209 (Pignata Patent) (Fig. 3, disclosing upper drive assembly 38 and lower driven assembly 26, connected with timing pulleys 38 & 26 compatible with timing belt 40, where timing belt 40 is unobstructed or acted upon by other bodies)).

### j. Claim 12 of the '035 Patent

Claim 12 of the '035 Patent discloses a "marine craft according to claim **7**, further comprising a mounting bracket assembly for temporarily attaching the portable drive assembly to the transom, the mounting bracket assembly comprising

a mounting bracket and a pivotal assembly for positioning the portable drive assembly in the horizontal plane." (Gator Tail Ex. 2 at p. 01855). For reasons explained above, the Court finds that Claim 7 of the '035 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim— specifically, "a mounting bracket assembly for temporarily attaching the portable drive assembly to the transom, the mounting bracket assembly comprising a mounting bracket and a pivotal assembly for positioning the portable drive assembly in the horizontal plane"—are also obvious in light of prior art. (*E.g.*, Go-Devil Ex. 39 at p. 001244 (Saito Patent) (Fig. 1, disclosing mounting bracket 7 & 8, with pivotal assembly whereby portable drive assembly can pivot about shaft 11 to enable assembly to be pivoted in horizontal plane); Go-Devil Ex. 43 at 001278–79 (Torrey Patent) (Figs. 1, 2, 3, & 5, showing same)).

### k. Claim 13 of the '035 Patent

Claim 13 of the '035 Patent discloses a "marine craft according to claim **12**, further comprising a first pivoting assembly for positively positioning the elongated drive housing beyond vertical relative to the mounting bracket in the vertical plane." (Gator Tail Ex. 2 at p. 01855). For reasons explained above, the Court finds that Claim 12 of the '035 Patent is invalid as obvious. The Court further finds that the additional aspects stated in this claim—specifically, "a first pivoting assembly for positively positioning the elongated drive housing beyond vertical relative to the mounting bracket in the vertical plane"—are also obvious in light of prior art. (*E.g.*,

74

Go-Devil Ex. 39 at p. 001244 (Saito Patent) (Fig. 1, showing pivoting assembly at shaft 11, and elongated drive housing 31 able to pivot beyond vertical relative to mounting bracket 7 & 8 through shaft 11); *see also* Go-Devil Ex. 45 at p. 001284 (Watson Patent) (Fig. 1, showing mounting bracket 16 pivoting around horizontal pin, and elongated drive housing able to pivot beyond vertical through pivoting mounting bracket 16)).

In sum, the Court finds that each of the asserted claims of the '035 Patent is obvious in light of prior art.

### 5.     *Secondary Considerations*

The Court finds that Defendants have established a *prima facie* case of obviousness according to the framework laid out in *Graham* and *KSR*.   Once a *prima facie* case of obviousness has been established, the final element of the *Graham* test requires the patent applicant to present evidence of any objective indicia of non-obviousness to overcome this *prima facie* showing. *See Graham*, 383 U.S. at 17–18; *e.g., In re Huang,* 100 F.3d 135, 139 (Fed. Cir. 1996).   So-called "secondary considerations" include commercial success, long-felt need, failure of others, skepticism and unexpected results. *See Graham,* 383 U.S. at 17–18; *3M v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1573 (Fed. Cir. 1992).   In some cases, such evidence is the most probative of obviousness. *See Richardson–Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997).   The Federal Circuit has cautioned, however, that secondary considerations "do[] not control the

obviousness determination." *Richardson–Vicks*, 122 F.3d at 1483. Stated differently, secondary considerations "are but a part of the totality of the evidence that is used to reach the ultimate conclusion of obviousness." *See Richardson–Vicks*, 122 F.3d at 1483 (quotation marks omitted). "[A] strong prima facie obviousness showing may stand even in the face of considerable evidence of secondary considerations." *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009); *see also Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1368 (Fed. Cir. 2008) ("Secondary considerations of nonobviousness . . . simply cannot overcome [a] strong prima facie case of obviousness."); *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1371 (Fed. Cir. 2006) ("The presence of certain secondary considerations of nonobviousness are insufficient as a matter of law to overcome [a] conclusion that the evidence *only* supports a legal conclusion that [a claim] would have been obvious.").

Gator Tail identifies five secondary considerations to rebut Defendants' showing of obviousness: (1) commercial success; (2) long-felt but unsolved need; (3) failure of others; (4) copying; (5) and unexpected results. (08-cv-00124 Doc. 125 at pp. 17–23). The Court addresses each secondary consideration in turn.

i. Commercial success

First, Gator Tail argues that the commercial success of Mr. Broussard's invention supports a finding of non-obviousness. (*Id.* at pp. 17–18). Generally, a product's commercial success is a relevant indicator of nonobviousness. *See*

*Graham*, 383 at 17–18. However, "[t]he commercial success of a product is relevant to the non-obviousness of a claim only insofar as the success of the product is due to the claimed invention." *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010). In other words, the party asserting commercial success must prove a nexus between the commercial success and the claimed invention. *See Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 1984). Specifically, the patent owner must show that "sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996). Additionally, "if the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006).

The Court is not persuaded by Gator Tail's argument that its product's commercial success proves its nonobviousness. First, Gator Tail's brief fails to identify *which* "unique characteristics of [its] claimed invention" led to its sales. *Huang*, 100 F.3d at 140. Rather, Gator Tail asserts without qualification that "the short-tail belt-driven mud motor has been a resounding success," and cites anecdotal evidence to show "a strong customer preference for the short-tail motor over the long-tail motor, regardless of marketing." (*See* 08-cv-00124 Doc. 125 at pp. 17–18). This simply is not enough. Lacking any explanation for which

characteristics of Gator Tail's motor led to its "commercial success," the Court cannot assess whether the Gator Tail motor's asserted success "is *due* to the claimed invention." *Geo. M. Martin Co.*, 618 F.3d at 1304 (emphasis added); *see Ormco*, 463 F.3d at 1311–12 ("Evidence of commercial success . . . is *only* significant *if* there is a nexus between the claimed invention and the commercial success." (emphasis added)).

Gator Tail's argument still fails even if the Court *assumes* that Gator Tail intends to rely on its motor's "short-tail" and/or "belt-driven" design as "the unique characteristics" which led to its commercial success," *Huang*, 100 F.3d at 140. (*See* 08-cv-00124 Doc. 125 at p. 17 ("[T]he short-tail belt-driven mud motor has been a resounding success . . . .")). This is because, as the Court has explained, each of these features was known in the prior art well before Mr. Broussard claimed them in the '340 and '035 Patents. Thus, at bottom, the Gator Tail motor's commercial success "is not pertinent." *Ormco*, 463 F.3d at 1312.

ii.  Long-felt but unsolved need

Next, Gator Tail asserts that "Mr. Broussard's invention fulfilled long-felt but unsolved needs." (08-cv-00124 Doc. 125 at p. 18). "Evidence of a long-felt but unsolved need provides another secondary consideration of non-obviousness." *Geo. M. Martin Co.*, 618 F.3d at 1304. However, "[w]here the differences between the prior art and the claimed invention are . . . minimal . . ., it cannot be said that any long-felt need was unsolved." *Id.* Further, "once another supplied the key element,

there was no long-felt need or, indeed, a problem to be solved . . . ." *Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988).

Here, Gator Tail offers two "long felt but unsolved needs" addressed by Mr. Broussard's motor: first, "Mr. Broussard's invention provided more power, was easier to operate, and more maneuverable" than the traditional long-tail mud motor, (08-cv-00125 Doc. 125 at pp. 18–19); second, "Mr. Broussard's invention provided a boat motor that could be used year-round," whereas "the long-tail was used primarily for duck hunting and sat the rest of the year," (*id.* at p. 19).

The Court agrees with Gator Tail's assessment *as far as it goes.* That is, based on the evidence at trial, the Court finds that Gator Tail's motor offers significant improvements in power, ease of operation, maneuverability, and multi-season use compared to the traditional long-tail mud motor. The Court remains unpersuaded that Gator Tail's motor addressed "long felt but unsolved needs", however, because Gator Tail *fails* to address the issue in light of Saito. Stated differently, even if Gator Tail's short-tail design addresses the problems of power, maneuverability, ease of operation, and season-specific use which plagued the traditional long-tail mud motor, the question remains whether Gator Tail's motor addresses the same *or* other needs presented by Saito.

The evidence at trial indicates the opposite—*i.e.*, that Saito "has the same kind of advantages" claimed by Gator Tail. (Transcript Vol. III at p. 288 (Mr. Broussard)). Specifically, Mr. Broussard *conceded* that the Pro-Drive motor—an

79

embodiment of the Saito Patent's design available on the market more than a year *prior* to release of Gator Tail's first motor—offered improved maneuverability, improved ease of operation, and the ability "to go in shallow water conditions as well as open water conditions." (Transcript Vol. III at pp. 288 (Mr. Broussard)). Because Pro-Drive "supplied the[se] key element[s], there was no long-felt need or, indeed, a problem to be solved" with regard to power, ease of operation, and maneuverability after Pro-Drive hit the market. *See Newell Companies*, 864 F.2d at 768.

As for single-season use—the only remaining "long felt but unsolved need" identified by Gator Tail—the evidence at trial was incomplete. Certainly, Mr. Broussard testified that the Gator Tail motor can be used year round, and that this is an improvement over the traditional long-tail mud motor. (Trial Transcript Vol. III at pp. 265–66 (Mr. Broussard)). There was no evidence, however, that Pro-Drive cannot also be used year-round. Lacking any indication that Pro-Drive is *not* a four-season motor, the Court cannot say that this feature of Mr. Broussard's motor addresses a "long felt but unsolved need." *Cf. Orthopedic Equip. Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1382 (Fed. Cir. 1983) ("[A]lthough the invention did achieve a result desirable in all businesses which stock goods, there was no evidence that the industry perceived a decrease in inventory as a long felt but unsolved need."), *abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011).

In sum, the Court is not convinced that Mr. Broussard's motor addressed any needs in the outboard marine motor field not already addressed by Saito and/or Pro-Drive. *Newell Companies*, 864 F.2d at 768.

### iii. Failure of others

Next, Gator Tail points to the widespread failure of others to develop a horizontal drive shaft short-tail mud motor design. (08-cv-00124 Doc. 125 at pp. 16–17).

As discussed, *Saito* revolutionized the mud motor field by disclosing the more maneuverable, short-tail design. Thereafter, "Mr. Broussard figured out how to use . . . a horizontal output engine" to propel a short-tail propeller shaft. (08-cv-00124 Doc. 125 at p. 21). But, in discussing the failure of others, Gator Tail fails to identify any evidence showing that Mr. Broussard's "horizontal output engine" marked an improvement over Saito's vertical output engine, much less "establish a nexus" between this improvement and the failure of others. (*See id.* at pp. 20–21). Accordingly, Gator Tail's argument once again fails to "establish a nexus between the evidence and the merits of the claimed invention." *In re GPAC Inc.*, 57 F.3d at 1580. Therefore, *at most*, "this secondary consideration can be accorded only little weight as evidence of nonobviousness." *Id.*

Further, the Court is not persuaded by Gator Tail's assertion that Defendants failed to develop a short-tail mud motor driven by a horizontal output engine in the time between the Saito Patent's issue in 1998 and Mr. Broussard's

81

senior engineering project in 2002. On the contrary, Mr. Foreman testified credibly that he "fabricated [the] first version [of the Mud Buddy short-tail belt drive] in the spring of 2001." (Transcript Vol. II at p. 24 (Mr. Glenn Foreman)). Multiple witnesses corroborated Mr. Foreman's testimony regarding the timing of the Mud Buddy motor's development. (*E.g.*, Mud Buddy Deposition 4 at pp. 44–45 (Clint Hovey Deposition, June 28, 2011) (indicating that Mr. Hovey discussed a "drop frame setup with a belt" with Mr. Foreman in "early 2000"); Mud Buddy Deposition 1 at pp. 12–14 (Paul Balding Deposition, June 30, 2011) (indicating that Mr. Balding fabricated a "short tube" for Mr. Foreman in "mid 2001"); Mud Buddy Deposition 6 at pp. 15–16 (Kent Saxon Deposition, June 16, 2011) (indicating that Mr. Saxon discussed a short-drive belt-driven motor with Mr. Foreman "two, three months, four at the most after [the] Louisiana Sportsman Show in March of 2001"); Mud Buddy Deposition 3 at pp. 22–23 (William Hendricks Deposition, June 30, 2011) (indicating that Mr. Hendricks discussed a short-drive belt-driven motor with Mr. Foreman in summer or fall of 2001)). In light of this evidence that Mr. Foreman successfully developed a prototype of the Mud Buddy short-tail belt-drive motor as early as 2001, the Court cannot conclude that the mud motor field was plagued by widespread failure to develop a belt-driven short-tail motor prior to Mr. Broussard's efforts in 2002.

iv.    Unexpected results

Additionally, Gator Tail asserts that "Mr. Broussard's invention achieved results which surprised dealers and customers." (08-cv-00124 Doc. 125 at p. 22). The Federal Circuit has explained that "[w]here the difference between the claimed invention and the prior art is some range or other variable within the claims, the patentee must show that the particular range is critical, generally by showing that the claimed range achieves unexpected results." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004) (quotations marks and alterations omitted). Here, Gator Tail fails to identify *any* evidence to quantify the "unexpected results" that "Mr. Broussard's invention achieved" vis-à-vis pre-existing short-tail motors such as Saito and Pro-Drive, *or* pre-existing long-tail motors such as Torrey and Scavenger. (*See* 08-cv-00124 Doc. 125 at p. 22–23). Instead, as proof of "unexpected results," Gator Tail points to vague testimony indicating that Mr. Broussard "produced a surprising result," (Transcript Vol. III at p. 194 (Dr. Trout)), that "awe[s]" people seeing it for the first time, (*id.* at p. 262 (Mr. Broussard)). (*See* 08-cv-00124 Doc. 125 at p. 22–23).

Lacking any specificity as to the range of results achieved by Mr. Broussard's invention versus Saito, Pro-Drive, Torrey, Scavenger and/or other mud motors— such as a comparison of top speeds, turning radiuses, and/or thrust loads—the Court cannot assess with any degree of confidence whether the self-serving testimony cited by Gator Tail is accurate. Accordingly, the Court finds that the

evidence in the record is, at best, equivocal as to whether Mr. Broussard's invention achieved unexpected results. *See Iron Grip Barbell Co.*, 392 F.3d at 1322–23.

v. Copying

Finally, Gator Tail asserts that "Mr. Broussard's invention has been so successful that it has attracted numerous imitators to the market." (08-cv-00124 Doc. 125 at p. 22). Certainly, evidence of "copying" is relevant to the non-obviousness of a claim. *See Geo. M. Martin Co.*, 618 F.3d at 1305. "[H]owever, . . . a showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations." *Id.* As explained above, Gator Tail has failed to identify evidence "of more compelling objective indicia of other secondary considerations." *Id.* Further, the evidence is that Mr. Foreman developed the Mud Buddy surface drive motor before and/or simultaneously with, Mr. Broussard's development of the Gator Tail motor. "Independently made, simultaneous inventions, made within a comparatively short space of time, are persuasive evidence that the claimed apparatus was the product only of ordinary mechanical or engineering skill." *Id.* (quotation marks omitted). In short, the Court is not at all satisfied that this indicator, standing alone, proves that the patents-in-suit are nonobvious.

Thus, the Court determines that the evidence in the record on several relevant secondary considerations does *not* weigh against a finding of obviousness and, consequently, does *not* undermine the Court's finding that the patents-in-suit

are obvious in light of the prior art. In sum, the Court finds that the evidence in the record clearly and convincingly demonstrates that each of the asserted claims of the patents-in-suit is simply the predictable combination Saito, Torrey, and other prior art elements "according to their established functions." *KSR*, 550 U.S. at 417. Accordingly, the asserted claims are each invalid as obvious in light of prior art. *Id.*

### B. Other Invalidity Arguments

Defendants raise additional arguments for why the patents-in-suit are invalid: (1) each patent is invalid for lack of enablement *and* lack of written description; (2) each patent is invalid for lack of definiteness. The Court addresses these arguments in turn.

### 1. *Lack of enablement and lack of written description*

The required content of the patent specification is set forth in Section 112 of Title 35:

> § 112 ¶ 1. The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. Section 112's "written description" clause "has been construed to mandate that the specification satisfy two closely related requirements." *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1344 (Fed. Cir. 2005).

> First, it must describe the manner and process of making and using the invention so as to enable a person of skill in the art to make and use the full scope of the invention without undue experimentation.

> Second, it must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed.

*Id.* at 1344–45. While the "legal criteria of enablement and written description are related and are often met by the same disclosure," the Federal Circuit has cautioned that "they serve discrete legal requirements." *Capon v. Eshhar*, 418 F.3d 1349, 1360 (Fed. Cir. 2005); *see also LizardTech*, 424 F.3d at 1344 (stating that the requirements of enablement and written description "usually rise and fall together").

Defendants assert that Mr. Broussard's invention fails the requirements set forth in Section 112 for various reasons.

> i. Failure to describe and/or enable a segmented propeller shaft

First, Defendants point out that despite the Court's *Markman* Hearing Ruling, which construed the term "propeller shaft" to include "shafts comprised of segments connected by universal joints," (Doc. 82 at pp. 24–25 & n.31), "there is nothing in either the '340 or '035 Patent specifications . . . that enables or describes such a segmented propeller shaft," (08-cv-00124 Doc. 124 at p. 30).

The Court cannot agree with Defendants' assessment that the '340 and '035 Patents each fail for lack of written description because they each fail to "describe[] a segmented propeller shaft." (08-cv-00124 Doc. 124 at p. 30). In its *Markman* Hearing Ruling, this Court indeed endorsed Gator Tail's position that "the term

86

'drive shaft' is understood by a person with ordinary skill in the art [of outboard marine motors] to include shafts comprised of segments connected by universal joints." (Doc. 82 at p. 25). This finding was based, in part, on Mr. Broussard's testimony that he did not intend to disclaim the possibility of using a universal join in the propeller shaft. (Gator Tail Ex. 48 at pp. 99–100 (Claim Construction Hearing Transcript)). At trial, Go-Devil's owner Warren Coco and Mud Buddy's manager Glenn Foreman each testified that while developing their respective surface drive motors, they experimented with designs incorporating various universal joints into the propeller shaft. (Transcript Vol. I at p. 170 (Warren Coco) ("We built a first prototype with a single u-joint and the bearings with a slip fit. And then we built a second prototype with another universal joint."); Transcript Vol. II at p. 25 (Glenn Foreman) ("I put a single universal joint [into the propeller shaft], like we were using on all of our long-tails at the time. And I put that on this machine, the first prototype I made. It vibrated like crazy, so I abandoned it.")). Based on this testimony, the Court is satisfied that a person of skill in the art of mud motor fabrication would read Mr. Broussard's Patents to include a segmented propeller shaft. In other words, one of ordinary skill in the art would be able to "make and use the full scope of the invention without undue experimentation." *See* *LizardTech*, 424 F.3d at 1344–45. Thus, the patents-in-suit do not fail for lack of enablement.

Based on the same evidence, the Court finds that Mr. Broussard's Patents "describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application"—in other words, the patents-in-suit do not fail for lack of written description. *See id.*

ii.   Failure to describe an engine mounting plate

Next, Defendants assert that the '340 Patent fails for lack of written description because "the words 'engine mounting plate' are nowhere to be found [in the original, as filed application]." (08-cv-00124 Doc. 124 at p. 33). Here, the Court agrees. Mr. Broussard only added the term "engine mounting plate" to Claim 1 by way of amendment on March 16, 2006, after his initial patent application was rejected. (*See* Gator Tail Ex. 14 at pp. 01045–67 (original patent application, failing to disclose or describe an engine mounting plate); *id.* at pp. 01028–35 (PTO's July 28, 2004 decision rejecting Mr. Broussard's patent application); *id.* at p. 00945 (Mr. Broussard's request to amend Claim 1 to include "an engine mounting plate attached externally to said drive housing located adjacent said upper drive assembly perpendicular to said drive housing"); *id.* at p. 00929–33 (PTO's March 16, 2006 Decision allowing Mr. Broussard's requested amendments to Claim 1)). "When the applicant adds a claim or otherwise amends his specification after the original filing date, as [Mr. Broussard] did in this case, the new claims or other added material must find support in the original specification." *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1118 (Fed. Cir.

2001). "The fundamental inquiry is whether the material added by amendment was inherently contained in the original application." *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1352 (Fed. Cir. 2000). "In order for a disclosure to be inherent, the missing descriptive matter must *necessarily be present* in the original application's specification such that one skilled in the art would recognize such a disclosure." *TurboCare*, 264 F.3d at 1119 (emphasis added).

To the extent it addressed how the engine was to be mounted to his motor, Mr. Broussard's initial specification stated: "The air-cooled engine 14 is vertically mounted with a horizontal shaft 16 seen in Fig. 7 and is structurally supported and enclosed in a cowling." (Gator Tail Ex. 16 at p. 01051). At best, this description is confusing: the phrase "vertically mounted" suggests that the "air-cooled engine" is mounted to the motor in some way by its "vertical[]" axis—for example, by attaching a "mounting flange on the side" of the engine, (Transcript Vol. III at p. 218 (Dr. Matthews)); alternatively, Mr. Broussard's use of the conjunctive with the phrase "structurally supported and enclosed in a cowling" suggests that the "cowling" itself plays some role in mounting the engine. (Gator Tail Ex. 16 at p. 01051). Of course, neither of these interpretations is correct, as is made clear by Mr. Broussard's request to amend Claim 1 of the '340 Patent application to include "an engine mounting plate attached externally to said drive housing located adjacent said upper drive assembly perpendicular to said drive housing." (*Id.* at p. 00945).

Dr. Matthews testified at trial that although it would be "unusual," it would be "possible . . . to mount an engine on a vertical surface." (Transcript Vol. III at p. 217 (Dr. Matthews)). Thus, because there are multiple ways for one of ordinary skill in the field of mud motors to interpret Mr. Broussard's original specification as it relates to mounting an engine to his motor, the Court cannot say that the "missing [engine mounting plate] must *necessarily be present* in the original application's specification." *See TurboCare*, 264 F.3d at 1119 (emphasis added). Accordingly, the Court finds that the '340 Patent fails the written description requirement. [41]

iii. Failure to describe the length of the propeller shaft

Last, Defendants contend that the '340 Patent fails for lack of written description because "Claims 1 and 8 describ[e] a propeller shaft housing 'extending at least 12 inches beyond said drive housing,'" but "[t]his 12" limitation is not . . .

_____

[41] Two additional notes are warranted on this point. First, much time was spent at trial discussing the significance of drawings included with the '340 Patent. In particular, the parties vigorously disputed whether the two parallel lines at the base (i.e., underneath) the engine depict a "cowling" or an "engine mounting plate." (*Compare* Transcript III at pp. 6–9, 93–120 (Dr. Garris) (insisting that the two lines depict "the outline of the cowling," p. 7), *with id.* at pp. 166–71, 212–16 (Dr. Matthews) (insisting that the two lines depict an "engine mounting plate . . . attached to the drive housing," p. 167)). Upon independent review, the Court determines that the drawings accompanying the '340 Patent are insolubly ambiguous regarding whether a cowling and/or an engine mounting plate is depicted. This ambiguity is only compounded by the original specification to the '340 Patent, which suggests that the engine is mounted "vertically" and/or "in a cowling." In sum, the Court is no more satisfied that "the missing descriptive matter must necessarily be present in the original application's *specification*," even considering the drawings accompanying the original application. *TurboCare*, 264 F.3d at 1119 (emphasis added).

Second, Gator Tail asserts in its Post-Trial Brief that "[the] Court effectively has already held in its *Markman* order that the engine mounting plate is enabled." (08-cv-00124 Doc. 125 at p. 28). However, the excerpt of the Court's *Markman* Ruling cited by Gator Tail refers to descriptions and diagrams accompanying *the '035 Patent, not* the '340 Patent. (*Compare id.* (Gator Tail's Post Trial Brief, citing "Docket Entry #82 at 18"), *with* Doc. 82 at p. 18 (discussing "the engine mounting plate" depicted in the "'035 Patent Fig. 1 and col. 4, lines 10–12")).

described in the as-filed specification, [indeed] it is flatly contradicted . . . ." (*Id.* at p. 35).

Based on the evidence in the record, the Court cannot agree with Defendants' position. The '340 Patent's original patent application claimed a "propeller shaft assembly [that] is in access [sic] of 18 inches in length." (Gator Tail Ex. 14 at p. 01056 ('340 Patent application, Claim 11)). The '340 Patent's original specification mirrored this claim, stating: "its [sic] is necessary to extend the length of the propeller shaft 28 and its housing assembly 26 a significant distance in excess of 18 inches from the belt drive housing 22 in accordance with the horsepower of the engine 14." (*Id.* at p. 01052).

Following the PTO's initial rejection of his application, (*id.* at 01029), Mr. Broussard amended certain claims to describe "a propeller shaft partially enclosed within a shaft housing . . . extending at least 12 inches beyond [the] drive housing." (*See id.* at pp. 01016–21 at Claims 1, 6, 13). These amendments (and others) eventually resulted in approval of the '340 Patent. However, they also produced the discrepancy pointed out by Defendants, because Mr. Broussard did *not* also amend the '340 Patent's specification to reflect the 12" propeller shaft disclosed in the claims. (*Compare* Gator Tail Ex. 1 at pp. 0658–59, Claims 1, 8, 14) (the '340 Patent's Claims, claiming "a propeller shaft . . . at least 12 inches), *with id.* at p. 0658, Col. 3, lns. 42–46 (the '340 Patent's Specification, stating "its [sic] is necessary to extend the length of the propeller shaft 28 and its housing assembly 26 a

significant distance in excess of 18 inches from the belt drive housing"). *But see id.* at p. 0659, Claim 13 (the '340 Patent's Claims, claiming a "propeller shaft assembly . . . in excess of 18 inches in length")). Mr. Broussard addressed this discrepancy during the reexamination proceedings, adding various claims to the '340 Patent describing a "propeller shaft and . . . housing . . . in excess of 18 inches." (Gator Tail Ex. 16 at p. 01225, Claims 16, 17, 19, 20, 22, 23 ('340 Patent Reexamination Certificate)).

The Court finds that this discrepancy between the '340 Patent's claims and its specification does *not* cause the '340 Patent to fail for lack of written description. To repeat: "[w]hen the applicant adds a claim or otherwise amends his specification after the original filing date, . . . the new claims or other added material must find support in the original specification." *TurboCare*, 264 F.3d at 1118. Here, Mr. Broussard amended his claims to describe a propeller shaft "extending at least 12 inches" in length. (Gator Tail Ex. 14 at pp. 01016–21, Claims 1, 6, 13). These amended claims are entirely *consistent* with the '340 Patent's original specification, which described the necessity of "extend[ing] the length of the propeller shaft 28 and its housing assembly 26 a significant distance *in excess of 18 inches* from the belt drive housing." (*Id.* at p. 01052 (emphasis added)). Insofar as a propeller shaft "in excess of 18 inches" is *necessarily* a propeller shaft "extending at least 12 inches," Mr. Broussard's "new claims" most certainly "find support in the original

specification." *TurboCare*, 264 F.3d at 1118. Accordingly, Defendants' argument fails.

## 2. Lack of Definiteness

Finally, Defendants argue that the patents-in-suit are invalid for lack of definiteness.[42] (08-cv-00124 Doc. 130; 08-cv-00125 Doc. 144). Specifically, Defendants assert: "As construed by this Court, the Broussard Patents' use of a belt and pulley drive system enclosed in a housing undefined as to length enables the designer to configure the engine, propeller shaft and propeller in a wide variety of ways, embodying long-tail designs, short-tail designs, and everything in between." 08-cv-00124 Doc. 130 at p. 7 (emphasis in original); 08-cv-000125 Doc. 144 ("adopt[ing] and re-urg[ing] the arguments set forth . . . by Go-Devil")). To illustrate their argument, Defendants include figures demonstrating the range of design possibilities which stem from the '340 and '035 Patents' claims, specifications, and prosecution histories. (*See* 08-cv-00124 Doc. 130 at pp. 7–8).

---

[42] Defendants raised the lack of definiteness issue at the summary judgment stage, (*see* 08-cv-00124 Doc. 91 at ¶ 3; Doc. 94 at pp. 55–57), but failed to raise the issue in their initial post-trial briefs. (*See* 08-cv-00124 Doc. 124 at pp. 2–3 (Defendant Go-Devil's Post-Trial Brief, limiting its analysis to whether the patents-in-suit are invalid as obvious, and for lack of enablement and written description); 08-cv-00125 Doc. 140 at p. 2 (Defendant Mud Buddy's Post-Trial Brief, limiting its analysis to whether the patents-in-suit are invalid as obvious)). Nevertheless, in light of the Supreme Court's most recent decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014)—which was published *after* the parties submitted their post-trial briefs—and mindful of the Supreme Court's admonishment that "the public . . . has a paramount interest in seeing that patent monopolies are kept within their legitimate scope," *Medtronic*, 134 S. Ct. at 851, the Court solicited supplemental briefing on the issue. (08-cv-00124 Doc. 129). Because all parties have had the opportunity to fully brief the definiteness issue, the Court now finds that the argument is "properly raise[d]" and, therefore, not waived. *Cf. Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1295 (Fed. Cir. 2009).

The Patent Act requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112, ¶ 2. Until recently, the Federal Circuit articulated the test for definiteness as follows: "A claim is indefinite only when it is 'not amenable to construction' or 'insolubly ambiguous.'" *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 898 (Fed. Cir. 2013), *cert. granted*, 134 S. Ct. 896 (2014), *and vacated*, 134 S. Ct. 2120 (2014). However, on June 2, 2014, the Supreme Court rejected the Federal Circuit's interpretation of § 112's definiteness requirement. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014). In place of the Federal Circuit's "'not amenable to construction' or 'insolubly ambiguous'" standard, the Supreme Court stated: "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). This new standard is stricter than that previously employed by the Federal Circuit. *See id.* at 2130 ("To tolerate imprecision just short of that rendering a claim 'insolubly ambiguous' would diminish the definiteness requirement's public-notice function and foster the innovation-discouraging 'zone of uncertainty,' against which this Court has warned." (citation omitted)). In reaching its new formulation of definiteness, the Supreme Court implicitly rejected a standard which would tolerate "a skilled

artisan['s] . . . trial and error process" to determine the scope of the invention. *See id.* at 2126.

Taking into account the '340 and '035 Patents' claims, specifications, and prosecution histories, including this Court's *Markman* Hearing Ruling, the Court now finds that Claims 1, 8, and 14 of the '340 Patent, and Claim 1 of the '035 Patent each fails the Supreme Court's new test for definiteness. As detailed above, each of these claims discloses (among other things) an "elongated drive housing enclosing an upper drive assembly" and "a lower driven assembly," said drive housing attached to a "propeller shaft," said propeller shaft (1) "extending at least 12 inches beyond said drive housing" in the '340 Patent, and (2) extending "in excess of 18 inches beyond [said] drive housing" in the '035 Patent. (*See* Gator Tail Ex. 1 at pp. 0658–59 ('340 Patent Claims 1, 8, 14); Gator Tail Ex. 2 at p. 01854 ('035 Patent Claim 1)). Significantly, in its *Markman* Hearing Ruling, the Court construed the term "elongated drive housing" to mean "a drive housing that is greater in measurement in one axis than in the other two axes." (Doc. 82 at p. 16). Further, as indicated above, the Court adopted Gator Tail's position that "the term 'drive shaft' . . . include[s] shafts comprised of segments connected by universal joints." (*Id.* at p. 25).

However, these constructions of the terms "elongated drive housing" and "drive shaft," *combined* with the '340 and '035 Patents' lack of *maximum length* limitation, expands the reach of Mr. Broussard's Patents well-beyond the scope of

his invention to *include* traditional long-tail motors. (*See, e.g.*, 08-cv-00124 Doc. 130 at pp. 7–8 (renderings depicting various designs complying with the '340 and '035 Patents' claims)). This ambiguity regarding the scope of the '340 and '035 Patents remains even when the Patents' claims are read in light of their respective specifications. *See Nautilus*, 134 S. Ct. at 2124. For example, the '340 Patent's specification states: "its [sic] is necessary to extend the length of the propeller shaft 28 and its housing assembly 26 *a significant distance in excess of 18 inches* from the belt drive housing 22 in accordance with the horsepower of the engine." (Gator Tail Ex. 1 at p. 0658 ('340 Patent Specification, Col. 3, lns. 42–46 (emphasis added))). Similarly, the '035 Patent's specification states: "Shaft housing 26 extends *in excess of 18 inches* beyond vertical housing," (Gator Tail Ex. 2 at p. 01853 ('035 Patent Specification, Col. 4, lns. 22–23 (emphasis added)). *But see id.* at p. 01854, Col. 5, lns. 43–46 ("As shown in Fig. 11 the overall length of the drive assembly 12 is considerably shorter than that of other drives used for this purpose . . . .")).

At trial, Defendants' expert witnesses testified to precisely this point. Dr. Garris stated: "[A]ctually the Broussard Patent is definitely not limited to short-tail. The short-tail has to do with the commercial embodiments. But . . . the claims of the patent are not . . . limited to . . . short-tail designs. There's nothing in the claims . . . that require a short-tail design." (Transcript Vol. II at p. 231 (Dr. Garris); *see also id.* at pp. 230–32)). Mr. Kueny confirmed that "[no] claims in the

96

Broussard Patents . . . give a maximum length of the propellor shaft." (*See id.* at p. 169 (Mr. Kueny)).

Additionally, Mr. Coco and Mr. Kliebert each testified regarding the "trial and error" process they engaged in while developing the Go-Devil surface drive motor, during which time they tested a prototype combining elements of their original long-tail motor—specifically, a drive shaft comprising u-joints—with elements of a short-tail—specifically, a drive housing—to create a motor with "the bottom of the housing [raised] up six inches" from where it would sit relative to the Gator Tail motor. (*See* Transcript Vol. I at pp. 245–46 (Mr. Kliebert)); *see also id.* at pp. 151–53 (Mr. Coco)). This "trial and error" process is representative of the same "skilled artisan[s'] . . . trial and error process" implicitly rejected by the Supreme Court in *Nautilus. See Nautilus*, 134 S. Ct. at 2126.

Relying only on the claims, specification, and prosecution history of the '340 and '035 Patents, it is hardly certain that one skilled in the art of marine motors would *not* conclude that the scope of Mr. Broussard's invention includes this hybrid motor tested by Go-Devil. Thus, the Court finds that the evidence clearly and convincingly demonstrates that Claims 1, 8, and 14 of the '340 Patent, and Claim 1 of the '035 Patent each "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of [Mr. Broussard's] invention." *Nautilus*, 134 S. Ct. at 2124. Accordingly, these claims are invalid for lack of definiteness under the newly minted test announced by the Supreme Court in *Nautilus*.

III.  CONCLUSION

For the reasons set forth above, the Court finds that the evidence clearly and convincingly proves: (1) all asserted claims of the patents-in-suit are invalid due to obviousness; (2) United States Patent Number 7,052,340 is invalid due to lack of written description; and (3) Claims 1, 8, and 14 of United States Patent Number 7,052,340 and Claim 1 of the United States Patent Number 7,297,035 are each invalid due to lack of definiteness.

Accordingly,

**IT IS ORDERED**

1. The asserted claims of the patents-in-suit are invalid due to obviousness.

2. Asserted Claim 1 of the '340 Patent is invalid due to lack of written description.

3. Asserted Claims 1, 8, and 14 of the '340 Patent, and Claim 1 of the '035 Patent are each invalid due to lack of definiteness.

**IT IS FURTHER ORDERED** that Defendants' respective requests for declaratory judgment of invalidity of the asserted claims of the patents-in-suit (08-cv-00124 Doc. 22; 08-cv-00125 Doc. 9) are **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to enter final judgment in favor of Defendants and against Plaintiffs in civil actions 3:08-cv-00124-BAJ-RLB *Kyle Broussard, et al. v. Go-Devil Manufacturing Co. of La., Inc.*

*d/b/a Go-Devil Manufacturers of Louisiana, Inc.* **and** 3:08-cv-00125-BAJ-RLB

*Gator Tail, et al. v. Mud Buddy, LLC d/b/a Mud Buddy Manufacturing.*

    **IT IS FURTHER ORDERED** that the Clerk of Court shall docket this order

in the case specific dockets of civil actions 08-cv-00124 *and* 08-cv-00125.

Baton Rouge, Louisiana, this 9th day of July, 2014.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

(12) **United States Patent**
Broussard

(10) Patent No.: US 7,052,340 B1
(45) Date of Patent: May 30, 2006

(54) **METHOD AND APPARATUS FOR AIR COOLED OUTBOAD MOTOR FOR SMALL MARINE CRAFT**

(76) Inventor: **Kyle Broussard**, P.O. Box 401, Loreauville, LA (US) 70552

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/662,487**

(22) Filed: **Sep. 15, 2003**

**Related U.S. Application Data**

(60) Provisional application No. 60/411,701, filed on Sep. 17, 2002.

(51) Int. Cl.
B63H 20/14 (2006.01)
(52) U.S. Cl. ..................... 440/75
(58) Field of Classification Search ........ 440/75, 440/900, 49, 76
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 941,827 A | 11/1909 | Trouche | |
| 1,953,599 A | 4/1934 | Grimes | |
| 2,722,193 A * | 11/1955 | Brindley | 440/49 |
| 3,752,111 A | 8/1973 | Meynier, Jr. | |
| D259,488 S | 6/1981 | Carter et al. | |
| 4,726,796 A | 2/1988 | Rivette et al. | |
| 4,869,692 A * | 9/1989 | Newman | 440/75 |
| 4,992,066 A * | 2/1991 | Watson | 440/75 |
| 5,178,566 A * | 1/1993 | Stojkov et al. | 440/75 |
| 5,336,119 A | 8/1994 | Lais et al. | |
| 5,415,576 A * | 5/1995 | Meisenburg et al. | 440/80 |
| 5,435,763 A | 7/1995 | Pignata | |
| 5,722,866 A * | 3/1998 | Brandt | 440/67 |
| 6,302,750 B1 | 10/2001 | Foreman | |
| 6,468,120 B1 * | 10/2002 | Hasl et al. | 440/61 R |

* cited by examiner

*Primary Examiner*—Lars A. Olson
(74) *Attorney, Agent, or Firm*—Robert N. Montgomery

(57) **ABSTRACT**

An air cooled, belt drive and engine assembly mountable to the transom of small flat bottom boats in much the same manner as water cooled outboard engines with a lower foot that does not extend below the bottom of the boat but extends a sufficient distance behind the boat to insure the proper angle of attack when the propeller is in contact with mud and vegetation. The engine mount includes tilt-up capability and pivotal horizontal steering. The propeller is capable of cutting through vegetation, provides propulsive thrust in mud and provides relatively fast boat speed in deep water.

14 Claims, 4 Drawing Sheets



## APPENDIX II: The '035 Patent (Gator Tail Ex. 2 at p. 01838)

(12) **United States Patent**
Broussard

(10) Patent No.: **US 7,297,035 B2**
(45) Date of Patent: *Nov. 20, 2007

(54) **MARINE CRAFT ADAPTED FOR SHALLOW WATER OPERATION**

(75) Inventor: Kyle Broussard, Loreauville, LA (US)

(73) Assignee: Gator Tail, L.L.C., Loreauville, LA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 11/419,669

(22) Filed: May 22, 2006

(65) **Prior Publication Data**
US 2006/0199451 A1    Sep. 7, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/844,192, filed on May 11, 2004, now Pat. No. 7,048,600, and a continuation-in-part of application No. 10/844,192, filed on May 11, 2004, now Pat. No. 7,048,600, which is a continuation-in-part of application No. 10/662,487, filed on Sep. 15, 2003, now Pat. No. 7,052,340.

(60) Provisional application No. 60/411,701, filed on Sep. 17, 2002.

(51) **Int. Cl.**
B63H 20/14      (2006.01)
(52) **U.S. Cl.** .................................... 440/75
(58) **Field of Classification Search** ............. 440/49, 440/53, 63, 65, 75, 76, 900; 248/640, 641, 248/642, 643

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 941,827 | A | 11/1909 | Trouche |
| 1,789,415 | A | 1/1931 | Phillips |
| 1,953,599 | A | 4/1934 | Grimes |
| 2,096,223 | A | 10/1937 | Chandler et al |
| 2,096,457 | A | 10/1937 | Ingens |

(Continued)

FOREIGN PATENT DOCUMENTS

JP        4368295      12/1992

(Continued)

OTHER PUBLICATIONS

Mud Buddy Outdoors Web Site, Copyright 2004; Mud Buddy Hyperdrive, Latest News & Info, 3 pages.

(Continued)

*Primary Examiner*—Lars A. Olson
(74) *Attorney, Agent, or Firm*—Sieberth & Patty, L.L.C.

(57)       **ABSTRACT**

A marine craft which includes a portable drive assembly temporarily attached to the transom, the portable drive assembly including an elongated drive housing enclosing an upper drive assembly and a lower driven assembly and a timing belt connecting the upper drive assembly to the lower driven assembly. The craft further includes an engine mounting plate attached externally to the drive housing adjacent the upper drive assembly perpendicular to the drive housing. The lower driven assembly also has a propeller shaft at least a portion of which is enclosed within a shaft housing attached to the drive housing adjacent the driven assembly, the shaft housing extending in excess of 18 inches beyond the drive housing, and a propeller attached to the propeller shaft.

**16 Claims, 12 Drawing Sheets**



101